**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                                                              :
ALPHA CAPITAL ANSTALT                                         :
                                                              :          **08 CV 03369 (DAB)**
                              Plaintiff,                      :
                                                              :
              -against-                                       :   **DECLARATION OF**
                                                              :   **LAWRENCE J. REINA**
BRILLIANT TECHNOLOGIES                                        :   **IN SUPPORT OF DEFENDANT'S**
CORPORATION,                                                  :   **MOTION TO DISMISS**
                              Defendant.                      :
                                                              :
------------------------------------------------------------- x

**LAWRENCE J. REINA**, an attorney duly admitted to the practice of law in the courts of the

State of New York, affirms the following under penalty of perjury:

      1.     I am counsel at Reed Smith LLP, attorneys for Defendant Brilliant

Technologies Corporation.  I submit this Declaration in support of Defendant Brilliant

Technologies Corporation's Motion to Dismiss  pursuant to Fed. R. Civ. P. 12(b)(6) and

12(b)(1), and to present true and correct copies of the following documents to the Court:

      2.     Attached as Exhibit A is a true and correct copy of the Complaint that was

filed by the Plaintiff in the above-captioned case.

      3.     Attached as Exhibit B is a true and correct copy of the Bridge Loan

Agreement that was entered into by the parties on September 18, 2006 and referenced in the

Complaint filed by the Plaintiff in the above-captioned case.

      4.     Attached as Exhibit C is a true and correct copy of the Promissory Note

that was entered into by the parties on September 18, 2006 and referenced in the Complaint filed

by the Plaintiff in the above-captioned case.

5.      Attached as Exhibit D is a true and correct copy of the Common Stock Purchase Warrant that was entered into by the parties on September 18, 2006 and referenced in the Complaint filed by the Plaintiff in the above-captioned case.

6.      Attached as Exhibit E is a true and correct copy of Form 10QSB, Commission File Number 0-230761, which was filed by Brilliant Technologies Corporation with the Securities and Exchange Commission  for the quarterly period ending March 31, 2007.

7.      Attached as Exhibit F is a true and correct copy of the complete set of filings by Brilliant Technologies Corporation, certified by the Secretary of State for the State of Delaware, dated April 1, 2008.

**WHEREFORE**  Defendant Brilliant Technologies Corporation respectfully requests that this Court grant its Motion to Dismiss Counts I and II of Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1).

Dated: New York, New York
       June 11, 2008

                         /s/ Lawrence J. Reina
                        LAWRENCE J. REINA



United States District Court
Southern District of New York
--------------------------------------------------------x

Alpha Capital Anstalt,

                          Plaintiff,

      vs.

Brilliant Technologies Corporation,

                          Defendant.

--------------------------------------------------------x

Complaint

08 - CV 03369 (DAB)

       Plaintiff Alpha Capital Anstalt, for its Complaint herein, by its attorneys, respectfully alleges:

<u>the parties</u>

       1.  Plaintiff Alpha Capital Anstalt ("Alpha Capital") is a Liechtenstein corporation with its principal place of business in Balzers, Liechtenstein.

       2.  Upon information and belief, Defendant Brilliant Technologies Corporation ("BTC") is a Delaware corporation with its principal place of business at 211 Madison Avenue, New York, New York 10016.

jurisdiction and venue

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that the action is between citizens of a state and citizens of a foreign state and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.  Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and the agreement of the parties.

factual allegations

5.  On or about September 18, 2006, Alpha Capital loaned to BTC the sum of $350,000. In consideration of the loan, BTC agreed to issue, and in fact issued, to Alpha Capital a promissory note in the principal amount of $371,000 (the "Note") and a common stock purchase warrant (the "Warrant") for Alpha Capital to obtain 10.6 million shares of BTC common stock at an initial exercise price of $0.07 per share. The Note and the Warrant were issued pursuant to the terms of the Bridge Loan Agreement dated as of September 18, 2006 (the "Agreement").

6.  The Note matured on November 3, 2006. BTC failed to pay the principal amount on that date. The Note, therefore, went into default.

2

7. After default, the terms of the Note permitted Alpha Capital, at its option, in addition to other remedies, to convert the Note in whole or in part, into shares of BTC common stock. Thus §5(b)(i) of the Note provided:

> Additionally, if an Event or Default occurs pursuant to Section 13(a)(i), (iii) - (x) hereof and continues for a period of 5 days after notice from the Holder to the Company of such Event of Default, the Holder of this Note will be entitled, at is option, from and after the Certificate of Incorporation Amendment Filing Date to convert at any time the principal amount of this Note, provided that the principal amount is at least US$10,000 (unless if at the time of such election to convert the aggregate principal amount of all Notes registered to the Holder is less than Ten Thousand Dollars (US$10,000), then the whole amount thereof), and accrued interest, into shares of Common Stock at a conversion price (the "Conversion Price") for each share of Common Stock equal to the lesser of (i) $0.07 and (ii) 75% of the Market Price on the Conversion Date (as defined below), as such price may be adjusted as provided herein (the "Variable Conversion Rate").

8. On August 22, 2007, therefore, Alpha Capital submitted a conversion notice by which it converted $100,000 in principal and $48,188.78 in interest into 16,603,785 shares of BTC common stock. In response to that conversion notice, on October 12, 2007, BTC issued 5 million shares of common stock to Alpha Capital. BTC, however, never delivered the remaining 11,603,785 shares of common stock because it had insufficient authorized shares to honor the conversion request.

3

9. Thus BTC is in default to Alpha Capital because it failed to deliver the 11,603,785 shares of common stock and is unable to honor its contractual obligation under the Note to allow Alpha Capital to convert the Note, in whole or in part, into common stock.

10. Alpha Capital also holds the Warrant which entitles it, upon exercise, to receive at least an additional 10.6 million shares of BTC common stock. BTC, however, is unable to honor the terms of the Warrant because it has insufficient shares of authorized common stock to deliver to Alpha Capital.

11. In the Agreement, §5i, BTC agreed to have at all times authorized and reserved for issuance a number of shares of common stock "at least equal to one hundred percent (100%) of the number of shares which would be issuable upon exercise of the outstanding Warrants held by all Holders." BTC, however, has no shares of stock authorized and reserved to meet its obligations to Alpha Capital upon exercise of the Warrant. BTC, therefore, is in default with respect to its obligations under §5i of the Agreement.

12. At the current conversion price, BTC needs to issue and reserve for Alpha Capital's benefit over 24 million shares to honor BTC's obligations under the Note and an additional 10.6 million shares under the Warrant. Because the price of BTC stock is volatile, BTC may well need to authorize substantially more shares in order to comply with its obligations to deliver stock upon conversion of the Note.

4

<u>First Claim for Relief</u>
(Failure To Deliver Shares Upon Conversion of Note
Failure To Authorize and Reserve Shares of Stock
relief sought - preliminary and permanent injunction)

13.  Alpha Capital realleges paragraphs 1 through 12.

14. BTC has failed to deliver shares of its common stock upon Alpha Capital's due submission of a notice to convert part of the Note into common stock. BTC's stated reason for failing to deliver the common stock was that it has insufficient shares of common stock to comply with its obligation.

15.  To comply with its obligation to deliver shares of common stock upon Alpha Capital's exercise of the Warrant, BTC is obligated to authorize and reserve for Alpha Capital's benefit 10.6 million shares of common stock.

16.  Despite Alpha Capital's request, BTC has failed and refused to authorize, reserve and deliver sufficient shares of common stock to comply with its obligations under the Note, Warrant and the Agreement.

17.  BTC agreed that upon its default in complying with its obligations under the Note, Warrant and the Agreement, Alpha Capital would suffer irreparable harm and be entitled to injunctive relief to remedy such default. Thus ¶11 of the Agreement provides:

5

The Company and the Buyer acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the other Transaction Agreements were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and the other Transactions Agreements and to enforce specifically the terms and provisions hereof and thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

18. Alpha Capital has no adequate remedy at law.

19. Alpha Capital, therefore, is entitled to an order preliminarily and permanently directing BTC to: i) authorize and reserve for issuance to Alpha Capital 50 million shares of BTC common stock; and ii) to honor all requests duly submitted by Alpha Capital to convert all or any portion of the Note into BTC common stock and to honor all exercises by Alpha Capital of the Warrant.

<div align="center">

**Second Claim for Relief**
(Failure To Deliver Shares Upon Conversion of Note
Failure To Authorize and Reserve Shares of Stock
relief sought - damages)

</div>

20. Alpha Capital realleges paragraphs 1 though 19.

21. As a result of BTC's failure to authorize, reserve and deliver common stock to Alpha Capital, Alpha Capital has been damaged in an amount to be determined at trial.

<div align="center">6</div>

<u>Third Claim for Relief</u>
(Failure To Pay Promissory Note
relief sought - damages)

22.  Alpha Capital realleges paragraphs 1 though 12.

23.  As a result of BTC's failure to pay the Note at maturity, BTC is liable to Alpha Capital for all unpaid principal and accrued interest on the Note, plus the costs of collection thereof, including reasonable attorneys fees.

Wherefore, Plaintiff Alpha Capital Anstalt demands judgment against Defendant Brilliant Technologies Corporation as follows:

i) on the First Claim for Relief, for an order preliminarily and permanently directing BTC to: i) authorize and reserve for issuance to Alpha Capital 50 million shares of BTC common stock; and ii) to honor all requests duly submitted by Alpha Capital to convert all or any portion of the Note and to honor all exercises by Alpha Capital of the Warrant; and

ii) on the Second Claim for Relief for damages in an amount to be determined at trial; and

iii) on the Third Claim for Relief for judgment against BTC for all amounts of unpaid principal and accrued interest on the Note; and

7

iv) on all Claims for Relief for interest, attorneys' fees and the costs and disbursements of this action; and

v) for such other, further and different relief as the Court deems just and proper.

Law Offices of Kenneth A. Zitter

By_____
     Kenneth A. Zitter
Attorneys for Plaintiff Alpha Capital Anstalt
260 Madison Avenue, 18th Floor
New York, New York 10016
212-532-8000
KAZ-3195

8

# BRIDGE LOAN AGREEMENT

**THIS BRIDGE LOAN AGREEMENT**, dated as of September 18, 2006, is entered into by and between **BRILLIANT TECHNOLOGIES CORPORATION**, a Delaware corporation with headquarters located at 211 Madison Avenue, New York, New York (the "Company"), and the entity named on an executed counterpart of the signature page hereto (the "Buyer").

## W I T N E S S E T H:

**WHEREAS,** the Company and the Buyer are executing and delivering this Agreement in accordance with and in reliance upon the exemption from securities registration for offers and sales to accredited investors afforded, inter alia, by Rule 506 under Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"), and/or Section 4(2) of the 1933 Act; and

**WHEREAS,** the Buyer wishes to lend funds in the amount of the Purchase Price (as defined below) to the Company, subject to and upon the terms and conditions of this Agreement and acceptance of this Agreement by the Company, the repayment of which will be represented by a Promissory Note of the Company (the "Note"), on the terms and conditions referred to herein; and

**WHEREAS,** in connection with the loan to be made by the Buyer, the Company has agreed to issue the Note and the Warrant (as defined below) to the Buyer;

**NOW THEREFORE,** in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT TO PURCHASE; PURCHASE PRICE.

**a.**   **Purchase.**

(i)   Subject to the terms and conditions of this Agreement and the other Transaction Agreements (as defined below), the Buyer hereby agrees to loan to the Company the principal amount specified on the Buyer's signature page of this Agreement (the "Purchase Price").

(ii)   The obligation to repay the loan of the relevant Purchase Price from the Buyer shall be evidenced by the Company's issuance of one or more Notes to the Buyer in the principal amount of ninety-four percent (94%) of the Purchase Price paid by the Buyer. Each Note shall be payable on the date which is the earlier of (i) November 3, 2006, or (ii) the date on

1

EXHIBIT C

which the New Transaction Threshold (as defined in the Note) occurs. Each Note, which shall be shall be in the form of **Annex I** annexed hereto.

(iii)    In consideration of the loan to be made by the Buyer, the Company will issue to the Buyer the Warrant to purchase the number of shares of Common Stock of the Company ("Common Stock") as provided in Section 4 hereof.

(iv)    The loan to be made by the Buyer and the issuance of the Note and the Warrant to the Buyer and the other transactions contemplated hereby are sometimes referred to herein and in the other Transaction Agreements as the purchase and sale of the Securities (as defined below), and are referred to collectively as the "Transactions."

**b.    Certain Definitions.** As used herein, each of the following terms has the meaning set forth below, unless the context otherwise requires:

"Affiliate" means, with respect to a specific Person referred to in the relevant provision, another Person who or which controls or is controlled by or is under common control with such specified Person.

"Buyer Control Person" means each director, executive officer, promoter, and such other Persons as may be deemed in control of the Buyer pursuant to Rule 405 under the 1933 Act or Section 20 of the 1934 Act (as defined below).

"Certificate of Incorporation Amendment" means an amendment to the Company's Certificate of Incorporation to increase the authorized capital stock of the Company in an amount sufficient such that all shares of Common Stock subject to the Warrants can be issued upon exercise of the Warrants.

"Certificate of Incorporation Amendment Filing Date" means the date the Company files with the Secretary of State of Delaware the Certificate of Incorporation Amendment.

"Certificates" means the ink-signed Note and the Warrant, each duly executed by the Company and issued on the Closing Date in the name of the Buyer.

"Closing Date" means the date of the closing of the Transactions, as provided herein.

"Company Control Person" means  each director, executive officer, promoter, and such other Persons as may be deemed in control of the Company pursuant to Rule 405 under the 1933 Act or Section 20 of the 1934 Act (as defined below).

"Conversion Shares" shall mean the shares of Common Stock issuable pursuant to the terms of the Note.

"Holder" means the Person holding the relevant Securities at the relevant time.

2

"Last Audited Date" means December 31, 2005.

"Material Adverse Effect" means an event or combination of events, which individually or in the aggregate, would reasonably be expected to (x) adversely affect the legality, validity or enforceability of the Purchased Securities or any of the Transaction Agreements, (y) have or result in a material adverse effect on the results of operations, assets, or financial condition of the Company and its subsidiaries, taken as a whole, or (z) adversely impair the Company's ability to perform fully on a timely basis its material obligations under any of the Transaction Agreements or the transactions contemplated thereby.

"New Common Stock" means shares of Common Stock and/or securities convertible into, and/or other rights exercisable for, Common Stock, which are offered or sold in a New Transaction.

"New Investor" means the third party investor, purchaser or lender (howsoever denominated) in a New Transaction.

"New Transaction" means the offer or sale of notes, debentures or New Common Stock by or on behalf of the Company to a New Investor in a transaction offered or consummated after the date hereof; provided, however, that it is specifically understood that the term "New Transaction" (1) includes, but is not limited to, a sale of Common Stock or of a security convertible into Common Stock or an equity or credit line transaction, but (2) does not include (a) the issuance of Common Stock upon the exercise or conversion of options, warrants or convertible securities outstanding on the date hereof, or in respect of any other financing agreements as in effect on the date hereof, (b) the issuance of Common Stock pursuant to an Employee Stock Option Plan (an "ESOP") of the Company, such ESOP having been properly approved by the shareholders of the Company, (c) the issuance of Common Stock to employees, directors or consultants of the Company, (d) the issuance of Common Stock upon the exercise of any options or warrants referred to in the preceding clauses of this paragraph (provided the same is not amended after the date hereof (other than the Company may extend the expiration date thereof), or (e) the issuance of shares to a Strategic Partner.

"New Transaction Funds" shall mean all amounts received in respect of any New Transaction.

"Person" means any living person or any entity, such as, but not necessarily limited to, a corporation, partnership or trust.

"Principal Trading Market" means the Over the Counter Bulletin Board or such other market on which the Common Stock is principally traded at the relevant time, but shall not include the "pink sheets."

"Purchased Securities" means the Note and the Warrant.

"Registrable Securities" means the Warrant Shares and Conversion Shares, unless such shares can then be sold by the Holder without volume or other restrictions or limit.

3

"Registration Rights Provisions" means the registration rights contemplated by the terms of this Agreement, including, but not necessarily limited to, Section 4(h) hereof, and of the other Transaction Agreements.

"Registration Statement" means an effective registration statement covering the Registrable Securities.

"Securities" means the Note, the Warrant and the Shares.

"Shares" means the shares of Common Stock representing any of the Warrant Shares.

"State of Incorporation" means Delaware.

"Strategic Partner" means a third party, whether or not currently affiliated with the Company, hereof, which party (i) is engaged in a business which is the business in which the Company or one of its subsidiaries is engaged or a similar or related business, and (ii) either (a) subsequently purchases equity securities of the Company (or securities convertible into equity securities of the Company), or (b) enters into an agreement for one or more of the following: the licensing by the Company or one of its subsidiaries of all or any portion of its technology to such third party, the licensing by such third party of all or any portion of its technology to the Company or one of its subsidiaries, or any other coordination of all or a portion of their respective business activities or operations by the Company or one of its subsidiaries and such third party.

"Trading Day" means any day during which the Principal Trading Market shall be open for business.

"Transfer Agent" means, at any time, the transfer agent for the Common Stock.

"Transaction Agreements" means this Bridge Loan Agreement, the Note, and the Warrant, and includes all ancillary documents referred to in those agreements.

"Warrant" means the warrant issued to the Buyer as contemplated by Section 4 of this Agreement.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrant.

**c.    Form of Payment; Delivery of Certificates.** On the Closing Date, the Buyer shall pay the Purchase Price by delivering immediately available good funds in United States Dollars to the Company no later than the date prior to the Closing Date and the Company shall deliver the Certificates, each duly executed on behalf of the Company and issued in the name of the Buyer, to the Buyer.

4

9-18-06

**d.    Method of Payment.**  Payment of the Purchase Price shall be made by wire transfer of funds to an account identified by the Company to the Buyer.

## 2.  BUYER REPRESENTATIONS, WARRANTIES, ETC.; ACCESS TO INFORMATION; INDEPENDENT INVESTIGATION.

The Buyer represents and warrants to, and covenants and agrees with, the Company as follows:

Without limiting Buyer's right to sell the Securities pursuant to an effective registration statement or otherwise in compliance with the 1933 Act, the Buyer is purchasing the Securities for its own account for investment only and not with a view towards the public sale or distribution thereof and not with a view to or for sale in connection with any distribution thereof.

The Buyer is (i) an "accredited investor" as that term is defined in Rule 501 of the General Rules and Regulations under the 1933 Act by reason of Rule 501(a)(3), (ii) experienced in making investments of the kind described in this Agreement and the related documents, (iii) able, by reason of the business and financial experience of its officers (if an entity) and professional advisors (who are not affiliated with or compensated in any way by the Company or any of its Affiliates or selling agents), to protect its own interests in connection with the transactions described in this Agreement, and the related documents, and to evaluate the merits and risks of an investment in the Securities, and (iv) able to afford the entire loss of its investment in the Securities.

All subsequent offers and sales of the Securities by the Buyer shall be made pursuant to registration of the relevant Securities under the 1933 Act or pursuant to an exemption from registration.

The Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of the 1933 Act and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

The Buyer and its advisors, if any, have been furnished with or have been given access to all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Buyer, including those set forth on in any annex attached hereto. The Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company and its management and have received complete and satisfactory answers to any such inquiries.  Without limiting the generality of the foregoing, the Buyer has also had the opportunity to obtain and to review the Company's filings on EDGAR listed on **Annex VI** hereto (the documents listed on such Annex

5

VI, to the extent available on EDGAR or otherwise provided to the Buyer as indicated on said Annex VI, collectively, the "Company's SEC Documents").

The Buyer understands that its investment in the Securities involves a high degree of risk.

The Buyer hereby represents that, in connection with its purchase of the Securities, it has not relied on any statement or representation by the Company or any of its officers, directors and employees or any of its attorneys or agents, except as specifically set forth herein.

The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities.

This Agreement and the other Transaction Agreements to which the Buyer is a party, and the transactions contemplated thereby, have been duly and validly authorized, executed and delivered on behalf of the Buyer and are valid and binding agreements of the Buyer enforceable in accordance with their respective terms, subject as to enforceability to general principles of equity and to bankruptcy, insolvency, moratorium and other similar laws affecting the enforcement of creditors' rights generally.

3.    **COMPANY REPRESENTATIONS, ETC.**    The Company represents and warrants to the Buyer as of the date hereof and as of the Closing Date that, except as otherwise provided in the Company's SEC Documents (which qualifies all such representations and warranties):

a.    **Rights of Others Affecting the Transactions.**    There are no preemptive rights of any shareholder of the Company, as such, to acquire the Note, the Warrant or the Shares.  No party has a currently exercisable right of first refusal which would be applicable to any or all of the transactions contemplated by the Transaction Agreements.

b.    **Status.**    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Incorporation and has the requisite corporate power to own its properties and to carry on its business as now being conducted.  The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have or result in a Material Adverse Effect.  The Company has registered its stock and is obligated to file reports pursuant to Section 12 or Section 15(d) of the Securities and Exchange Act of 1934, as amended (the "1934 Act").  The Common Stock is quoted on the Principal Trading Market.  The Company has received no notice, either oral or written, with respect to the continued eligibility of the Common Stock for such quotation on the Principal Trading Market, and the Company has maintained all requirements on its part for the continuation of such quotation.

6

9-18-06

c.     **Authorized Shares.**

(i)     The authorized capital stock of the Company consists of (x) 800,000,000 shares of Common Stock, $0.0001 par value per share, of which approximately 421,177,105 are outstanding as of August 2, 2006, and (y) 1,000,000 shares of Preferred Stock, $0.001 par value, of which none are outstanding as of the date hereof.

(ii)     There are no outstanding securities which are convertible into shares of Common Stock, whether such conversion is currently exercisable or exercisable only upon some future date or the occurrence of some event in the future.

(iii)     All issued and outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid and non-assessable. On the Certificate of Incorporation Amendment Filing Date the Company will have sufficient authorized and unissued shares of Common Stock as would be necessary to effect the issuance of the Shares upon the exercise of the Warrant.

(iv)     On the Certificate of Incorporation Amendment Filing Date the Shares will be duly authorized by all necessary corporate action on the part of the Company, and, when issued upon exercise of the Warrant, in accordance with its terms, will have been duly and validly issued, fully paid and non-assessable and will not subject the Holder thereof to personal liability by reason of being such Holder.

d.     **Transaction Agreements and Stock.** This Agreement and each of the other Transaction Agreements, and the transactions contemplated thereby, have been duly and validly authorized by the Company, this Agreement has been duly executed and delivered by the Company and this Agreement is, and the Note, the Warrant and each of the other Transaction Agreements, when executed and delivered by the Company, will be, valid and binding agreements of the Company enforceable in accordance with their respective terms, subject as to enforceability to general principles of equity and to bankruptcy, insolvency, moratorium, and other similar laws affecting the enforcement of creditors' rights generally.

e.     **Non-contravention.** The execution and delivery of this Agreement and each of the other Transaction Agreements by the Company, the issuance of the Securities, and the consummation by the Company of the other transactions contemplated by this Agreement, the Note, the Warrant and the other Transaction Agreements do not and will not conflict with or result in a breach by the Company of any of the terms or provisions of, or constitute a default under (i) the certificate of incorporation or by-laws of the Company, each as currently in effect, (ii) any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Company is a party or by which it or any of its properties or assets are bound, including any listing agreement for the Common Stock except as herein set forth, or (iii) to its knowledge, any existing applicable law, rule, or regulation or any applicable decree, judgment, or order of any court, United States federal or state regulatory body, administrative agency, or other governmental body having jurisdiction over the Company or any of its properties or assets,

7

except such conflict, breach or default which would not have or result in a Material Adverse Effect.

   **f. Approvals.** No authorization, approval or consent of any court, governmental body, regulatory agency, self-regulatory organization, or stock exchange or market or the shareholders of the Company is required to be obtained by the Company for the issuance and sale of the Securities to the Buyer as contemplated by this Agreement, except approval by the shareholders of the Company holding a majority of the outstanding shares of Common Stock on the relevant record date of the Certificate of Incorporation Amendment and such authorizations, approvals and consents that have been obtained.

   **g. Filings.** None of the Company's SEC Documents contained, at the time they were filed, any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements made therein in light of the circumstances under which they were made, not misleading.

   **h. Absence of Certain Changes.** Since the Last Audited Date, there has been no material adverse change and no Material Adverse Effect. Since the Last Audited Date, the Company has not (i) incurred or become subject to any material liabilities (absolute or contingent) except liabilities incurred in the ordinary course of business consistent with past practices; (ii) discharged or satisfied any material lien or encumbrance or paid any material obligation or liability (absolute or contingent), other than current liabilities paid in the ordinary course of business consistent with past practices; (iii) declared or made any payment or distribution of cash or other property to shareholders with respect to its capital stock, or purchased or redeemed, or made any agreements to purchase or redeem, any shares of its capital stock; (iv) sold, assigned or transferred any other tangible assets, or canceled any debts owed to the Company by any third party or claims of the Company against any third party, except in the ordinary course of business consistent with past practices; (v) waived any rights of material value, whether or not in the ordinary course of business, or suffered the loss of any material amount of existing business; (vi) made any increases in employee compensation, except in the ordinary course of business consistent with past practices; or (vii) experienced any material problems with labor or management in connection with the terms and conditions of their employment.

   **i. Full Disclosure.** To the best of the Company's knowledge, there is no fact known to the Company (other than general economic conditions known to the public generally) that has not been disclosed in writing to the Buyer that would reasonably be expected to have or result in a Material Adverse Effect.

   **j. Absence of Litigation.** There is no action, suit, proceeding, inquiry or investigation before or by any court, public board or body pending or, to the knowledge of the Company, threatened against or affecting the Company before or by any governmental authority or nongovernmental department, commission, board, bureau, agency or instrumentality or any other person, wherein an unfavorable decision, ruling or finding would have a Material Adverse Effect or which would adversely affect the validity or enforceability of, or the authority or ability of the Company to perform its obligations under, any of the Transaction Agreements. The

9-18-06

Company is not aware of any valid basis for any such claim that (either individually or in the aggregate with all other such events and circumstances) could reasonably be expected to have a Material Adverse Effect. There are no outstanding or unsatisfied judgments, orders, decrees, writs, injunctions or stipulations to which the Company is a party or by which it or any of its properties is bound, that involve the transaction contemplated herein or that, alone or in the aggregate, could reasonably be expect to have a Material Adverse Effect.

     **k.**    **Absence of Events of Default.**  Except as set forth in Section 3(e) hereof, (i) neither the Company nor any of its subsidiaries is in default in the performance or observance of any material obligation, agreement, covenant or condition contained in any material indenture, mortgage, deed of trust or other material agreement to which it is a party or by which its property is bound, and (ii) no Event of Default (or its equivalent term), as defined in the respective agreement to which the Company or its subsidiary is a party, and no event which, with the giving of notice or the passage of time or both, would become an Event of Default (or its equivalent term) (as so defined in such agreement), has occurred and is continuing, which would have a Material Adverse Effect.

     **l.**    **Absence of Certain Company Control Person Actions or Events.**  To the Company's knowledge, none of the following has occurred during the past five (5) years with respect to a Company Control Person:

    (1) A petition under the federal bankruptcy laws or any state insolvency law was filed by or against, or a receiver, fiscal agent or similar officer was appointed by a court for the business or property of such Company Control Person, or any partnership in which he was a general partner at or within two years before the time of such filing, or any corporation or business association of which he was an executive officer at or within two years before the time of such filing;

    (2) Such Company Control Person was convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

    (3) Such Company Control Person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from, or otherwise limiting, the following activities:

        (i) acting, as an investment advisor, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, any other Person regulated by the Commodity Futures Trading Commission ("CFTC") or engaging in or continuing any conduct or practice in connection with such activity;

        (ii) engaging in any type of business practice; or

(iii) engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of federal or state securities laws or federal commodities laws;

(4) Such Company Control Person was the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any federal or state authority barring, suspending or otherwise limiting for more than 60 days the right of such Company Control Person to engage in any activity described in paragraph (3) of this item, or to be associated with Persons engaged in any such activity; or

(5) Such Company Control Person was found by a court of competent jurisdiction in a civil action or by the CFTC or SEC to have violated any federal or state securities law, and the judgment in such civil action or finding by the CFTC or SEC has not been subsequently reversed, suspended, or vacated.

      **m.    No Undisclosed Liabilities or Events.**  To the best of the Company's knowledge, the Company has no liabilities or obligations other than those disclosed in the Transaction Agreements or those incurred in the ordinary course of the Company's business since the Last Audited Date, or which individually or in the aggregate, do not or would not have a Material Adverse Effect. No event or circumstances has occurred or exists with respect to the Company or its properties, business, operations, condition (financial or otherwise), or results of operations, which, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed. Except for the Certificate of Incorporation Amendment, there are no proposals currently under consideration or currently anticipated to be under consideration by the Board of Directors or the executive officers of the Company which proposal would (x) change the articles or certificate of incorporation or other charter document or by-laws of the Company, each as currently in effect, with or without shareholder approval, which change would reduce or otherwise adversely affect the rights and powers of the shareholders of the Common Stock or (y) materially or substantially change the business, assets or capital of the Company, including its interests in subsidiaries.

      **n.    No Integrated Offering.**  Neither the Company nor any of its Affiliates nor any Person acting on its or their behalf has, directly or indirectly, at any time since June 1, 2005, made any offer or sales of any security or solicited any offers to buy any security under circumstances that would eliminate the availability of the exemption from registration under Regulation D in connection with the offer and sale of the Securities as contemplated hereby.

      **o.    Dilution.**  The number of shares issuable upon exercise of the Warrant may have a dilutive effect on the ownership interests of the other shareholders (and Persons having the right to become shareholders) of the Company.  The Company's executive officers and directors have studied and fully understand the nature of the Securities being sold hereby and recognize that they have such a potential dilutive effect.  The board of directors of the Company has concluded, in its good faith business judgment, that such issuance is in the best interests of the Company.  The Company specifically acknowledges that its obligation to issue the Warrant

10                             9-18-06

Shares upon exercise of the Warrant is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company, and the Company will honor such obligations, including honoring every Notice of Exercise (as contemplated by the Warrant), unless the Company is subject to an injunction (which injunction was not sought by the Company) prohibiting the Company from doing so.

**p.      Fees to Brokers, Finders and Others.** The Company has taken no action which would give rise to any claim by any Person for brokerage commission, finder's fees or similar payments by Buyer relating to this Agreement or the transactions contemplated hereby. Buyer shall have no obligation with respect to such fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this paragraph that may be due in connection with the transactions contemplated hereby. The Company shall indemnify and hold harmless each of the Buyer, its employees, officers, directors, agents, and partners, and their respective Affiliates, from and against all claims, losses, damages, costs (including the costs of preparation and attorney's fees) and expenses suffered in respect of any such claimed or existing fees, as and when incurred.

**q.      Confirmation.** The Company confirms that all statements of the Company contained herein shall survive acceptance of this Agreement by the Buyer for a period of eighteen (18) months from the Closing Date. The Company agrees that, if any events occur or circumstances exist prior to the Closing Date or the release of the Purchase Price to the Company which would make any of the Company's representations, warranties, agreements or other information set forth herein materially untrue or materially inaccurate as of such date, the Company shall immediately notify the Buyer (directly or through its counsel, if any) in writing prior to such date of such fact, specifying which representation, warranty or covenant is affected and the reasons therefor.

### 4.      CERTAIN COVENANTS AND ACKNOWLEDGMENTS.

**a.      Transfer Restrictions.** The Buyer acknowledges that (1) the Securities have not been and are not being registered under the provisions of the 1933 Act and, except as provided in the Registration Rights Provisions or otherwise included in an effective registration statement, the Shares have not been and are not being registered under the 1933 Act, and may not be transferred unless (A) subsequently registered thereunder or (B) the Buyer shall have delivered to the Company an opinion of counsel, reasonably satisfactory in form, scope and substance to the Company, to the effect that the Securities to be sold or transferred may be sold or transferred pursuant to an exemption from such registration; (2) any sale of the Securities made in reliance on Rule 144 promulgated under the 1933 Act may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any resale of such Securities under circumstances in which the seller, or the Person through whom the sale is made, may be deemed to be an underwriter, as that term is used in the 1933 Act, may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (3) neither the Company nor any other Person is under any obligation to register the Securities (other than pursuant to the Registration Rights Provisions) under the 1933 Act or to comply with the terms and conditions of any exemption thereunder.

11

**b.    Restrictive Legend.**  The Buyer acknowledges and agrees that, until such time as the relevant Shares have been registered under the 1933 Act, as contemplated by the Registration Rights Provisions and sold in accordance with an effective Registration Statement or otherwise in accordance with another effective registration statement, the certificates and other instruments representing any of the Securities shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of any such Securities):

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES OR AN OPINION OF COUNSEL OR OTHER EVIDENCE ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

**c.    Filings.**  The Company undertakes and agrees to make all necessary filings in connection with the sale of the Securities to the Buyer under any United States laws and regulations applicable to the Company, or by any domestic securities exchange or trading market, and to provide a copy thereof to the Buyer promptly after such filing.

**d.    Reporting Status.**  So long as the Buyer beneficially owns any of the Securities and for at least twenty (20) Trading Days thereafter, the Company shall file all reports required to be filed with the SEC pursuant to Section 13 or 15(d) of the 1934 Act, shall take all reasonable action under its control to ensure that adequate current public information with respect to the Company, as required in accordance with Rule 144(c)(2) of the 1933 Act, is publicly available, and shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would permit such termination.  The Company will take all reasonable action under its control to maintain the continued listing and quotation and trading of its Common Stock (including, without limitation, all Registrable Securities) on the Principal Trading Market or a listing on the NASDAQ/Small Cap or National Markets and, to the extent applicable to it, will comply in all material respects with the Company's reporting, filing and other obligations under the by-laws or rules of the Principal Trading Market and/or the National Association of Securities Dealers, Inc., as the case may be, applicable to it at least through the date which is sixty (60) days after the Warrant has been exercised in full or has expired.

**e.    Use of Proceeds.**  The Company will use the proceeds received hereunder (excluding amounts paid by the Company for legal fees (i) first, as provided in **Annex VII** attached hereto, and (ii) then, for general corporate purposes.

**f.    Warrant.**  The Company agrees to issue to the Buyer on the Closing Date a transferable warrant (the "Warrant") for the purchase of 10,000,000 shares of Common Stock. The exercise price of the Warrant will be equal to $.07, subject to adjustment as provided in the Warrant and herein.  The Warrant shall be exercisable initially on the Commencement Date specified in the Warrant and shall expire on the last day of the calendar month in which the fifth anniversary of the Closing Date occurs.  Except as specified above, each Warrant shall generally

12                                                                                          9-18-06

be in the form annexed hereto as **Annex IV**, and shall have the benefit of the Registration Rights provisions set forth in Section 4 (h) hereof.

g.       **INTENTIONALLY DELETED**

h.       **Piggy-Back Rights; Rule 144.**

(i)       The Holder shall have piggy-back registration rights with respect to the Warrant Shares subject to the conditions set forth below. If the Company participates (whether voluntarily or by reason of an obligation to a third party) in the registration of any shares of the Company's stock (other than a registration on Form S-8 or on Form S-4) filed after the date hereof, the Company shall give written notice thereof to the Holder and the Holder shall have the right, exercisable within ten (10) Trading Days after receipt of such notice, to demand inclusion of all or a portion of the Holder's Registrable Securities in such registration statement.  If the Holder exercises such election, the Registrable Securities so designated shall be included in the registration statement (without any holdbacks) at no cost or expense to the Holder (other than any commissions, if any, relating to the sale of Holder's shares).   The Holder's rights under this Section 4(h)(i) shall expire at such time as such Holder can sell all of such Holder's remaining Registrable Securities under Rule 144 (as defined below) without volume or other restrictions or limit.

(ii)       The Company shall prepare and file with the SEC within five (5) business days of the Certificate of Incorporation Amendment Filing Date, a Registration Statement registering for resale by the Holder a sufficient number of shares of Common Stock for the Holder to sell any Registrable Securities not previously registered, but in no event less than the number of shares equal to the sum of (x) one hundred fifty percent (150%) of the number of shares into which the Note would be convertible at the time of filing of such Registration Statement (assuming for such purposes that this Note had been issued, had been eligible to be converted, and had been converted, into Conversion Shares in accordance with its terms, whether or not such issuance, eligibility, accrual of interest or conversion had in fact occurred as of such date) and (y) one hundred percent (100%) of the number of Warrant Shares which would be issuable on exercise of the Warrants (assuming for such purposes that all Warrants had been issued, had been eligible for exercise and had been exercised for Warrant Shares in accordance with their terms, whether or not such issuance, eligibility or exercise had in fact occurred as of such date).   Unless otherwise specifically agreed to in writing in advance by the Holder, the Registration Statement shall state that, in accordance with Rule 416 and 457 under the 1933 Act, it also covers such indeterminate number of additional shares of Common Stock as may become issuable upon conversion of the Note or exercise of the Warrants to prevent dilution resulting from stock splits, or stock dividends. The Company will use its reasonable best efforts to cause such Registration Statement to be declared effective on a date (the "Initial Required Effective Date") which is no later than the earlier of (Y) five (5) days after oral or written notice by the SEC that it may be declared effective or (Z) seventy-five (75) days folliwng the Certificate of Incorporation Amendment Filing Date.

(iii)       If at any time (an "Increased Registered Shares Date") after a Registration Statement has been filed with the SEC, the number of shares of Common Stock represented by

the Registrable Shares, issued or to be issued as contemplated by this Agreement, exceeds the aggregate number of shares of Common Stock then registered or sought to be registered in a Registration Statement which has not yet been declared effective, the Company shall either

> (X) amend the relevant Registration Statement filed by the Company pursuant to the preceding provisions of this Section 4(h), if such Registration Statement has not been declared effective by the SEC at that time, to register, in the aggregate, at least the number of shares (the "Increased Shares Amount") equal to (A) the number of shares theretofore issued on conversion of the Notes (including any interest paid on conversion by the issuance of Conversion Shares) , plus (B) the number of shares theretofore issued on exercise of the Warrants, plus (C) the sum of:

> > (I) the number of shares into which the unconverted Note and all interest thereon through the Maturity Date would be convertible at the date of such filing (assuming for such purposes that this Note had been issued, had been eligible to be converted, and had been converted, into Conversion Shares in accordance with its terms, whether or not such issuance eligibility, accrual of interest, or conversion had in fact occurred as of such date), and

> > (II) the number of Warrant Shares which would be issuable on exercise of the unexercised Warrants (assuming for such purposes that all such Warrants had been issued, had been eligible for exercise and had been exercised for Warrant Shares in accordance with their terms, whether or not such issuance, eligibility or exercise had in fact occurred as of such date), or

> (Y) if such Registration Statement has been declared effective by the SEC at that time, file with the SEC an additional Registration Statement (an "Additional Registration Statement") to register the number of shares equal to the excess of the Increased Shares Amount over the aggregate number of shares of Common Stock already registered.

The Company will use its reasonable best efforts to cause such Registration Statement to be declared effective on a date (each, an "Increased Required Effective Date") which is no later than (q) with respect to a Registration Statement under clause (X) of this subparagraph (ii), the Initial Required Effective Date and (r) with respect to an Additional Registration Statement, the earlier of (I) five (5) days after notice by the SEC that it may be declared effective or (II) forty-five (45) days after the Increased Registered Shares Date.

> (iv)    With a view to making available to the Holder the benefits of Rule 144 promulgated under the 1933 Act or any other similar rule or regulation of the SEC that may at any time permit Holder to sell securities of the Company to the public without registration (collectively, "Rule 144"), the Company agrees to:

14

(a)    make and keep public information available, as those terms are understood and defined in Rule 144;

(b)    file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act; and

(c)    furnish to the Holder so long as such party owns Registrable Securities, promptly upon request, (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144, the 1933 Act and the 1934 Act, (ii) if not available on the SEC's EDGAR system, a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company and (iii) such other information as may be reasonably requested to permit the Holder to sell such securities pursuant to Rule 144 without registration;

(d)    at the request of any Holder then holding Registrable Securities, give the Transfer Agent instructions (supported by an opinion of Company counsel, if required or requested by the Transfer Agent) to the effect that, upon the Transfer Agent's receipt from such Holder of

(i) a certificate (a "Rule 144 Certificate") certifying (A) that the Holder's holding period (as determined in accordance with the provisions of Rule 144) for the Shares which the Holder proposes to sell (the "Securities Being Sold") is not less than (1) year and (B) as to such other matters as may be appropriate in accordance with Rule 144 under the Securities Act, and

(ii) an opinion of counsel acceptable to the Company (for which purposes it is agreed that Krieger & Prager LLP shall be deemed acceptable if not given by Company counsel) that, based on the Rule 144 Certificate, Securities Being Sold may be sold pursuant to the provisions of Rule 144, even in the absence of an effective registration statement,

the Transfer Agent is to effect the transfer of the Securities Being Sold and issue to the buyer(s) or transferee(s) thereof one or more stock certificates representing the transferred Securities Being Sold without any restrictive legend and without recording any restrictions on the transferability of such shares on the Transfer Agent's  books and records (except to the extent any such legend or restriction results from facts other than the identity of the relevant Holder, as the seller or transferor thereof, or the status, including any relevant legends or restrictions, of the shares of the Securities Being Sold while held by the Buyer).  If the Transfer Agent reasonably requires any additional documentation at the time of the transfer, the Company shall deliver or cause to be delivered all such reasonable additional documentation as may be necessary to effectuate the issuance of an unlegended certificate.

(v)    Notwithstanding the foregoing, if at any time or from time to time after the date of effectiveness of the registration statement, the Company notifies the Holder in writing that the effectiveness of the Registration Statement is suspended for any reason, whether due to the existence of a Potential Material Event (as defined below) or otherwise, the Holder shall not offer or sell any Registrable Securities, or engage in any other transaction involving or relating to

9-18-06

the Registrable Securities, from the time of the giving of notice with respect to a Potential Material Event until the Holder receives written notice from the Company that such Potential Material Event either has been disclosed to the public or no longer constitutes a Potential Material Event; provided, however, that the Company may not so suspend such right other than during a Permitted Suspension Period. The term "Potential Material Event" means any of the following: (i) the possession by the Company of material information not ripe for disclosure in a registration statement, which shall be evidenced by determinations in good faith by the Board of Directors of the Company that disclosure of such information in the registration statement would be detrimental to the business and affairs of the Company; or (ii) any material engagement or activity by the Company which would, in the good faith determination of the Board of Directors of the Company, be adversely affected by disclosure in a registration statement at such time, which determination shall be accompanied by a good faith determination by the Board of Directors of the Company that the registration statement would be materially misleading absent the inclusion of such information. The term "Permitted Suspension Period" means up to two suspension periods during any consecutive 12-month period, each of which suspension period shall not either (i) be for more than ten (10) business days (and forty five (45) days in the case of the requirement to file a post-effective amendment in connection with the filing with the SEC of the Company's audited financial statements in its annual report) or (ii) begin less than ten (10) business days after the last day of the preceding suspension (whether or not such last day was during or after a Permitted Suspension Period).

        **i.**    **Available Shares.**  After the Certificate of Incorporation Amendment Filing Date, the Company shall have at all times authorized and reserved for issuance, free from preemptive rights, a number of shares (the "Minimum Available Shares") at least equal to one hundred percent (100%) of the number of shares which would be issuable upon exercise of the outstanding Warrants held by all Holders (in each case, whether such Warrant were originally issued to the Holder, the Buyer or to any other party). For the purposes of such calculations, the Company should assume that the Warrant were then exercisable without regard to any restrictions which might limit any Holder's right to exercise the Warrant held by any Holder.

        **j.**    **Publicity, Filings, Releases, Etc.**  Each of the parties agrees that it will not disseminate any information relating to the Transaction Agreements or the transactions contemplated thereby, including issuing any press releases, holding any press conferences or other forums, or filing any reports (collectively, "Publicity"), without giving the other party reasonable advance notice and an opportunity to comment on the contents thereof. Neither party will include in any such Publicity any statement or statements or other material to which the other party reasonably objects, unless in the reasonable opinion of counsel to the party proposing such statement, such statement is legally required to be included. In furtherance of the foregoing, the Company will provide to the Buyer drafts of the applicable text of the first filing of a Current Report on Form 8-K or a Quarterly or Annual Report on Form 10-Q or 10-K intended to be made with the SEC which refers to the Transaction Agreements or the transactions contemplated thereby as soon as practicable (but at least two (2) Trading Days before such filing will be made) will not include in such filing any statement or statements or other material to which the other party reasonably objects, unless in the reasonable opinion of counsel to the party proposing such statement, such statement is legally required to be included. Notwithstanding the foregoing, each of the parties hereby consents to the inclusion of the text of

               9-18-06

the Transaction Agreements in filings made with the SEC as well as any descriptive text accompanying or part of such filing which is accurate and reasonably determined by the Company's counsel to be legally required. Notwithstanding, but subject to, the foregoing provisions of this Section 4(i), the Company will, after the Closing Date, promptly file a Current Report on Form 8-K or, if appropriate, a quarterly or annual report on the appropriate form, referring to the transactions contemplated by the Transaction Agreements.

       **k. Stockholders Meeting**. The Company, acting through its Board of Directors and in accordance with applicable law and the Certificate of Incorporation and the Bylaws of the Company, shall at its expense, duly call, give notice of, convene and hold a special meeting of its stockholders within 60 business days following the date of the Agreement. The Company shall, at its expense, secure the services of a proxy solicitation firm in connection with such special meeting.

      **5.**     **TRANSFER AGENT INSTRUCTIONS.**

      The Company warrants that, with respect to the Securities, other than the stop transfer instructions to give effect to Section 4(a) hereof, it will give its transfer agent no instructions inconsistent with instructions to issue Common Stock from time to time upon exercise of the Warrant or conversion of the Note , if applicable, in such amounts as specified from time to time by the Company to the transfer agent, bearing the restrictive legend specified in Section 4(b) of this Agreement prior to registration of the Shares under the 1933 Act, registered in the name of the Buyer or its nominee and in such denominations to be specified by the Holder in connection with each exercise of the Warrant or conversion of the Note , if applicable,. Except as so provided, the Shares shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the other Transaction Agreements. Nothing in this Section shall affect in any way the Buyer's obligations and agreement to comply with all applicable securities laws upon resale of the Securities. If the Buyer provides the Company with an opinion of counsel reasonably satisfactory to the Company that registration of a resale by the Buyer of any of the Securities in accordance with clause (1)(B) of Section 4(a) of this Agreement is not required under the 1933 Act, the Company shall (except as provided in clause (2) of Section 4(a) of this Agreement) permit the transfer of the Securities and, in the case of the Warrant Shares and shares issuable upon conversion of the Note, promptly instruct the Company's transfer agent to issue one or more certificates for Common Stock without legend in such name and in such denominations as specified by the Buyer.

      Subject to the provisions of this Agreement, the Company will permit the Buyer to exercise the Warrant in the manner contemplated by the Warrant.

      (i)     The Company understands that a delay in the issuance of the Shares of Common Stock beyond the Delivery Date (as defined in the Warrant) could result in economic loss to the Buyer. As compensation to the Buyer for such loss, the Company agrees to pay late payments to the Buyer for late issuance of Shares upon exercise in accordance with the following

17

schedule (where "No. Business Days Late" refers to the number of Trading Days which is beyond two (2) Trading Days after the Delivery Date):[2]

| No. Business Days Late | Late Payment For Each $10,000 of Exercise Price of Warrant Being Exercised |
|---|---|
| 1 | $100 |
| 2 | $200 |
| 3 | $300 |
| 4 | $400 |
| 5 | $500 |
| 6 | $600 |
| 7 | $700 |
| 8 | $800 |
| 9 | $900 |
| 10 | $1,000 |
| >10 | $1,000 + $200 for each Business Day Late beyond 10 days |

The Company shall pay any payments incurred under this Section in immediately available funds upon demand as the Buyer's exclusive remedy (other than the following provisions of this Section 5(c)) for such delay.  Furthermore, in addition to any other remedies which may be available to the Buyer, in the event that the Company fails for any reason to effect delivery of such shares of Common Stock by close of business on the tenth Trading Day after the Delivery Date, the Buyer will be entitled to revoke the relevant Notice of Exercise by delivering a notice to such effect to the Company, whereupon the Company and the Buyer shall each be restored to their respective positions immediately prior to delivery of such Notice of Exercise; provided, however, that an amount equal to any payments contemplated by this Section 5(c) which have accrued through the date of such revocation notice shall remain due and owing to the Exercising Holder notwithstanding such revocation.

            (ii)     If, by the close of business on the fifth Trading Day after the Delivery Date, the Company fails for any reason to deliver the Shares to be issued upon exercise of the Warrant and after such fifth Trading Day, the Holder of the Warrant being exercised (an "Exercising Holder") purchases, in an arm's-length open market transaction or otherwise, shares of Common Stock (the "Covering Shares") in order to make delivery in satisfaction of a sale of Common Stock by the Exercising Holder (the "Sold Shares"), which delivery such Exercising Holder anticipated to make using the Shares to be issued upon such exercise (a "Buy-In"), the Exercising Holder shall have the right, in addition to and not in lieu of all other amounts

---

[2]     Example: Notice of Exercise is delivered on Monday, July 10, 2006.  The Delivery Date would be Thursday, July 13 (the third Trading Day after such delivery).  If the certificate is delivered by Monday, July 17 (2 Trading Days after the Delivery Date), no payment under this provision is due.  If the certificates are delivered on July 18, that is 1 "Business Day Late" in the table below; if delivered on July 25, that is 6 "Business Days Late" in the table.

9-18-06

18

contemplated in other provisions of the Transaction Agreements, including, but not limited to, the provisions of the immediately preceding Section 5(c)(i)), the Buy-In Adjustment Amount (as defined below). The "Buy-In Adjustment Amount" is the amount equal to the number of Sold Shares multiplied by the excess, if any, of (x) the Exercising Holder's total purchase price per share (including brokerage commissions, if any) for the Covering Shares over (y) the net proceeds per share (after brokerage commissions, if any) received by the Exercising Holder from the sale of the Sold Shares. The Company shall pay the Buy-In Adjustment Amount to the Exercising Holder in immediately available funds immediately upon demand by the Exercising Holder. By way of illustration and not in limitation of the foregoing, if the Exercising Holder purchases shares of Common Stock having a total purchase price (including brokerage commissions) of $11,000 to cover a Buy-In with respect to shares of Common Stock it sold for net proceeds of $10,000, the Buy-In Adjustment Amount which Company will be required to pay to the Exercising Holder will be $1,000.

The provisions of this paragraph apply on or after the effective date of the Registration Statement. After such effective date, if the Holder provides reasonable evidence to the Company and the Transfer Agent that the Holder has sold Shares pursuant to the Registration Statement the Company will issue such Shares without legend and without transfer restrictions on the books of the Transfer Agent, and, at the request of the Holder, will use it best efforts to have previously issued certificates representing such Shares re-issued without legend and without transfer restrictions on the books of the Transfer Agent. In lieu of delivering physical certificates representing the Common Stock issuable upon exercise of a Warrant or at the request of the Holder with respect to any Shares previously issued, provided the Transfer Agent is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer program, upon request of the Holder and its compliance with the provisions contained in this paragraph, so long as the certificates therefor do not bear a legend and the Holder thereof is not obligated to return such certificate for the placement of a legend thereon, the Company shall use its best efforts to cause the Transfer Agent to electronically transmit to the Holder the Common Stock issuable upon exercise of the Warrant or in replacement of any Shares previously issued by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission system. In connection therewith, it will be the Holder's obligation to obtain formal requirements, such as medallion guaranty, if necessary.

The Company shall assume any fees or charges of the Transfer Agent or Company counsel regarding (i) the removal of a legend or stop transfer instructions with respect to Registrable Securities, and (ii) the issuance of certificates or DTC registration to or in the name of the Holder or the Holder's designee or to a transferee as contemplated by an effective Registration Statement.

The Holder of the Warrant shall be entitled to exercise its exercise privilege with respect to the Warrant notwithstanding the commencement of any case under 11 U.S.C. §101 et seq. (the "Bankruptcy Code"). In the event the Company is a debtor under the Bankruptcy Code, the Company hereby waives, to the fullest extent permitted, any rights to relief it may have under 11 U.S.C. §362 in respect of such holder's exercise privilege. The Company hereby waives, to the fullest extent permitted, any rights to relief it may have under 11 U.S.C. §362 in respect of

19

the exercise of the Warrant. The Company agrees, without cost or expense to such Holder, to take or to consent to any and all action necessary to effectuate relief under 11 U.S.C. §362.

The Company will authorize the Transfer Agent to give information relating to the Company directly to the Holder or the Holder's representatives upon the request of the Holder or any such representative, to the extent such information relates to (i) the status of shares of Common Stock issued or claimed to be issued to the Holder in connection with a Notice of Exercise, or (ii) the aggregate number of outstanding shares of Common Stock of all shareholders (as a group, and not individually) as of a current or other specified date. At the request of the Holder, the Company will provide the Holder with a copy of the authorization so given to the Transfer Agent.

### 6.    CLOSING DATE.

a.    The Closing Date shall occur on the date which is the first Trading Day after each of the conditions contemplated by Sections 7 and 8 hereof shall have either been satisfied or been waived by the party in whose favor such conditions run.

The closing of the Transactions shall occur on the Closing Date at the offices of the Company and shall take place no later than 3:00 P.M., New York time, on such day or such other time as is mutually agreed upon by the Company and the Buyer.

### 7.    CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

The Buyer understands that the Company's obligation to sell the Note and the Warrant to the Buyer pursuant to this Agreement on the Closing Date is conditioned upon:

The execution and delivery of this Agreement by the Buyer;

Delivery by the Buyer to the Company of good funds as payment in full of an amount equal to the Purchase Price in accordance with this Agreement;

The accuracy on such Closing Date of the representations and warranties of the Buyer contained in this Agreement, each as if made on such date, and the performance by the Buyer on or before such date of all covenants and agreements of the Buyer required to be performed on or before such date; and

There shall not be in effect any law, rule or regulation prohibiting or restricting the transactions contemplated hereby, or requiring any consent or approval which shall not have been obtained.

### 8.    CONDITIONS TO THE BUYER'S OBLIGATION TO PURCHASE.

The Company understands that the Buyer's obligation to purchase the Note and the Warrant on the Closing Date is conditioned upon:

20                                                9-18-06

The execution and delivery of this Agreement and the other Transaction Agreements by the Company;

Delivery by the Company to the Buyer of the Certificates in accordance with this Agreement;

The accuracy in all material respects on the Closing Date of the representations and warranties of the Company contained in this Agreement, each as if made on such date, and the performance by the Company on or before such date of all covenants and agreements of the Company required to be performed on or before such date;

On the Closing Date, all required SEC periodic filings shall have been filed, and the designation "E" on the Company symbol as traded on the OTC shall have been removed;

There shall not be in effect any law, rule or regulation prohibiting or restricting the transactions contemplated hereby, or requiring any consent or approval which shall not have been obtained; and

From and after the date hereof to and including the Closing Date, each of the following conditions will remain in effect: (i) the trading of the Common Stock shall not have been suspended by the SEC or on the Principal Trading Market; (ii) trading in securities generally on the Principal Trading Market shall not have been suspended or limited; (iii) no minimum prices shall been established for securities traded on the Principal Trading Market; and (iv) there shall not have been any material adverse change in any financial market.

## 9.    INDEMNIFICATION AND REIMBURSEMENT.

a.    (i) The Company agrees to indemnify and hold harmless the Buyer and its officers, directors, employees, and agents, and each Buyer Control Person from and against any losses, claims, damages, liabilities or expenses incurred (collectively, "Damages"), joint or several, and any action in respect thereof to which the Buyer, its partners, Affiliates, officers, directors, employees, and duly authorized agents, and any such Buyer Control Person becomes subject to, resulting from, arising out of or relating to any misrepresentation, breach of warranty or nonfulfillment of or failure to perform any covenant or agreement on the part of Company contained in this Agreement, as such Damages are incurred, except to the extent such Damages result primarily from Buyer's failure to perform any covenant or agreement contained in this Agreement or the Buyer's or its officer's, director's, employee's, agent's or Buyer Control Person's gross negligence, recklessness or bad faith in performing its obligations under this Agreement.

(ii)    The Company hereby agrees that, if the Buyer, other than by reason of its gross negligence, illegal or willful misconduct (in each case, as determined by a non-appealable judgment to such effect), (x) becomes involved in any capacity in any action, proceeding or investigation brought by any shareholder of the Company, in connection with or as a result of the consummation of the transactions contemplated by this Agreement or the other

21

9-18-06

Transaction Agreements, or if the Buyer is impleaded in any such action, proceeding or investigation by any Person, or (y) becomes involved in any capacity in any action, proceeding or investigation brought by the SEC, any self-regulatory organization or other body having jurisdiction, against or involving the Company or in connection with or as a result of the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements, or (z) is impleaded in any such action, proceeding or investigation by any Person, then in any such case, the Company shall indemnify, defend and hold harmless the Buyer from and against and in respect of all losses, claims, liabilities, damages or expenses resulting from, imposed upon or incurred by the Buyer, directly or indirectly, and reimburse such Buyer for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith, as such expenses are incurred.  The indemnification and reimbursement obligations of the Company under this paragraph shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Affiliates of the Buyer who are actually named in such action, proceeding or investigation, and partners, directors, agents, employees and Buyer Control Persons (if any), as the case may be, of the Buyer and any such Affiliate, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, the Buyer, any such Affiliate and any such Person. The Company also agrees that neither the Buyer nor any such Affiliate, partner, director, agent, employee or Buyer Control Person shall have any liability to the Company or any Person asserting claims on behalf of or in right of the Company in connection with or as a result of the consummation of this Agreement or the other Transaction Agreements, except (i) as may be expressly and specifically provided in or contemplated by this Agreement, (ii) as a result of the breach of a Transaction Agreement by the Buyer or (iii) by reason of the Buyer's actions.

      b.     All claims for indemnification by any Indemnified Party (as defined below) under this Section shall be asserted and resolved as follows:

      (i)     In the event any claim or demand in respect of which any Person claiming indemnification under any provision of this Section (an "Indemnified Party") might seek indemnity under paragraph (a) of this Section is asserted against or sought to be collected from such Indemnified Party by a Person other than a party hereto or an Affiliate thereof (a "Third Party Claim"), the Indemnified Party shall deliver a written notification, enclosing a copy of all papers served, if any, and specifying the nature of and basis for such Third Party Claim and for the Indemnified Party's claim for indemnification that is being asserted under any provision of this Section against any Person (the "Indemnifying Party"), together with the amount or, if not then reasonably ascertainable, the estimated amount, determined in good faith, of such Third Party Claim (a "Claim Notice") with reasonable promptness to the Indemnifying Party. If the Indemnified Party fails to provide the Claim Notice with reasonable promptness after the Indemnified Party receives notice of such Third Party Claim, the Indemnifying Party shall not be obligated to indemnify the Indemnified Party with respect to such Third Party Claim to the extent that the Indemnifying Party's ability to defend has been prejudiced by such failure of the Indemnified Party. The Indemnifying Party shall notify the Indemnified Party as soon as practicable within the period ending thirty (30) calendar days following receipt by the Indemnifying Party of either a Claim Notice or an Indemnity Notice (as defined below) (the "Dispute Period") whether the Indemnifying Party disputes its liability or the amount of its

22

liability to the Indemnified Party under this Section and whether the Indemnifying Party desires, at its sole cost and expense, to defend the Indemnified Party against such Third Party Claim. The following provisions shall also apply.

(x)  If the Indemnifying Party notifies the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Indemnified Party with respect to the Third Party Claim pursuant to this paragraph (b) of this Section, then the Indemnifying Party shall have the right to defend, with counsel reasonably satisfactory to the Indemnified Party, at the sole cost and expense of the Indemnifying Party, such Third Party Claim by all appropriate proceedings, which proceedings shall be vigorously and diligently prosecuted by the Indemnifying Party to a final conclusion or will be settled at the discretion of the Indemnifying Party (but only with the consent of the Indemnified Party in the case of any settlement that provides for any relief other than the payment of monetary damages or that provides for the payment of monetary damages as to which the Indemnified Party shall not be indemnified in full pursuant to paragraph (a) of this Section). The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that the Indemnified Party may, at the sole cost and expense of the Indemnified Party, at any time prior to the Indemnifying Party's delivery of the notice referred to in the first sentence of this subparagraph (x), file any motion, answer or other pleadings or take any other action that the Indemnified Party reasonably believes to be necessary or appropriate to protect its interests; and provided further, that if requested by the Indemnifying Party, the Indemnified Party will, at the sole cost and expense of the Indemnifying Party, provide reasonable cooperation to the Indemnifying Party in contesting any Third Party Claim that the Indemnifying Party elects to contest. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this subparagraph (x), and except as provided in the preceding sentence, the Indemnified Party shall bear its own costs and expenses with respect to such participation. Notwithstanding the foregoing, the Indemnified Party may take over the control of the defense or settlement of a Third Party Claim at any time if it irrevocably waives its right to indemnity under paragraph (a) of this Section with respect to such Third Party Claim.

(y)  If the Indemnifying Party fails to notify the Indemnified Party within the Dispute Period that the Indemnifying Party desires to defend the Third Party Claim pursuant to paragraph (b) of this Section, or if the Indemnifying Party gives such notice but fails to prosecute vigorously and diligently or settle the Third Party Claim, or if the Indemnifying Party fails to give any notice whatsoever within the Dispute Period, then the Indemnified Party shall have the right to defend, at the sole cost and expense of the Indemnifying Party, the Third Party Claim by all appropriate proceedings, which proceedings shall be prosecuted by the Indemnified Party in a reasonable manner and in good faith or will be settled at the discretion of the Indemnified Party (with the consent of the Indemnifying Party, which consent will not be unreasonably withheld). The Indemnified Party will have full control of such defense and proceedings, including any compromise or settlement thereof; provided, however, that if requested by the Indemnified Party, the Indemnifying Party will, at the sole cost and expense of the Indemnifying Party, provide

9-18-06

reasonable cooperation to the Indemnified Party and its counsel in contesting any Third Party Claim which the Indemnified Party is contesting. Notwithstanding the foregoing provisions of this subparagraph (y), if the Indemnifying Party has notified the Indemnified Party within the Dispute Period that the Indemnifying Party disputes its liability or the amount of its liability hereunder to the Indemnified Party with respect to such Third Party Claim and if such dispute is resolved in favor of the Indemnifying Party in the manner provided in subparagraph(z) below, the Indemnifying Party will not be required to bear the costs and expenses of the Indemnified Party's defense pursuant to this subparagraph (y) or of the Indemnifying Party's participation therein at the Indemnified Party's request, and the Indemnified Party shall reimburse the Indemnifying Party in full for all reasonable costs and expenses incurred by the Indemnifying Party in connection with such litigation. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this subparagraph (y), and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(z)  If the Indemnifying Party notifies the Indemnified Party that it does not dispute its liability or the amount of its liability to the Indemnified Party with respect to the Third Party Claim under paragraph (a) of this Section or fails to notify the Indemnified Party within the Dispute Period  whether the Indemnifying Party disputes its liability or the amount of its liability to the Indemnified Party with respect to such Third Party Claim, the amount of Damages specified in the Claim Notice shall be conclusively deemed a liability of the Indemnifying Party under paragraph (a) of this Section and the Indemnifying Party shall pay the amount of such Damages to the Indemnified Party on demand. If the Indemnifying Party has timely disputed its liability or the amount of its liability with respect to such claim, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute; provided, however, that if the dispute is not resolved within thirty (30) days after the Claim Notice, the Indemnifying Party shall be entitled to institute such legal action as it deems appropriate.

(ii)     In the event any Indemnified Party should have a claim under paragraph (a) of this Section against the Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party shall deliver a written notification of a claim for indemnity under paragraph (a) of this Section specifying the nature of and basis for such claim, together with the amount or, if not then reasonably ascertainable, the estimated amount, determined in good faith, of such claim (an "Indemnity Notice") with reasonable promptness to the Indemnifying Party. The failure by any Indemnified Party to give the Indemnity Notice shall not impair such party's rights hereunder except to the extent that the Indemnifying Party demonstrates that it has been irreparably prejudiced thereby. If the Indemnifying Party notifies the Indemnified Party that it does not dispute the claim or the amount of the claim described in such Indemnity Notice or fails to notify the Indemnified Party within the Dispute Period whether the Indemnifying Party disputes the claim or the amount of the claim described in such Indemnity Notice, the amount of Damages specified in the Indemnity Notice will be conclusively deemed a liability of the Indemnifying Party under paragraph (a) of this Section and the Indemnifying Party shall pay the amount of such Damages to the Indemnified Party on demand. If the Indemnifying Party has timely disputed its liability or the amount of its liability with respect to such claim, the

9-18-06

Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute; provided, however, that if the dispute is not resolved within thirty (30) days after the Indemnity Notice, the Indemnifying Party shall be entitled to institute such legal action as it deems appropriate.

The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar rights of the indemnified party against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to.

10.    **JURY TRIAL WAIVER.**  The Company and the Buyer hereby waive a trial by jury in any action, proceeding or counterclaim brought by either of the Parties hereto against the other in respect of any matter arising out or in connection with the Transaction Agreements.

11.    **GOVERNING LAW: MISCELLANEOUS.**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws.  Each of the parties consents to the exclusive jurisdiction of the federal courts whose districts encompass any part of the County of New York or the state courts of the State of New York sitting in the County of New York in connection with any dispute arising under this Agreement or any of the other Transaction Agreements and hereby waives, to the maximum extent permitted by law, any objection, including any objection based on *forum non conveniens*, to the bringing of any such proceeding in such jurisdictions or to any claim that such venue of the suit, action or proceeding is improper. To the extent determined by such court, the Company shall reimburse the Buyer for any reasonable legal fees and disbursements incurred by the Buyer in enforcement of or protection of any of its rights under any of the Transaction Agreements.  Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

The Company and the Buyer acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the other Transaction Agreements were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement and the other Transaction Agreements and to enforce specifically the terms and provisions hereof and thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.

This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto.

25

9-18-06

All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

A facsimile transmission of this signed Agreement shall be legal and binding on all parties hereto.

This Agreement may be signed in one or more counterparts, each of which shall be deemed an original.

The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement or the validity or enforceability of this Agreement in any other jurisdiction.

This Agreement may be amended only by an instrument in writing signed by the party to be charged with enforcement thereof.

This Agreement supersedes all prior agreements and understandings among the parties hereto with respect to the subject matter hereof.

All dollar amounts referred to or contemplated by this Agreement or any other Transaction Agreement shall be deemed to refer to US Dollars, unless otherwise explicitly stated to the contrary.

12.    **NOTICES.**  Any notice required or permitted hereunder shall be given in writing (unless otherwise specified herein) and shall be deemed effectively given on the earliest of

(a) the date delivered, if delivered by personal delivery as against written receipt therefor or by confirmed facsimile transmission,

(b) the fifth Trading Day after deposit, postage prepaid, in the United States Postal Service by registered or certified mail, or

(c) the third Trading Day after mailing by domestic or international express courier, with delivery costs and fees prepaid,

in each case, addressed to each of the other parties thereunto entitled at the following addresses (or at such other addresses as such party may designate by ten (10) days' advance written notice similarly given to each of the other parties hereto):

26

9-18-06

**COMPANY:**        211 Madison Avenue, #28B
New York, New York 10016
Attn: Allan Klepfisz
Telephone No.: (212) 532-2736
Telecopier No.: (212) 532-2904

**BUYER:**        At the address set forth on the signature page of this Agreement.

        **12.**    **SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** The Company's and the Buyer's representations and warranties herein shall survive the execution and delivery of this Agreement and the delivery of the Certificates and the payment of the Purchase Price, and shall inure to the benefit of the Buyer and the Company and their respective successors and assigns.

        [BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

9-18-06

SEP-19-2006(TUE) 02:32    LH Financial                    (FAX)2125868244                P.002/002
19/09 2006 07:53 FAX    2120021001        ALPHA CAPITAL        → LH __ __  __ ..    002
09/18/2006  16:47    2125827891                ESTELLE GRUBIN                        PAGE  02/02

**IN WITNESS WHEREOF**, with respect to the Purchase Price specified below, this Agreement has been duly executed by the Buyer and the Company as of the date set first above written.

**PURCHASE PRICE:**                               $ 371,000.00

**BUYER:**

**ALPHA CAPITAL AG**

Address                               Printed Name of Buyer

Pradafant 7 Fustenlms
Vaduz, Liechtenstein

By: X
Telecopier No. 212-586-8244    (Signature of Authorized Person)

                               Konrad Ackerman  Director
Leichtenstein                    Printed Name and Title
Jurisdiction of Incorporation
or Organization

**COMPANY**

**BRILLIANT TECHNOLOGIES CORPORATION**

By: _____
(Signature of Authorized Person)

_____
Printed Name and Title

9-18-06

28

**IN WITNESS WHEREOF,** with respect to the Purchase Price specified below, this Agreement has been duly executed by the Buyer and the Company as of the date set first above written.

**PURCHASE PRICE:**                                   $ _371,000.00_

<div align="center">

**BUYER:**

**ALPHA CAPITAL AG**

</div>

Address                                  Printed Name of Buyer

Pradafant 7 Fustertums
Vaduz, Liechtenstein

                                         By: _____
Telecopier No. _____        (Signature of Authorized Person)

                                         _____
_____           Printed Name and Title
Jurisdiction of Incorporation
or Organization

<div align="center">

**COMPANY**

</div>

**BRILLIANT TECHNOLOGIES CORPORATION**

By: _____
(Signature of Authorized Person)

_ALAN KLEPAK, PRESIDENT + CEO._
Printed Name and Title

9-15-06

## FORM OF NOTE

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES OR AN OPINION OF COUNSEL OR OTHER EVIDENCE ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

No.   06-09-01

US $371,000.00

## BRILLIANT TECHNOLOGIES CORPORATION

PROMISSORY NOTE DUE November 3, 2006

FOR VALUE RECEIVED, **BRILLIANT TECHNOLOGIES CORPORATION**, a corporation organized and existing under the laws of the State of Delaware (the "Company"), promises to pay to ALPHA CAPITAL AG, the registered holder hereof (the "Holder"), the principal sum of Three Hundred Seventy-One Thousand and 00/100 Dollars (US $371,000.00) on the Maturity Date (as defined below).

TIME IS OF THE ESSENCE WITH RESPECT TO THE COMPANY'S FULFILLMENT OF ALL OF ITS PAYMENT OBLIGATIONS HEREUNDER. The Holder shall not be required to give the Company any notice of default of payment if any such payment is not timely paid or otherwise satisfied. All provisions of this Note which apply in the event of the Company's not timely fulfilling any of its payment obligations hereunder shall apply whether or not such notice of default is given. The Holder's giving of any notice to the Company shall not be deemed a waiver, modification or amendment of this provision with respect to the failure referred to in that notice or to any other failure by the Company timely to make any other payment due hereunder.

This Note or its predecessor was originally issued on September 18, 2006 (the "Issue Date").

This Note is being issued pursuant to the terms of the Bridge Loan Agreement, dated as of September 18, 2006 (the "Bridge Loan Agreement"), to which the Company and the Holder (or the Holder's predecessor in interest) are parties. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bridge Loan Agreement.

This Note is subject to the following additional provisions:

1.    The Note will initially be issued in denominations determined by the Company, but are exchangeable for an equal aggregate principal amount of Note of different denominations, as requested by the Holder surrendering the same. No service charge will be made for such registration or transfer or exchange.

1

9-18-06

EXHIBIT A

2.      No interest will accrue on this Note until the Maturity Date.  If any portion of this Note is outstanding on the Maturity Date, interest at the rate of fourteen percent (14%) per annum or the highest rate allowed by law, whichever is lower, shall accrue on the outstanding principal of this Note from the Maturity Date to and including the date of payment by the Company.  Such interest shall accrue on a daily basis and shall be payable in cash. The Holder may demand payment of all or any part of this Note, together with accrued interest, if any, and any other amounts due hereunder, as of the Maturity Date or any date thereafter.

3.      The Company shall be entitled to withhold from all payments of principal of, and, if applicable, interest on, this Note any amounts required to be withheld under the applicable provisions of the United States income tax laws or other applicable laws at the time of such payments, and Holder shall execute and deliver all required documentation in connection therewith.

4.      This Note has been issued subject to investment representations of the original purchaser hereof and may be transferred or exchanged only in compliance with the Securities Act of 1933, as amended (the "Act"), and other applicable state and foreign securities laws and the terms of the Bridge Loan Agreement.  In the event of any proposed transfer of this Note, the Company may require, prior to issuance of a new Note in the name of such other person, that it receive reasonable transfer documentation that is sufficient to evidence that such proposed transfer complies with the Act and other applicable state and foreign securities laws and the terms of the Bridge Loan Agreement.  Prior to due presentment for transfer of this Note, the Company and any agent of the Company may treat the person in whose name this Note is duly registered on the Company's Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note be overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

5 .     (a)    The term "Maturity Date" means the earlier of (a) November 3, 2006 (the "Stated Maturity Date") or (b) the second Trading Day on which New Transaction Funds in the aggregate amount of $1,390,000.00 ("New Transaction Threshold") have been received by the Company (as defined in the Bridge Loan Agreement) occurs.

      (b)    (i) Additionally,  if an Event of Default occurs pursuant to Section 13(a)(i), (iii) - (x) hereof and continues for a period of 5 days after notice from the Holder to the Company of such Event of Default, the Holder of this Note will be entitled, at its option, from and after the Certificate of Incorporation Amendment Filing Date to convert at any time the principal amount of this Note, provided that the principal amount is at least US$10,000 (unless if at the time of such election to convert the aggregate principal amount of all Notes registered to the Holder is less than Ten Thousand Dollars (US$10,000), then the whole amount thereof), and accrued interest, into shares of Common Stock at a conversion price (the "Conversion Price") for each share of Common Stock equal to the lesser of (i) $0.07 and (ii) 75% of the Market Price on the Conversion Date (as defined below), as such price may be adjusted as provided herein (the "Variable Conversion Rate").  For purposes of this section, the Market Price shall be the average of the lowest five (5) days closing bid prices (not necessarily consecutive) of the Common Stock for the thirty (30) Trading Days immediately preceding the Conversion Date, as reported by the Reporting Service, or, in the event the Common Stock is listed on a stock exchange or traded on NASDAQ, the Market Price shall be the closing prices on the exchange on such dates, as reported in the Wall Street Journal.

9-18-06

(ii)    Conversion of this Note, if applicable in accordance with Section 5(b)(i), shall be effectuated by faxing a Notice of Conversion (as defined below) to the Company as provided in this Section 5(b)(ii). The Notice of Conversion shall be executed by the Holder of this Note and shall evidence such Holder's intention to convert this Note in the form annexed hereto as Exhibit A. No fractional shares of Common Stock or scrip representing fractions of shares will be issued on conversion, but the number of shares of Common Stock issuable shall be rounded to the nearest whole share. The date on which notice of conversion is given (the "Conversion Date") shall be deemed to be the date on which the Holder faxes or otherwise delivers the conversion notice ("Notice of Conversion") to the Company so that it is received by the Company on such specified date, and the Holder shall deliver to the Company the original Note being converted no later than five (5) business days thereafter. Facsimile delivery of the Notice of Conversion shall be accepted by the Company at facsimile number 212-532-2904; Attn: Allan Klepfisz. Certificates representing Common Stock upon conversion will be delivered to the Holder at the address specified in the Notice of Conversion, via express courier, by electronic transfer or otherwise, within three (3) business days after the Conversion Date. The Holder shall be deemed to be the holder of the shares issuable to it in accordance with the provisions of this Section 5(b)(ii) on the Conversion Date.

6.    (a)    Any payment made on account of this Note shall be applied in the following order of priority: (i) first, to any amounts due hereunder other than principal and accrued interest, (ii) then, to accrued interest, if any, through and including the date of payment, and (iii) then, to principal of this Note.

(b)    Subject to the provisions of Section 6(a) hereof, this Note may be prepaid in whole or in part at the option of the Company at any time prior to the Maturity Date.

7.    All payments contemplated hereby are to be made "in cash" and shall be made in immediately available good funds of United States of America currency by wire transfer to an account designated in writing by the Holder to the Company (which account may be changed by notice similarly given). For purposes of this Note, the phrase "date of payment" means the date good funds are received in the account designated by the notice which is then currently effective.

8.    Subject to the terms of the Bridge Loan Agreement, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and, if applicable, interest on, this Note at the time, place, and rate, and in the coin or currency, as herein prescribed. This Note is direct obligations of the Company.

9.    No recourse shall be had for the payment of the principal of, or, if applicable, the interest on, this Note, or for any claim based hereon, or otherwise in respect hereof, against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, all such liability being, by the acceptance hereof and as part of the consideration for the issue hereof, expressly waived and released.

10.    The Holder of the Note, by its acceptance hereof, agrees that this Note is being acquired for investment and that such Holder will not offer, sell or otherwise dispose of this Note except under circumstances which will not result in a violation of the Act or any applicable state Blue Sky or foreign laws or similar laws relating to the sale of securities.

9-18-06

11.    Any notice required or permitted hereunder shall be given in manner provided in the Section headed "NOTICES" in the Bridge Loan Agreement, the terms of which are incorporated herein by reference.

12.    (a)    This Note shall be governed by and interpreted in accordance with the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws. Each of the Company and by its acceptance of this Note, the Holder consents to the exclusive jurisdiction of the federal courts whose districts encompass any part of the County of New York or the state courts of the State of New York sitting in the County of New York in connection with any dispute arising under this Note and hereby waives, to the maximum extent permitted by law, any objection, including any objection based on *forum non conveniens*, to the bringing of any such proceeding in such jurisdictions. To the extent determined by such court, the Company shall reimburse the Holder for any reasonable legal fees and disbursements incurred by the Holder in enforcement of or protection of any of its rights under this Note.

(b) The Company and the Holder, by the acceptance of this Note, hereby waive a trial by jury in any action, proceeding or counterclaim brought by either of them hereto against the other in respect of any matter arising out of or in connection with this Note.

13.    (a)    The following shall constitute an "Event of Default":

i.    The Company shall default in the timely payment of principal on this Note or any other amount due hereunder (without the requirement of any further notice with respect thereto from the Holder); or

ii.    Any of the representations or warranties made by the Company herein, in the Bridge Loan Agreement or any of the other Transaction Agreements shall be false or misleading in any material respect at the time made; or

iii.    The Company shall fail to perform or observe, in any material respect, any other covenant, term, provision, condition, agreement or obligation of any Note in this series and such failure shall continue uncured for a period of thirty (30) days after the Company's receipt of written notice thereof from the Holder; or

iv.    The Company shall fail to perform or observe, in any material respect, any covenant, term, provision, condition, agreement or obligation of the Company under any of the Transaction Agreements and such failure shall continue uncured for a period of thirty (30) days after the Company's receipt of written notice thereof from the Holder; or

v.    The Company shall (1) admit in writing its inability to pay its debts generally as they mature; (2) make an assignment for the benefit of creditors or commence proceedings for its dissolution; or (3) apply for or consent to the appointment of a trustee, liquidator or receiver for its or for a substantial part of its property or business; or

9-18-06

vi.   A trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within sixty (60) days after such appointment; or

vii.   Any governmental agency or any court of competent jurisdiction at the instance of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company and shall not be dismissed within sixty (60) days thereafter; or

viii.   Any money judgment, writ or warrant of attachment, or similar process in excess of Five Hundred Thousand ($500,000) Dollars in the aggregate shall be entered or filed against the Company or any of its properties or other assets and shall remain unpaid, unvacated, unbonded or unstayed for a period of sixty (60) days or in any event later than five (5) days prior to the date of any proposed sale thereunder; or

ix.   Bankruptcy, reorganization, insolvency or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company and, if instituted against the Company, shall not be dismissed within sixty (60) days after such institution or the Company shall by any action or answer approve of, consent to, or acquiesce in any such proceedings or admit the material allegations of, or default in answering a petition filed in any such proceeding, or

x.   The Company shall fail to perform or observe, in any material respect, the terms and provisions of Section 4 (k) of the Bridge Loan Agreement and such failure shall continue uncured for a period of five (5) days after the Company's receipt of written notice thereof from the Holder.

(b)   If an Event of Default shall have occurred and is continuing, then, or at any time thereafter, and in each and every such case, unless such Event of Default shall have been cured or waived in writing by the Holder (which waiver shall not be deemed to be a waiver of any subsequent default), at the option of the Holder and in the Holder's sole discretion, the Holder may consider this Note immediately due and payable (and the Maturity Date shall be accelerated accordingly), without presentment, demand, protest or notice of any kinds, all of which are hereby expressly waived, anything herein or in any note or other instruments contained to the contrary notwithstanding, and the Holder may immediately enforce any and all of the Holder's rights and remedies provided herein or any other rights or remedies afforded by law, including, but not necessarily limited to, the equitable remedy of specific performance and injunctive relief.

14.   In the event for any reason, any payment by or act of the Company or the Holder shall result in payment of interest which would exceed the limit authorized by or be in violation of the law of the jurisdiction applicable to this Note, then *ipso facto* the obligation of the Company to pay interest or perform such act or requirement shall be reduced to the limit authorized under such law, so that in no event shall the Company be obligated to pay any such interest, perform any such act or be bound by any requirement which would result in the payment of interest in excess of the limit so authorized. In the event any payment by or act of the Company shall result in the extraction of a rate of interest in excess of a sum which is lawfully collectible as interest, then such amount (to the extent of such excess not returned to the Company) shall, without further agreement or notice

9-18-06

between or by the Company or the Holder, be deemed applied to the payment of principal, if any, hereunder immediately upon receipt of such excess funds by the Holder, with the same force and effect as though the Company had specifically designated such sums to be so applied to principal and the Holder had agreed to accept such sums as an interest-free prepayment of this Note. If any part of such excess remains after the principal has been paid in full, whether by the provisions of the preceding sentences of this Section or otherwise, such excess shall be deemed to be an interest-free loan from the Company to the Holder, which loan shall be payable immediately upon demand by the Company. The provisions of this Section shall control every other provision of this Note.

15.    (a)    This Note has not been registered under the Act, and has been issued to the Holder for investment and not with a view to distribution. Neither this Note nor any of the Conversion Shares or any other security issued or issuable upon conversion of this Note may be sold, transferred, pledged or hypothecated in the absence of an effective registration statement under the Act relating to such security or an opinion of counsel satisfactory to the Company that registration is not required under the Act. Each certificate for the Conversion Shares and any other security issued or issuable upon conversion of this Note shall contain a legend on the face thereof, in form and substance satisfactory to counsel for the Company, setting forth the restrictions on transfer contained in this Section.

(b)    Reference is made to the provisions of Section 4(h) of the Bridge Loan Agreement, the terms of which are incorporated herein by reference.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized.

Dated: September 18, 2006

                    BRILLIANT TECHNOLOGIES CORPORATION

                    By: _____

                    ALLAN KRETMSR
                    (Print Name)

                    PRESIDENT + CEO.
                    (Title)

6                                                                          9-15-06

EXHIBIT A

NOTICE OF CONVERSION

(To be Executed by the Registered Holder in order to Convert the Note)

The undersigned hereby irrevocably elects to convert $ _____ of the principal amount of the above Note  into shares of Common Stock of BRILLIANT TECHNOLOGIES CORPORATION (the "Company") according to the conditions hereof, as of the date written below.

Date of Conversion* _____

Accrued Interest     $_____

Applicable Conversion Price _____

Signature _____
                              [Name]

Address: _____

_____

7

9-18-06

september

## FORM OF WARRANT

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES OR AN OPINION OF COUNSEL OR OTHER EVIDENCE ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

## BRILLIANT TECHNOLOGIES CORPORATION

### COMMON STOCK PURCHASE WARRANT

1.   <u>Issuance</u>. In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by **BRILLIANT TECHNOLOGIES CORPORATION**, a Delaware corporation (the "Company"), ALPHA CAPITAL AG, or registered assigns (the "Holder") is hereby granted the right to purchase at any time, during the period (the "Exercise Period") on or after the Commencement Date (as defined below) until 5:00 P.M., New York City time, on September 17, 2011 (the "Expiration Date"), Ten Million Six Hundred Thousand   (10,600,000) fully paid and nonassessable shares of the Company's Common Stock, $0.001 par value per share (the "Common Stock"), at an initial exercise price per share (the "Exercise Price) of $.07 per share, subject to further adjustment as set forth herein. This Warrant is being issued pursuant to the terms of that certain Bridge Loan Agreement, dated as of September 18, 2006 (the "Agreement"), to which the Company and Holder (or Holder's predecessor in interest) are parties.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement.  This Warrant was originally issued to the Holder of the Holder's predecessor in interest on September 18, 2006 (the "Issue Date").

2.   <u>Exercise of Warrants</u>.

2.1   <u>General</u>.

(a)  This Warrant is exercisable in whole or in part at any time during the Exercise Period  Such exercise shall be effectuated by submitting to the Company (either by delivery to the Company or by facsimile transmission as provided in Section 8 hereof) a completed and duly executed Notice of Exercise (substantially in the form attached to this Warrant Certificate) as provided in the Notice of Exercise (or revised by notice given by the Company as contemplated by the Section headed "NOTICES" in the Agreement).  The date such Notice of Exercise is faxed to the Company shall be the "Exercise Date," provided that, if such exercise represents the full exercise of the outstanding balance of the Warrant, the Holder of this Warrant tenders this Warrant Certificate to the Company within five (5) Trading Days thereafter. The Notice of Exercise shall be executed by the Holder of this Warrant and shall indicate (i) the

1

9-18-06

EXHIBIT B

number of shares then being purchased pursuant to such exercise and (ii) if applicable (as provided below), whether the exercise is a cashless exercise.

(b) The provisions of this Section 2.1(b) shall only be applicable (i) on or after the first anniversary of the Issue Date, and (ii) if, and only if, on the Exercise Date there is no effective Registration Statement covering the resale of the Warrant Shares by the Holder (other than during a Permitted Suspension Period). If the Notice of Exercise form elects a "cashless" exercise, the Holder shall thereby be entitled to receive a number of shares of Common Stock equal to (w) the excess of the Current Market Value (as defined below) over the total cash exercise price of the portion of the Warrant then being exercised, divided by (x) the Market Price of the Common Stock as of the trading day immediately prior to the Exercise Date. For the purposes of this Warrant, the terms (y) "Current Market Value" shall mean an amount equal to the Market Price of the Common Stock as of the Trading Day immediately prior to the Exercise Date, multiplied by the number of shares of Common Stock specified in such Notice of Exercise Form, and (z) "Market Price of the Common Stock" shall mean the Closing Price (as defined below) of the Common Stock.

(c) If the Notice of Exercise form elects a "cash" exercise (or if the cashless exercise referred to in the immediately preceding paragraph (b) is not available in accordance with its terms), the Exercise Price per share of Common Stock for the shares then being exercised shall be payable, at the election of the Holder, in cash or by certified or official bank check or by wire transfer in accordance with instructions provided by the Company at the request of the Holder.

(e) Upon the appropriate payment, if any, of the Exercise Price for the shares of Common Stock purchased, together with the surrender of this Warrant Certificate (if required), the Holder shall be entitled to receive a certificate or certificates for the shares of Common Stock so purchased. The Company shall deliver such certificates representing the Warrant Shares in accordance with the instructions of the Holder as provided in the Notice of Exercise (the certificates delivered in such manner, the "Warrant Share Certificates") within three (3) Trading Days (such third Trading Day, a "Delivery Date") of (i) with respect to a "cashless exercise," the Exercise Date or, (ii) with respect to a "cash" exercise, the later of the Exercise Date or the date the payment of the Exercise Price for the relevant Warrant Shares is received by the Company.

(f) The Holder shall be deemed to be the holder of the shares issuable to it in accordance with the provisions of this Section 2.1 on the Exercise Date.

2.2     Limitation on Exercise. Notwithstanding the provisions of this Warrant, the Agreement or of the other Transaction Agreements, in no event (except (i) as specifically provided in this Warrant as an exception to this provision, (ii) during the forty-five (45) day period prior to the Expiration Date, or (iii) while there is outstanding a tender offer for any or all of the shares of the Company's Common Stock) shall the Holder be entitled to exercise this Warrant, or shall the Company have the obligation to issue shares upon such exercise of all or any portion of this Warrant to the extent that, after such exercise the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of

2                                                      9-18-06

Common Stock which may be deemed beneficially owned through the ownership of the unexercised portion of the Warrants or other rights to purchase Common Stock or through the ownership of the unconverted portion of convertible securities), and (2) the number of shares of Common Stock issuable upon the exercise of the Warrants with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock (after taking into account the shares to be issued to the Holder upon such exercise). For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), except as otherwise provided in clause (1) of such sentence. The Holder, by its acceptance of this Warrant, further agrees that if the Holder transfers or assigns any of the Warrants to a party who or which would not be considered such an affiliate, such assignment shall be made subject to the transferee's or assignee's specific agreement to be bound by the provisions of this Section 2.2 as if such transferee or assignee were the original Holder hereof.

       2.3    <u>Certain Definitions</u>. As used herein, each of the following terms has the meaning set forth below, unless the context otherwise requires:

       (a) "Commencement Date" means the Certificate of Incorporation Amendment Filing Date

       (b) "Closing Price" means the 4:00 P.M. closing bid price of the Common Stock on the Principal Trading Market on the relevant Trading Day(s), as reported by the Reporting Service for the relevant date.

       (c) "Reporting Service" means Bloomberg LP or if that service is not then reporting the relevant information regarding the Common Stock, a comparable reporting service of national reputation selected by a Majority in Interest of the Holders and reasonably acceptable to the Company.

       (d) "Majority in Interest of the Holders" means, as of the relevant date, one or more Holders whose respective outstanding principal amounts of the Notes held by each of them, as of such date, aggregate more than fifty percent (50%) of the aggregate outstanding principal amounts of the outstanding Notes held by all Holders on that date.

       3.    <u>Reservation of Shares</u>. The Company hereby agrees that at all times during the Exercise Period there shall be reserved for issuance upon exercise of this Warrant one hundred percent (100%) of the number of shares of its Common Stock as shall be required for issuance of the Warrant Shares for the then unexercised portion of this Warrant. For the purposes of such calculations, the Company should assume that the outstanding portion of this Warrants were exercisable in full at any time, without regard to any restrictions which might limit the Holder's right to exercise any portion of this Warrant held by the Holder.

       4.    <u>Mutilation or Loss of Warrant</u>. Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and (in the case of loss, theft or destruction) receipt of reasonably satisfactory indemnification, and (in the case of

3

mutilation) upon surrender and cancellation of this Warrant, the Company will execute and deliver a new Warrant of like tenor and date and any such lost, stolen, destroyed or mutilated Warrant shall thereupon become void.

5.    Rights of the Holder. The Holder shall not, by virtue hereof, be entitled to any rights of a stockholder in the Company, either at law or equity, and the rights of the Holder are limited to those expressed in this Warrant and are not enforceable against the Company except to the extent set forth herein.

6.    Protection Against Dilution and Other Adjustments.

6.1    Adjustment Mechanism. If an adjustment of the Exercise Price is required pursuant to this Section 6 (other than pursuant to Section 6.4), the Holder shall be entitled to purchase such number of shares of Common Stock as will cause (i) (x) the total number of shares of Common Stock Holder is entitled to purchase pursuant to this Warrant following such adjustment, multiplied by (y) the adjusted Exercise Price per share, to equal the result of (ii) (x) the dollar amount of the total number of shares of Common Stock Holder is entitled to purchase before adjustment, multiplied by (y) the total Exercise Price before adjustment.[1]

6.2    Capital Adjustments. In case of any stock split or reverse stock split, stock dividend, reclassification of the Common Stock or recapitalization, the provisions of this Section 6 shall be applied as if such capital adjustment event had occurred immediately prior to the date of this Warrant and the original Exercise Price had been fairly allocated to the stock resulting from such capital adjustment; and in other respects the provisions of this Section shall be applied in a fair, equitable and reasonable manner so as to give effect, as nearly as may be, to the purposes hereof. A rights offering to stockholders shall be deemed a stock dividend to the extent of the bargain purchase element of the rights. If, for as long as this Warrant remains outstanding, the Company enters into a merger (other than where the Company is the surviving entity) or consolidation with another corporation or other entity (collectively, a "Sale"), and the holders of the Common Stock are entitled to receive stock, securities or property in respect of or in exchange for Common Stock, then as a condition of such Sale, the Company and any such successor or transferee will agree that this Warrant may thereafter be converted on the terms and subject to the conditions set forth above into the kind and amount of stock, securities or property receivable upon such merger or consolidation by a holder of the number of shares of Common Stock into which this Warrant might have been converted immediately before such merger or consolidation, subject to adjustments which shall be as nearly equivalent as may be practicable.

6.3    Adjustment for Spin Off. If, for any reason, prior to the exercise of this Warrant in full, the Company spins off or otherwise divests itself of a part of its business or

---

[1] Example: Assume 10,000 shares remain under Warrant at original stated Exercise Price of US$0.07. Total exercise price (clause (y) in text) is (i) 10,000 x (ii) US$0.07, or US$700. Company effects 2:1 stock split. Exercise Price is adjusted to US$0.035. Number of shares covered by Warrant is adjusted to 20,000, because (applying clause (x) in text) (i) 20,000 x (ii) US$0.035 = US$700.

9-18-06

operations or disposes all or of a part of its assets in a transaction (the "Spin Off") in which the Company does not receive compensation for such business, operations or assets, but causes securities of another entity (the "Spin Off Securities") to be issued to security holders of the Company, then the Company shall cause (i) to be reserved Spin Off Securities equal to the number thereof which would have been issued to the Holder had all of the Holder's unexercised Warrants outstanding on the record date (the "Record Date") for determining the amount and number of Spin Off Securities to be issued to security holders of the Company (the "Outstanding Warrants") been exercised as of the close of business on the Trading Day immediately before the Record Date (the "Reserved Spin Off Shares"), and (ii) to be issued to the Holder on the exercise of all or any of the Outstanding Warrants, such amount of the Reserved Spin Off Shares equal to (x) the Reserved Spin Off Shares, multiplied by (y) a fraction, of which (I) the numerator is the amount of the Outstanding Warrants then being exercised, and (II) the denominator is the amount of the Outstanding Warrants.

6.4    Adjustment for Certain Transactions.  Reference is made to the provisions of Appendix A to this Warrant, the terms of which are incorporated herein by reference. The Exercise Price shall be adjusted as provided in the applicable provisions of said Appendix A.

7.    Transfer to Comply with the Securities Act; Registration Rights.

7.1    Transfer.  This Warrant has not been registered under the Securities Act of 1933, as amended, (the "Act") and has been issued to the Holder for investment and not with a view to the distribution of either the Warrant or the Warrant Shares. Neither this Warrant nor any of the Warrant Shares or any other security issued or issuable upon exercise of this Warrant may be sold, transferred, pledged or hypothecated in the absence of an effective registration statement under the Act relating to such security or an opinion of counsel satisfactory to the Company that registration is not required under the Act. Each certificate for the Warrant, the Warrant Shares and any other security issued or issuable upon exercise of this Warrant shall contain a legend on the face thereof, in form and substance satisfactory to counsel for the Company, setting forth the restrictions on transfer contained in this Section.

7.2    Registration Rights.  Reference is made to the provisions of Section 4(h) of the Agreement, the terms of which are incorporated herein by reference.

8.    Notices.  Any notice required or permitted hereunder shall be given in manner provided in the Section headed "NOTICES" in the Agreement, the terms of which are incorporated herein by reference.

9.    Supplements and Amendments; Whole Agreement.  This Warrant may be amended or supplemented only by an instrument in writing signed by the Company and the Holder. This Warrant contains the full understanding of the Company and, by its acceptance of this Note, the Holder with respect to the subject matter hereof and thereof and there are no representations, warranties, agreements or understandings other than expressly contained herein and therein.

9-18-06

10. <u>Governing Law</u>. This Warrant shall be deemed to be a contract made under the laws of the State of New York for contracts to be wholly performed in such state and without giving effect to the principles thereof regarding the conflict of laws. Each of the Company and, by its acceptance of this Note, the Holder consents to the jurisdiction of the federal courts whose districts encompass any part of the County of New York or the state courts of the State of New York sitting in the County of New York in connection with any dispute arising under this Warrant and hereby waives, to the maximum extent permitted by law, any objection, including any objection based on *forum non conveniens*, to the bringing of any such proceeding in such jurisdictions. To the extent determined by such court, the Company shall reimburse the Holder for any reasonable legal fees and disbursements incurred by the Holder in enforcement of or protection of any of its rights under any of the Transaction Agreements.

11. <u>JURY TRIAL WAIVER</u>. The Company and, by its acceptance of this Note, the Holder hereby waive a trial by jury in any action, proceeding or counterclaim brought by either of them against the other in respect of any matter arising out or in connection with this Warrant.

12. <u>Remedies</u>. The Company stipulates that the remedies at law of the Holder of this Warrant in the event of any default or threatened default by the Company in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

9-18-06

13.    <u>Descriptive Headings</u>. Descriptive headings of the several Sections of this Warrant are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Warrant as of the 18th day of September, 2006.

BRILLIANT TECHNOLOGIES CORPORATION

By: _____

_____
(Print Name)

_____
(Title)

7                                              9-15-06

APPENDIX A
TO
COMMON STOCK PURCHASE WARRANT
OF
BRILLIANT TECHNOLOGIES CORPORATION

1.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement or in the Warrant.

2.    (a)    The term "Lower Price Transaction" means a New Transaction offered or consummated during the New Transaction Period (as defined below), where the lowest fixed exercise price (but not including any such exercise price based on a percentage of the market price of the Common Stock) of any New Transaction Warrants (as defined below) is, or by its terms or by an existing understanding of the Company and the New Investor, could subsequently be adjusted or revised to be, lower than the then effective Exercise Price of the Warrants (such Exercise Price, in each case, subject to adjustment in the same manner as the initial Exercise Price of the Warrant is adjusted, other than as a result of the application of this Appendix A) (and, if no minimum exercise price is set, it shall be assumed that such minimum exercise price is $.01).

      (b)    The term "New Transaction Warrants" means any warrant, option or other right (howsoever denominated) issued to the New Investor in the New Transaction to purchase shares of Common Stock.

      (c)    The term "New Transaction Period" means the period commencing on the Issue Date and continuing until the earlier of (i) the Expiration Date or (ii) the date on which this Warrant has been fully exercised.

3.    The Company covenants and agrees that, if there is a Lower Price Transaction during the New Transaction Period, then the Exercise Price on the unexercised portion of this Warrant shall be adjusted to equal the lowest Exercise Price applicable to the Lower Price Transaction.

8

9-18-06

NOTICE OF EXERCISE OF WARRANT

TO:    Brilliant Technologies Corporation          VIA TELECOPIER TO:
       211 Madison Avenue                           (212) 532-2904
       New York, New York
       Attn: President

The undersigned hereby irrevocably elects to exercise the right, represented by the Warrant Certificate, dated as of _____, 20___ , to purchase _____ shares of the Common Stock, $0.001 par value ("Common Stock"), of **BRILLIANT TECHNOLOGIES CORPORATION** and tenders herewith payment in accordance with Section 2 of said Common Stock Purchase Warrant, as follows:

___    CASH:$ _____ = (Exercise Price x Exercise Shares)

          Payment is being made by:

              ___    enclosed check

              ___    wire transfer

              ___    other

___    CASHLESS EXERCISE [if available pursuant to Section 2.1(b)]:

          Net number of Warrant Shares to be issued to Holder : _____ *

      * based on:    Current Market Value - (Exercise Price x Exercise Shares)
                             Market Price of Common Stock
      where:
      Market Price of Common Stock ["MP"]          =    $ _____
      Current Market Value [MP x Exercise Shares]    =    $ _____

It is the intention of the Holder to comply with the provisions of Section 2.2 of the Warrant regarding certain limits on the Holder's right to exercise thereunder. Based on the analysis on the attached Worksheet Schedule, the Holder believes this exercise complies with the provisions of said Section 2.2. Nonetheless, to the extent that, pursuant to the exercise effected hereby, the Holder would have more shares than permitted under said Section, this notice should be amended and revised, ab initio, to refer to the exercise which would result in the issuance of shares consistent with such provision. Any exercise above such amount is hereby deemed void and revoked.

As contemplated by the Warrant and the Bridge Loan Agreement, this Notice of Conversion is being sent by facsimile to the telecopier number and officer indicated above.

9                                                         9-18-06

If this Notice of Exercise represents the full exercise of the outstanding balance of the Warrant, the Holder either (1) has previously surrendered the Warrant to the Company or (2) will surrender (or cause to be surrendered) the Warrant to the Company at the address indicated above by express courier within five (5) Trading Days after delivery or facsimile transmission of this Notice of Exercise.

The certificates representing the Warrant Shares should be transmitted by the Company to the Holder

via express courier, or

by electronic transfer

after receipt of this Notice of Exercise (by facsimile transmission or otherwise) to:

_____

_____

_____

Dated: _____

_____
[Name of Holder]

By: _____

10

9-18-06

## NOTICE OF EXERCISE OF WARRANT
## WORKSHEET SCHEDULE

1. Current Common Stock holdings of Holder and Affiliates    _____
2. Shares to be issued on current exercise    _____
3. Other shares to be issued on other current exercise(s) and
       other current conversion(s)[2]    _____
4. Other shares eligible to be acquired within next 60 days
       without restriction    _____
5. Total [sum of Lines 1 through 4]
   _____


6. Outstanding shares of Common Stock[3]
   _____

7. Adjustments to Outstanding
       a. Shares known to Holder as previously issued
          to Holder or others but not included in Line 6    _____
       b. Shares to be issued per Line(s) 2 and 3    _____
       c. Total Adjustments [Lines 7a and 7b]
   _____

8. Total Adjusted Outstanding [Lines 6 plus 7c]
   _____


9. Holder's Percentage [Line 5 divided by Line 8]
   _____%
[Note: Line 9 not to be above 4.99%]

---

[2]  Includes shares issuable on conversion of convertible securities (including assumed payment, if relevant, of interest or dividends) or exercise of other rights, including other warrants or options

[3]  Based on latest SEC filing by Company or information provided by executive officer of Company, counsel to Company or transfer agent

9-18-06

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 ELochNFOJPTy/AO8aKcR1a1GWVDpj3E/2XV9DE4kFA167NJbIAmZ7A98YcZan8qn
 fmYIeifKJugs8eZADksSWQ==

<SEC-DOCUMENT>0001019687-07-001581.txt : 20070521
<SEC-HEADER>0001019687-07-001581.hdr.sgml : 20070521
<ACCEPTANCE-DATETIME>20070521170836
ACCESSION NUMBER:               0001019687-07-001581
CONFORMED SUBMISSION TYPE:      10QSB
PUBLIC DOCUMENT COUNT:          3
CONFORMED PERIOD OF REPORT:     20070331
FILED AS OF DATE:               20070521
DATE AS OF CHANGE:              20070521

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           Brilliant Technologies, CORP
                CENTRAL INDEX KEY:                0001054825
                STANDARD INDUSTRIAL CLASSIFICATION:   INVESTORS, NEC [6799]
                IRS NUMBER:                       134000208
                FISCAL YEAR END:                  1231

        FILING VALUES:
                FORM TYPE:            10QSB
                SEC ACT:             1934 Act
                SEC FILE NUMBER:     000-23761
                FILM NUMBER:         07868623

        BUSINESS ADDRESS:
                STREET 1:            211 MADISON AVE #28B
                CITY:                NEW YORK
                STATE:               NY
                ZIP:                 10016
                BUSINESS PHONE:      212-532-2736

        MAIL ADDRESS:
                STREET 1:            211 MADISON AVE #28B
                CITY:                NEW YORK
                STATE:               NY
                ZIP:                 10016

        FORMER COMPANY:
                FORMER CONFORMED NAME:  ADVANCED TECHNOLOGY INDUSTRIES INC
                DATE OF NAME CHANGE:    20000515

        FORMER COMPANY:
                FORMER CONFORMED NAME:  KURCHATOV RESEARCH HOLDINGS LTD /DE/
                DATE OF NAME CHANGE:    20000114

        FORMER COMPANY:
                FORMER CONFORMED NAME:  ABERDEEN ACQUISITION CORP /DE/
                DATE OF NAME CHANGE:    19980206
</SEC-HEADER>
```

```
<DOCUMENT>
<TYPE>10QSB
<SEQUENCE>1
<FILENAME>brilliant_10qsb-033107.txt
<DESCRIPTION>QUARTERLY REPORT
<TEXT>
<PAGE>
```

                          UNITED STATES
                SECURITIES AND EXCHANGE COMMISSION
                     WASHINGTON, D.C. 20549

                          FORM 10-QSB

                          (Mark One)

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
                    EXCHANGE ACT OF 1934.

              For the quarterly period ended March 31, 2007

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
                    EXCHANGE ACT OF 1934.

          For the transition period from _____ to _____

                  COMMISSION FILE NUMBER 0-230761


                  BRILLIANT TECHNOLOGIES CORPORATION
                  ----------------------------------
            (Exact name of small business issuer as specified in its charter)


     District of Delaware                          13-4000208
     --------------------                          ----------
(State or other jurisdiction of                 (I.R.S. Employer
 incorporation or organization)                 Identification No.)


                     211 Madison Avenue #28B
                     New York, New York 10116
                     ------------------------
                 (Address of principal executive offices)

                          212-532-2736
                          ------------
                    (Issuer's telephone number)

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or
for such shorter period that the registrant was required to file such reports),
and (2) has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ]

Indicate by check mark whether the registrant is a shell company (as defined in
Rule 12b-2 of the Exchange Act)
Yes [ ] No [X]

The number of outstanding shares of the issuer's only class of common stock as
of May 16, 2007 was 657,317,311.

TRANSITIONAL SMALL BUSINESS DISCLOSURE FORMAT (CHECK ONE):
Yes [ ] No [X]

<PAGE>
<TABLE>
<S>                                                                            <C>
                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                            (A Development Stage Company)

                               INDEX TO FORM 10-QSB
                                 March 31, 2007

                                                                          Page N
                                                                          ------

PART I - FINANCIAL INFORMATION

ITEM 1 - FINANCIAL STATEMENTS

    CONDENSED CONSOLIDATED BALANCE SHEET (unaudited)
      At March 31, 2007

    CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (unaudited)
      For the Three Months Ended March 31, 2007 and 2006 and
      For the Period from Inception (October 31, 1999) to March 31, 2007

    CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY (unaudited)
      For the Three Months Ended March 31, 2007

    CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (unaudited)
      For the Three Months Ended March 31, 2007 and 2006 and
      For the Period from Inception (October 31, 1999) to
        March 31, 2007

    NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (unaudited)

ITEM 2 - PLAN OF OPERATION

ITEM 3 - CONTROL AND PROCEDURES

PART II - OTHER INFORMATION

ITEM 1 - LEGAL PROCEEDINGS

ITEM 2 - UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

ITEM 3 - DEFAULTS UPON SENIOR SECURITIES

ITEM 4 - SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

ITEM 5 - OTHER INFORMATION

ITEM 6 - EXHIBITS


                                        1
<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES

(A Development Stage Company)

CONDENSED CONSOLIDATED BALANCE SHEET

At March 31, 2007
(unaudited)

ASSETS
------

| | |
|---|---:|
| **Current Assets:** | |
| Cash | $ 339,947 |
| Prepaid expenses and other current assets | 257,677 |
| | ------------- |
| Total Current Assets | 597,624 |
| Property and equipment, net | 63,638 |
| Deferred licenses and other fees, net | 1,068,470 |
| Deferred financing costs, net | 18,293 |
| Capitalized software | 851,728 |
| Other assets | 13,205 |
| | ------------- |
| TOTAL ASSETS | $ 2,612,958 |
| | ============= |

LIABILITIES AND STOCKHOLDERS' DEFICIENCY
----------------------------------------

| | |
|---|---:|
| **CURRENT LIABILITIES:** | |
| Notes payable, including related parties of $27,468 | $ 4,073,446 |
| Convertible debentures, net of debt discount of $39,518 | 1,720,482 |
| Accrued liabilities | 7,025,325 |
| Accrued minimum royalties | 1,150,667 |
| Due to related parties | 1,574,528 |
| Derivative liabilities for conversion options and warrants | 6,651,705 |
| | ------------- |
| TOTAL LIABILITIES | 22,196,153 |
| | ------------- |

COMMITMENTS AND CONTINGENCIES

| | |
|---|---:|
| **STOCKHOLDERS' DEFICIENCY:** | |
| Preferred stock - $.001 par value; 1,000,000 shares authorized; | |
| - 0 - shares issued and outstanding | -- |
| Common stock - $.0001 par value; 800,000,000 shares authorized; | |
| 640,844,081 issued and outstanding | 64,083 |
| Additional paid-in capital | 32,817,194 |
| Accumulated other comprehensive income | (26,866) |
| Deficit accumulated during the development stage | (52,437,606) |
| | ------------- |

```
TOTAL STOCKHOLDERS' DEFICIENCY                          (19,583,195)
                                                       -------------

TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY         $  2,612,958
                                                       =============
```

See Notes To Condensed Consolidated Financial Statements.

F-1

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2007 | 2006 |
| REVENUE | $        -- | $        -- |
| OPERATING COSTS: | | |
| Research and development | 378,326 | 166,476 |
| In-process research and development | -- | -- |
| Consulting fees | 298,805 | 390,792 |
| General and administrative, including compensatory element of stock issuances of $154,333 and $1,069,398 for the three months ended March 31, 2007 and 2006, respectively | 887,708 | 1,566,436 |
| Depreciation and amortization | 8,146 | 7,573 |
| Settlement provision | -- | - |
| TOTAL OPERATING COSTS | 1,572,985 | 2,131,277 |
| LOSS FROM OPERATIONS | (1,572,985) | (2,131,277) |
| Derivative gains, net | (3,476,925) | (8,919,806) |
| Interest and amortization of debt costs and stock issuances for interest of $500,000 and $1,492,768 for the three months ended March 31, 2007 and 2006, respectively | 3,170,627 | 2,263,268 |
| Other (income) expense | (10,751) | (12,515) |
| NET (LOSS) INCOME | $  (1,255,936) | $  4,537,776 |

| | | | |
|---|---|---|---|
| Basic net (loss) income per common share | $ (0.00) | $ 0.02 |
| | ============== | ============== |
| Diluted net (loss) income per common share | $ (0.00) | $ 0.01 |
| | ============== | ============== |
| Weighted average number of shares outstanding - Basic | 626,467,966 | 280,693,220 |
| | ============== | ============== |
| Weighted average number of shares outstanding - Diluted | 626,467,966 | 446,802,925 |
| | ============== | ============== |

See Notes To Condensed Consolidated Financial Statements.

F-2

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBS
(A Development Stage Company)

CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDER

For the three months ended March 31, 2

| | Common Stock | | Additional Paid In Capital | Unearned Compensation | Accumulat Other Comprehens Income (Lo |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance at January 1, 2007 | 625,849,751 | $ 62,584 | $ 32,146,193 | $ (154,333) | $ 40,4 |
| Conversion of accrued liability into stock | 750,000 | 75 | 36,925 | – | |
| Conversion of convertible debenture and interest | 4,244,330 | 424 | 74,576 | – | |
| Issuance of common stock in connection with financing | 10,000,000 | 1,000 | 499,000 | – | |
| Conversion of note | – | – | – | – | |
| Reclassification of Debenture Options From Derivative liabilities | | $ | 60,500 | | |
| Amortization of Unearned Compensation | | | | $ 154,333 | |
| COMPREHENSIVE INCOME: | | | | | |
| NET LOSS | | | | | |

```
FOREIGN CURRENCY
  TRANSLATION ADJUSTMENT                                              $    (67,3
COMPREHENSIVE INCOME:                                                -
                            ------------ -------- ------------ ------------ ----------
                            640,844,081   64,083   32,817,194        -       (26,8
                            ============ ======== ============ ============ ==========
```

See notes to condensed consolidated financial statements.

                                    F-3

<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                              (A Development Stage Company)

                        CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
                                        (Unaudited)

|  | For the Three Months End March 31, | |
|---|---|---|
|  | 2007 | 2006 |
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |  |
| Net (loss) income | $ (1,255,936) | $ 4,537 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: |  |  |
| Acquired in process technology | -- |  |
| Gain on derivative liabilities | (3,476,925) | (8,919 |
| Stock-based costs | 154,333 | 2,562 |
| Accrued settlement provision | -- |  |
| Amortization of license | 258,030 |  |
| Depreciation and amortization | 8,146 | 7 |
| Loss on sale of investment | -- |  |
| Non-cash charges for finance and consulting | 500,000 | 76 |
| Amortization of deferred financing costs | 29,315 |  |
| Write-off of fixed assets | -- |  |
| Debt discount amortization | 2,306,280 | 417 |
| Changes in Operating Assets and Liabilities: |  |  |
| Prepaid expenses and other current assets | (141,032) | 7 |
| Other assets | (-) |  |
| Accrued liabilities | 288,741 | 332 |
| Net Cash Used in Operating Activities | (1,329,048) | (978 |
| CASH FLOWS FROM INVESTING ACTIVITIES: |  |  |
| Proceeds from sale of ATI stock prior to merger | -- |  |
| Capitalized software costs | -- |  |
| Advances to ATI prior to merger | -- |  |
| Proceeds of sale of investments | -- |  |

```
    Capital expenditures                              (-)
                                            --------------    ---------

          Net Cash Used in Investing Activities       (-)
                                            --------------    ---------

CASH FLOWS FROM FINANCING ACTIVITIES:

  Proceeds from issuance of common stock             --
  Capitalized financing costs                        --          (22
  Exercise of warrants                               --          368
  Proceeds from loans (net)                    1,305,000        750
  Repayment of loans                            (106,500)
  Due from (to) related parties, net              383,568       (106
                                            --------------    ---------

          Net Cash Provided by Financing Activities  1,582,068    989
                                            --------------    ---------

Increase (Decrease) in Cash                     253,020          11

Cash - Beginning of Period                       86,927          44
                                            --------------    ---------

Cash - End of Period                      $     339,947    $      55
                                            ==============    =========
```

See Notes To Condensed Consolidated Financial Statements.

                                  F-4

<PAGE>

                BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                       (A Development Stage Company)

                CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
                                (Unaudited)

|                                          |     | For the Three Months End |       |
|                                          |     | March 31,                |       |
|                                          |     | 2007          |          | 2006  |
| Interest paid                            | $   | --            | $        |       |
| Income taxes paid                        | $   | --            | $        |       |
| Non-Cash Investing and Financing Transactions: |  |          |          |       |
| Conversion of debt and related interest  | $   | 75,000        | $        | 1,303 |
| Exercise of warrants satisfied by reduction in related party | $ | -- | $ |  |
| Conversion of advances to affiliate      | $   | --            | $        |       |

| | | | | |
|---|---|---|---|---|
| Conversion of accrued liabilities | $ | 37,000 | $ | |
| Reclassification of derivative liability | $ | 60,501 | $ | 114 |
| Offering costs satisfied by transfer of ATI stock | $ | -- | $ | |
| Deferred license fee and related liability | $ | -- | $ | |

See Notes To Condensed Consolidated Financial Statements.

F-5

</TABLE>

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION

REVERSE MERGER

On December 15, 2004 (the "Closing Date"), Brilliant Technologies Corporation
("BLLN") (formerly Advanced Technology Industries, Inc. ("ATI")) consummated the
acquisition of all of the issued and outstanding shares of capital stock of
LTDnetwork, Inc., a Delaware corporation ("LTDN"). LTDN and BLLN collectively
are referred to herein as "the Company".

LTDN and its wholly-owned Australian subsidiary, LTD network PTY LTD ("LTD
PTY"), are development stage companies and their efforts have been primarily
devoted to technology identification and acquisition, research and development
and raising capital. LTDN and LTD PTY specialize in the development of
innovative technologies, software and services for online e-tailers,
advertising, media and marketing companies.

The acquisition was consummated pursuant to the Amended and Restated Agreement
and Plan of Merger, dated as of August 11, 2004, among BLLN, LTDN and LTDN
Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of BLLN
("Acquisition Sub"), as amended by the First Amendment thereto, dated as of
December 15, 2004, among BLLN, LTDN and Acquisition Sub. Such acquisition was
effected pursuant to a merger (the "Merger") of LTDN with and into Acquisition
Sub. Pursuant to the terms of the Merger and taking into account the purchase
price adjustment in connection therewith, BLLN issued to the stockholders of
LTDN consideration (the "Merger Consideration") consisting of (i) 193,336 shares
of Series A Convertible Preferred Stock of BLLN ("Series A Preferred Stock") and
(ii) warrants (the "Warrants") to purchase 487,903 shares of Series A Preferred
Stock at an exercise price of $16.33 per share. The exercise period with respect
to the Warrants expired on June 18, 2006. The board of directors determined to
extend the exercise period of the Warrants subject to the Company having a
sufficient number of authorized shares of common stock of the Company ("Common
Stock") available to be issued upon the exercise of the Warrants. As a result,
the definition of "Exercise Period" in the Warrant Agreement relating to the
Warrants has been amended as follows:

"Exercise Period" means the period commencing on the date the Merger is
consummated and terminating on June 18, 2006 and the period commencing on the
date (the "Second Commencement Date") LTDN files with the Delaware Secretary of
State an amendment to BLLN's Certificate of Incorporation to increase the

authorized capital stock of BLLN in an amount equal to the greater of (x) 1,300,000,000 shares of Common Stock and (y) 120% of the sum of (A) the outstanding number of shares of Common Stock on the Second Commencement Date, (B) with respect to securities of LTDN that are convertible or exercisable into shares of Common Stock (including the Warrants), the number of shares of Common Stock that are issuable upon the conversion or exercise of such securities on the Second Commencement Date and (C) without duplication of securities referenced in clause (B) above, the number of shares of Common Stock that LTDN is obligated to issue pursuant to any binding obligation of LTDN in effect as of the Second Commencement Date and terminating (i) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 60th day following the Second Commencement Date, (ii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 90th day following the Second Commencement Date,(iii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 120th day following the Second Commencement Date and (iv) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 150th day following the Second Commencement Date; provided that if the Second Commencement Date does not occur prior to December 31, 2006, the Exercise Period shall terminate on December 31, 2006, as amended. As of April 15, 2007, BLLN has not filed such an amendment to its Certificate of Incorporation.

                                    F-6

<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                            (A Development Stage Company)

                    NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                    (unaudited)


NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

REVERSE MERGER (CONTINUED)

The terms of the Series A Preferred Stock provided that each share of Series A Preferred Stock would automatically convert into 400 shares of Common Stock when the holders of the Common Stock approved an amendment to the certificate of incorporation of the Company to increase the authorized capital stock from 100,000,000 shares to at least 500,000,000 shares. The holders of the Common Stock approved such amendment at the Company's annual meeting of stockholders held on September 26, 2005 to increase the number of authorized shares of Common Stock to 800,000,000 and the Company filed such amendment with the Secretary of State of the State of Delaware on September 27, 2005. As a result, all shares of the Series A Preferred Stock were converted into shares of Common Stock and the corresponding Warrants became Warrants to purchase shares of Common Stock at approximately $0.04 per share.

BLLN agreed to file a registration statement with the Securities and Exchange Commission ("SEC") relating to the resale of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock issued in the Merger. The Company has filed such registration statement and it became effective on January 26, 2006. The Company has agreed to keep such registration statement effective until the earliest of (a) the sale of all securities eligible to be sold thereunder, (b) the expiration of the period referred to in Rule 144(k) under the Securities Act of 1933 and (c) two years from the effective date of such registration statement. The use of such registration statement has been suspended by the Company until it files a post-effective amendment thereto

updating certain information contained therein.

Since immediately following the Merger the former stockholders of LTDN owned a majority of the Common Stock (assuming the conversion of all the shares of the Series A Preferred Stock and the exercise of all the Warrants, in each case issued to such stockholders) and the management of LTDN controlled the Board of Directors of the Company, the Merger has been accounted for as a reverse merger with LTDN as the acquirer of BLLN. The accompanying consolidated financial statements of the Company reflect the historical results of LTDN, and the consolidated results of operations of BLLN subsequent to the Closing Date.

The common stock of LTDN has been retroactively restated to reflect the recapitalization and merger transactions discussed above.

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America for interim financial information. Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary to make the financial statements not misleading have been included. Operating results for the three period ended March 31, 2007, is not necessarily indicative of the results that may be expected for the year ending December 31, 2007.

For further information, refer to the consolidated financial statements and footnotes included in the Company's Form 10-KSB filed April 25, 2007 for the year ended December 31, 2006.

F-7

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

GOING CONCERN AND MANAGEMENT'S PLAN

The accompanying unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate the continuation of the Company as a going concern. As shown in the accompanying unaudited condensed consolidated financial statements, the Company has incurred losses from operations since inception. Management anticipates incurring substantial additional losses in 2007. Further, the Company may incur additional losses thereafter, depending on its ability to generate revenues from the licensing or sale of its technologies and products, or to enter into any or a sufficient number of joint ventures. The Company has no significant revenue to date. There is no assurance that the Company can successfully commercialize any of its technologies and products and realize any revenues there from. The Company's technologies and products have never been utilized on a large-scale commercial basis and there is no assurance that any of its technologies or products will receive market acceptance. There is no assurance that the Company can continue to identify and acquire new technologies. These factors raise substantial doubt about the Company's ability

to continue as a going concern. As of March 31, 2007, the Company had an accumulated deficit since inception of $52,437,606 and a working capital deficiency and stockholder's deficiency of $21,598,529 and $19,583,195 respectively.

While no assurance can be given, management believes the Company can raise adequate capital to keep the Company functioning during 2007. During the quarter ended March 31, 2007 the Company received proceeds from Bridge notes of $1,305,000. No assurance can be given that the Company can obtain additional working capital, or if obtained, that such funding will not cause substantial dilution to stockholders of the Company. If the Company is unable to raise additional funds, it may be forced to change or delay its contemplated marketing and business plans. During the year ended December 31, 2006, the Company has raised from various financing sources approximately $6,680,000 through the issuance of common stock, convertible debt, Bridge notes and exercise of warrants (Notes 6 and 7). The Company has been late filing three of its periodic filings with the Securities and Exchange Commission and accordingly the Company is not eligible for quotation on the Over the Counter Bulletin Board. (See Note 7)

The Company's principal business activity consists of the development of a technology referred to as Qtrax. Qtrax is a music file sharing technology-based internet service, which when available will provide consumers the ability at no charge to download music files. This free service will allow a consumer to play the ad-supported music files only on the computer such consumer uses to download such music files as well as a portable device with DRM rules attached to the service. It is the intention that QTrax will also operate as an online music store where a consumer can purchase music files as a permanent download so that the consumer can play such music files on any device that plays MP3 files. In addition, LTDN and Brilliant Technologies will be able to offer online e-tailers, advertising, media and marketing companies the ability to provide highly targeted advertising, promotional and other marketing information to consumers who may have a strong interest in such advertisers' products.

To date, the Company has entered into license agreements with Major Labels and Publishers for use of their catalogues and publishing rights. These include EMI Music & EMI Publishing, TVT Records, SonyATV Publishing, SonyBMG, Warner Music Group, Universal Music Publishing. The Company has also entered into license agreements with several independent record labels for use of their catalogues.

To date, Qtrax has not been launched and additional development activities and various collaborative agreements need to be completed. There is no assurance that the development activities and agreements can be successfully completed and, if so, there is no assurance that Qtrax will be commercially successful.

Being a development stage company, the Company is subject to all the risks inherent in the establishment of a new enterprise and the marketing and manufacturing of a new product, many of which risks are beyond the control of the Company. All of the factors discussed above raise substantial doubt about the Company's ability to continue as a going concern.

These condensed consolidated financial statements do not include any adjustments relating to the recoverability of recorded asset amounts that might be necessary as a result of the above uncertainty.

F-8

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES

(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

PRINCIPLES OF CONSOLIDATION

The unaudited condensed consolidated financial statements include the accounts of LTDN and its subsidiaries and Brilliant and all of its wholly-owned and its majority-owned subsidiaries commencing with the Closing Date. All significant intercompany accounts and transactions have been eliminated in consolidation. Investments in unconsolidated affiliates are accounted for using the equity method when the Company owns at least 20%, but no more than 50% of such affiliates and under the cost method when the Company owns less than 20%. Under the equity method, the Company records its proportionate shares of profits and losses based on its percentage interest in earnings.

USE OF ESTIMATES

The preparation of financial statements, in conformity with accounting principles generally accepted in the United States of America, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

EQUITY METHOD OF ACCOUNTING FOR UNCONSOLIDATED AFFILIATES

At March 31, 2007, investments in companies accounted for under the equity method consist of the following inactive foreign development-stage technology companies:

|  | % Owned | Country of Operations |
|---|---|---|
| Flexitech,Ltd | 20.00% | Israel |
| Pirocat,Ltd. | 20.00% | Israel |
| Sibconvers | 50.00% | Russia |
| Container Engineering, Ltd | 50.00% | Russia |

The Company does not have sufficient control over management, the board of directors or financial matters and accordingly the Company does not consolidate such entities. The above companies do not have any revenue nor any significant assets, liabilities, commitments and contingencies. The Company's carrying values in these equity-method investments is zero as of March 31, 2007.

F-9

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

IMPAIRMENT OF LONG-LIVED ASSETS

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal On Long-Lived Assets," the Company reviews the carrying amount of long-lived assets on a regular basis for the existence of facts or circumstances, both internally and externally, that suggest impairment. The Company determines if the carrying amount of a long-lived asset is impaired based on anticipated undiscounted cash flows before interest from the use of the asset. In the event of impairment, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the asset. Fair value is determined based on appraised value of the assets or the anticipated cash flows from the use of the asset, discounted at a rate commensurate with the risk involved.

INCOME TAXES

Effective January 1, 2007, the company adopted the provisions of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes-an interpretation of FASB Statement No. 109" ("FIN48"). FIN 48 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. Differences between tax positions taken or expected to be taken in a tax return and the benefit recognized and measured pursuant to the interpretation are referred to as "unrecognized benefits". A liability is recognized (or amount of net operating loss carry forward or amount of tax refundable is reduced) for an unrecognized tax benefit because it represents an enterprise's potential future obligation to the taxing authority for a tax position that was not recognized as a result of applying the provisions of FIN 48.

In accordance with FIN 48, interest costs related to unrecognized tax benefits are required to be calculated (if applicable) and would be classified as "Interest Expense, net" in the consolidated statements of operations. Penalties would be recognized as a component of "General and administrative expenses".

The Company files income tax returns in the United States (federal) and in various state and local jurisdictions. The Company is delinquent in its findings of its 2004 and 2005 tax returns. The Company is subject to federal, state and local income tax examinations by tax authorities for years after December 31, 2003.

The adoption of the provisions of FIN 48 did not have a material impact on the company's consolidated financial position and results of operations. As of March 31, 2007, no liability for unrecognized tax benefits was required to be recorded.

The Company recognized a deferred tax asset (for its US operations excluding pre-merger net operating losses subject to limitations) of approximately $6.1 million as of March 31, 2007, primarily relating to net operating loss carryforwards of approximately $17.9 million, available to offset future taxable income through 2025. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. The Company considers projected future taxable income as tax planning strategies in making this assessment. At present, the Company does not have a sufficient history of income

to conclude that it is more likely than not that the Company does not have a sufficient history of income to conclude that it is more likely than not that the Company will be able to realize all of its tax benefits in the near future and therefore a valuation allowance was established in the full value of the deferred tax asset.

A valuation allowance will be maintained until sufficient positive evidence exists to support the reversal of any portion or all of the valuation allowance net of appropriate reserves. Should the Company continue to be profitable in future periods with supportable trends, the valuation allowance will be reversed accordingly.

REVENUE RECOGNITION

The Company expects that it will derive substantially all of its revenues for the sale of advertising on its Qtrax product. The Company anticipates to have four major advertising revenues streams; Click Ad, revenues will be recognized when an ad that is placed in Qtrax is successfully `Clicked' and linked to another website or area; Video revenues will be recognized when ads are played within the Qtrax product; Banner revenues will be recognized when an ad is displayed on the Qtrax site; and Imprint revenues will be recognized one the established number of time an ad is to be shown is shown. Any prepaid advertising payments received will be treated as deferred revenues.

F-10

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CAPITALIZED SOFTWARE

Capitalization of computer software development costs begins upon the establishment of technological feasibility. Technological feasibility for the Company's computer software is generally based upon achievement of a detailed program design free of high risk development issues and the completion of research and development on the product hardware in which it is to be used. The establishment of technological feasibility and the ongoing assessment of recoverability of capitalized computer software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenue, estimated economic life and changes in software and hardware technology.

Amortization of capitalized computer software development costs commences when the related products become available for general release to customers. Amortization is provided on a product by product basis. The annual amortization is the greater of the amount computed using (a) the ratio that current gross revenue for a product bears to the total of current and anticipated future gross revenue for that product, or (b) the straight-line method over the remaining estimated economic life of the product.

The Company periodically performs reviews of the recoverability of such

capitalized software development costs. At the time a determination is made that capitalized amounts are not recoverable based on the estimated cash flows to be generated from the applicable software, the capitalized costs of each software product is then valued at the lower of its remaining unamortized costs or net realizable value. There were no costs capitalized during the three months ended March 31, 2007. There was no amortization expense for the three months ended March 31, 2007 and 2006 as the software product was not placed into use.

COMPREHENSIVE LOSS

SFAS No. 130, "Accounting for Comprehensive Income," establishes standards for reporting and disclosure of comprehensive income and its components (including revenues, expenses, gains and losses) in a full set of general-purpose financial statements. The items of other comprehensive income that are typically required to be disclosed are foreign currency items, minimum pension liability adjustments, and unrealized gains and losses on certain investments in debt and equity securities.

Accumulated other comprehensive loss, at March 31, 2007, consists of foreign currency translation adjustments in the amount of $26,866.


                              F-11
<PAGE>

                 BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                         (A Development Stage Company)

              NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                (unaudited)


NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

TRANSLATION OF FOREIGN CURRENCIES

The U.S. dollar is the functional currency for all of the Company's businesses, except its operations in Australia and Europe. Foreign currency denominated assets and liabilities for these units are translated into U.S. dollars based on exchange rates prevailing at the end of each period presented, and revenues and expenses are translated at average exchange rates during the period presented. The effects of foreign exchange gains and losses arising from these translations of assets and liabilities are included as a component of equity.

NET INCOME (LOSS) PER SHARE OF COMMON STOCK

Basic net income (loss) per share of common stock are computed by dividing net income (loss) available to common stockholders by the weighted average number of shares of common stock outstanding during the periods presented.

Diluted net income (loss) per share reflects per share amounts that result if dilutive common stock equivalents are converted to common stock.

Common stock equivalents, consisting of convertible debt, options and warrants, discussed in Note 6, were not included in the calculation of diluted loss per share for the three months ended March 31, 2007 because their inclusion would have had been anti-dilutive.

Basic and diluted loss per share have been calculated assuming the Series A Preferred Stock has been converted under the "if converted method" since each

share of Series A Preferred Stock automatically converts into 400 shares of
common stock upon the increase in authorized common shares to 500 million. The
Series A Preferred Stock was converted into common shares on September 27, 2005.


                              F-12
<PAGE>

                BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                       (A Development Stage Company)

                NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                              (unaudited)


NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

NET INCOME (LOSS) PER SHARE OF COMMON STOCK (CONTINUED)

The following table sets forth the components used in the computation of basic
and diluted income (loss) per common share:

Net Income (Loss) Per Share of Common Stock:

<TABLE>
<CAPTION>

|  |  |  |
|---|---|---|
|  | Three Months Ended March 31, | |
|  | 2007 | 2006 |
| <S> | <C> | <C> |
| Numerator: | | |
| Net (loss) income - numerator for basic income (loss) per share | $ (1,255,936) | $ 4,494,4 |
| Effect of dilutive securities: Interest related to Convertible Debentures | N/A | 486,6 |
| Numerator for diluted (loss) income per share - income after assumed conversions | $ (1,255,936) | $ 4,981,5 |
| Denominator: | | |
| Denominator for basic (loss) income per share - weighted average shares | 626,467,966 | 280,693,2 |
| Effect of dilutive securities: Convertible debentures and accrued interest | N/A | 103,707,1 |
| Warrants | N/A | 62,402,5 |
| Total potentially dilutive securities | N/A | 166,109,7 |
| Denominator for diluted (loss) income per share - adjusted weighted average shares and assumed conversions | 626,467,966 | 446,802,9 |

```
Basic net (loss) income per share               $       (0.00)   $         0
                                                 ==============   ===========
Diluted net (loss) income per share             $       (0.00)   $         0
                                                 ==============   ===========
```

</TABLE>

BUSINESS SEGMENT

SFAS No. 131, "Disclosures About Segments of an Enterprise and Related
Information," establishes standards for the way public enterprises report
information about operating segments in annual consolidated financial statements
and requires reporting of selected information about operating segments in
interim financial statements regarding products and services, geographical areas
and major customers. The Company has determined that under SFAS No. 131, it
operates in three geographic segments (see Note 8).


                                    F-13

<PAGE>

                  BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                           (A Development Stage Company)

                  NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                   (unaudited)


NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CONVERTIBLE NOTES AND WARRANTS

The Company accounts for conversion options embedded in convertible notes in
accordance with SFAS No. 133 "Accounting for Derivative Instruments and Hedging
Activities" ("SFAS 133") and ("EITF") 00-19, "Accounting for Derivative
Financial Instruments Indexed to, and Potentially Settled in, a Company's Own
Stock" ("EITF 00-19"). SFAS 133 generally requires companies to bifurcate
conversion options embedded in convertible notes from their host instruments and
to account for them as free standing derivative financial instruments in
accordance with EITF 00-19. SFAS 133 provides for an exception to this rule when
convertible notes, as host instruments, are deemed to be conventional as that
term is described in the implementation guidance under Appendix A to SFAS 133
and further clarified in EITF 05-2 "The Meaning of "Conventional Convertible
Debt Instrument" in Issue No. 00-19.

The Company accounts for convertible notes deemed conventional and conversion
options embedded in non-convertible notes which qualify as equity under EITF
00-19, in accordance with the provisions of Emerging Issues Task Force Issue
("EITF") 98-5 "Accounting for Convertible Securities with Beneficial Conversion
Features," and EITF 00-27 "Application of EITF 98-5 to Certain Convertible
Instruments," Accordingly, the Company records, as a discount to convertible
notes, the intrinsic value of such conversion options based upon the differences
between the fair value of the underlying common stock at the commitment date of
the note transaction and the effective conversion price embedded in the note.
Debt discounts under these arrangements are amortized over the term of the
related debt to their earliest date of redemption.

The Company accounts for embedded conversion options in non-conventional
convertible notes which do not qualify as equity under EITF 00-19, as derivation
liabilities. Accordingly, the Company determines the fair value (as determined
under the Black-Scholes Valuation Method) of all embedded derivatives (usually

conversion option and warrants). Such fair value is recorded as a debt discount up to the proceeds of the debt and any amount in excess of the proceeds of the debt is charged to operations at the security issuance date.

The Company's 2005 and 2006 Convertible Notes host embedded conversion options that are deemed to be free standing derivatives financial instruments which have been accounted for as derivative liabilities (Note 4).

The Company accounts for the issuance of common stock purchase warrants issued and other free standing derivative financial instruments in accordance with the provisions of EITF 00-19. Based on the provisions of EITF 00-19, the Company classifies as equity any contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the Company and (ii) give the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement). All of the outstanding warrants have been classified as free standing derivative liabilities (Note 4).


F-14

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)


NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

STOCK BASED COMPENSATION

Effective January 1, 2006, the Company adopted SFAS No. 123R, "Share Based Payment," using the modified-prospective-transition method. There was no effect to the accompanying financial statements pursuant to the adoption of SFAS No. 123R since at the date of the adoption, all employee stock options were fully vested. SFAS No. 123R is a revision of SFAS No. 123, and supersedes APB Opinion No. 25, and its related implementation guidance. SFAS No. 123R addresses all forms of share-based payment awards including shares issued under employee stock purchase plans, stock options, restricted stock and stock appreciation rights. Under SFAS No. 123R, stock-based awards result in a cost that will be measured at Fair value on the award's grant date, based on the estimated number of awards that are expected to vest that will result in a charge to operations.

There were no stock options granted to employees or unvested stock options during the three months ended March 31, 2007 and the Company had no unvested options.

The cost of stock-based compensation awards issued to non-employees for services are recorded at either the fair value of the services rendered or of the instruments issued in exchange for such services, whichever is more readily determinable, using the measurement date guidelines enumerated in Emerging Issues Task Force ("EITF") Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."

F-15

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In February 2006, the FASB issued SFAS No. 155 "Accounting for Certain Hybrid
Financial Instruments-an amendment of FASB Statements No. 133 and 140" ("FAS
155"). FAS 155 addresses the following: a) permits fair value re-measurement for
any hybrid financial instrument that contains an embedded derivative that
otherwise would require bifurcation; b) clarifies which interest-only strips and
principal-only strips are not subject to the requirements of Statement 133; c)
establishes a requirement to evaluate interests in securitized financial assets
to identify interests that are freestanding derivatives or that are hybrid
financial instruments that contain an embedded derivative requiring bifurcation;
d) clarifies that concentrations of credit risk in the form of subordination are
not embedded derivatives; and e) amends Statement 140 to eliminate the
prohibition on a qualifying special-purpose entity from holding a derivative
financial instrument that pertains to a beneficial interest other than another
derivative financial instrument. FAS 155 is effective for all financial
instruments acquired or issued after the beginning of an entity's first fiscal
year that begins after September 15, 2006. The Company's adoption of this
pronouncement did not have an impact on the Company's financial position,
results of operations and cash flows.

In March 2006, the FASB issued SFAS 156 - "Accounting for Servicing of Financial
Assets - an amendment of FASB Statement No. 140" ("SFAS 156"). SFAS 156 is
effective for the first fiscal year beginning after September 15, 2006. SFAS 156
changes the way entities account for servicing assets and obligations associated
with financial assets acquired or disposed of. The Company's adoption of this
pronouncement did not have an impact on the Company's financial position,
results of operations and cash flows.

In September 2006, the FASB issued Statement of Financial Accounting Standard
("SFAS") No. 157, "Fair Value Measurements." This statement defines fair value,
establishes a fair value hierarchy to be used in generally accepted accounting
principles and expands disclosures about fair value measurements. Although this
statement does not require any new fair value measurements, the application
could change current practice. The statement is effective for fiscal years
beginning after November 15, 2007. The Company's adoption of this pronouncement
did not have an impact on the Company's financial position, results of
operations and cash flows.

F-16

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS (CONTINUED)

In September 2006, the staff of the Securities and Exchange Commission issued SAB No. 108 which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. SAB 108 becomes effective in fiscal 2007. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

In December 2006, the FASB approved FASB Staff Position (FSP) No. EITF 00-19-2, "Accounting for Registration Payment Arrangements" ("FSP EITF 00-19-2"), which specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument or other agreement, should be separately recognized and measured in accordance with SFAS No. 5, "Accounting for Contingencies". FSP EITF 00-19-2 also requires additional disclosure regarding the nature of any registration payment arrangements, alternative settlement methods, the maximum potential amount of consideration and the current carrying amount of the liability, if any. The guidance in FSP EITF 00-19-2 amends FASB Statements No. 133, "Accounting for Derivative Instruments and Hedging Activities", and No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity", and FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others", to include scope exceptions for registration payment arrangements.

FSP EITF 00-19-2 is effective immediately for registration payment arrangements and the financial instruments subject to those arrangements that are entered into or modified subsequent to the issuance date of this FSP, or for financial statements issued for fiscal years beginning after December 15, 2006, and interim periods within those fiscal years, for registration payment arrangements entered into prior to the issuance date of this FSP. The Company's adoption of this pronouncement did not have a material impact on the Company's financial position, results of operations and cash flows.

In June 2006, the EITF reached a consensus on Issue No. 06-3 ("EITF 06-03"), "Disclosure Requirements for Taxes Assessed by a Governmental Authority on Revenue-Producing Transactions." The consensus allows companies to choose between two acceptable alternatives based on their accounting policies for transactions in which the company collects taxes on behalf of a governmental authority, such as sales taxes. Under the gross method, taxes collected are accounted for as a component of sales revenue with an offsetting expense. Conversely, the net method allows a reduction to sales revenue. If such taxes are reported gross and are significant, companies should disclose the amount of those taxes. The guidance should be applied to financial reports through retrospective application for all periods presented, if amounts are significant, for interim and annual reporting beginning after December 15, 2006 with early adoption is permitted. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

F-17

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 3 - ROYALTY/LICENSE AGREEMENTS

The Company entered into nine Royalty and License Agreements. The Company has
made various payments and is obligated to make additional non-refundable
recoupable prepayments. At March 31, 2007 such fees aggregated as follows:

|                                      |             |
| ------------------------------------ | ----------- |
| Deferred license and other fees      | $1,666,500  |
| Less: accumulated amortization       | (598,030)   |
|                                      | ----------  |
|                                      | $1,068,470  |
|                                      | ========== |

Royalty/license payments are accounted for in accordance with statement of
Financial Accounting Standard ("SFAS") No. 50 "Financial Reporting for the
Record and Music Industry". The Company reports such minimum guaranteed license
payments as an asset and charged to expense in accordance with the terms of the
license agreements. In May 2006 and August 2006, the Company signed agreements
with EMI Music Publishing And EMI Records ("EMI") whereby EMI has licensed its
music publishing properties for listening and download on the Company's Qtrax
legal P2P music network. Under the terms of the agreement, the Company is
required to make non-refundable, recoupable prepayments to EMI in the amount of
$385,000. These payments are recoupable against payments due under various
subscription agreements. Under the terms of the agreement, the payments are due
as follows: (a) upon execution of the agreement, the Company shall pay $225,000
with a remaining payment of $162,500 to be paid to EMI at least 14 days prior to
the commercial launch of the service. As of March 31, 2007, the Company has paid
EMI $222,500 under these agreements.

In November 2006, the Company signed an agreement with Sony/ATV Music Publishing
LLC ("ATV") whereby ATV has licensed its music publishing properties for
listening and download on the Company's Qtrax legal P2P music network. Under the
terms of the agreement, the Company is required to make two non-refundable,
recoupable prepayments to ATV in the amount of $15,000 and $15,000 for a total
of $30,000. These payments shall be recoupable against payments due under
various subscription agreements. Under the terms of the agreement, the payments
are due as follows: (a) upon execution of the agreement, the Company shall pay
$15,000 with remaining payment of $15,000 to be paid to ATV no later than March
31, 2007. As of March 31, 2007, the Company has made such payments totaling
$30,000.

In April 2006, the Company signed an agreement with TVT Music Inc. and TVT
Records ("TVT"), which was amended in December 2006, whereby TVT has licensed
its music publishing properties for listening and download on the Company's
Qtrax legal P2P music network. Under the terms of the agreement, the Company is
required to make a non-refundable, recoupable prepayments to TVT in the amount
of $30,000. This payment shall be recoupable against payments due under various
subscription agreements. Under the terms of the agreement, the payments are due
by December 2006. As of March 31, 2007, the Company has made such payments
totaling $30,000.

In August 2006, the Company signed an agreement with Warner Music Inc ("Warner")
whereby ATV has licensed its music publishing properties for listening and

download on the Company's Qtrax legal P2P music network. Under the terms of the
agreement, the Company is required to make recoupable non-refundable payment of
$100,000, $50,000 and $75,000 for a total of $225,000. These payments shall be
recoupable against payments due under various subscription agreements. Under the
terms of the agreement, the payments are due as follows: (a) upon execution of
the agreement, the Company shall pay $100,000, with $50,000 due in 3 months of
the signing date with remaining payments of $25,000 each to be paid in November
and December 2006 and January 2007. As of December 31, 2006, the Company paid
Warner $33,333 under the agreement, and was in default under the terms of the
agreement. In February 2007, the Company paid an additional $33,333.

On April 17, 2007, the above payment terms were amended as follows: $85,000
payable upon signing of the amended agreement; $23,333 on May 15, 2007; $25,000
on June 15, 2007; and the final payment on June 17, 2007.


                                    F-18

<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                           (A Development Stage Company)

                    NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                    (unaudited)


NOTE 3 - ROYALTY/LICENSE AGREEMENTS (CONTINUED)

In October 2006, the Company signed an agreement with Sony BMG ("BMG"), whereby
BMG has licensed its music publishing properties for listening and download on
the Company's Qtrax legal P2P music network. Under the terms of the agreement,
the Company is required to make a non-refundable, recoupable prepayments to BMG
in the amount of $1,000,000. This payment shall be recoupable against payments
due under various subscription agreements. Under the terms of the agreement, the
payments are due as follows: (a) upon execution of the agreement, the Company
shall pay $200,000 with the remaining payment of $800,000 to be paid in equal
monthly installments commencing in November. On March 26, 2007 the Company
amended its payment terms with BMG. The new payment terms are as follows:
$200,000 upon the execution of the amended agreement and $800,000 in 12 equal
payments of $66,666 commencing on July 1, 2007. As of March 31, 2007, the
Company has paid $200,000 under this agreement

The terms of the licenses vary from twelve to twenty two months and provide for
various conditions to be met. As of April 17, 2007 the Company was renegotiating
the terms of some of the agreements that had certain milestones which as of
April 17, 2007 had not been met and included the launching of the Qtrax site.
The Company is in the process of renegotiating the terms of payment and
milestones and is anticipating that these terms will be extended and milestones
reset, however there is no guarantee that the record companies will alter the
terms of the agreements. The inability to have terms and milestones adjusted
will significantly impact the viability of the Qtrax product.

In September 2006, the Company signed an agreement with Universal Music
Publishing Group ("UMP"), whereby UMP has licensed its music publishing
properties for listening and download on the Company's Qtrax legal P2P music
network. Under the terms of the agreement, the Company is required to make a
non-refundable, recoupable prepayments to UMP in the amount of $30,000. This
payment shall be recoupable against payments due under various subscription
agreements with the amount due upon execution of the agreement. As of March 31,
2007, the Company has paid $30,000 under the terms of the agreement.

Amortization expense under these contracts totaled $258,030 for the three months ended March 31, 2007. This amount is included in general and administrative expenses in the accompanying statement of operations.

F-19

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 4 - CONVERTIBLE DEBENTURES

Convertible Debentures consist of the following at March 31,, 2007:

2005 CONVERTIBLE DEBENTURES

The total dollar value of the Debentures and number of Debenture Warrants sold to investors during 2005 totaled $2,745,000 and 39,214,285, respectively. The Debentures bear interest at 9% per annum on a simple non-compounded basis and are due and payable on August 20, 2006. The Debentures are convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs) or 75% of the average of the 10 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. If a holder elects to convert all or a portion of the Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs), in lieu of effecting such conversion, the Company may elect to redeem the amount of the Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of the Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of the Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of the Common Stock from trading on the Over the Counter Bulletin Board.

The Debenture Warrants are exercisable at a per share exercise price of $0.10, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. Each Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement described below. If the average of the closing bid prices of the Common Stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of the Common Stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each Debenture Warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from the Company that such average price and closing bid prices have occurred, the exercise price for such Debenture Warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs). Holders of

Debenture Warrants are entitled to effect a cashless exercise of the Debenture Warrants if the registration statement (as described below) has not been declared effective prior the first anniversary of the issuance of the Debenture Warrants.

In 2006, $2,958,438 of Debentures (including related accrued interest) were converted into 132,976,205 shares of Common Stock. None of the Debenture warrants were exercised as of December 31, 2006. As of December 31, 2006, there was no principal amount outstanding.

The Company has filed a registration statement to register the shares of Common Stock issuable upon the conversion of the Debentures and the exercise of the Debenture Warrants. The Company was obligated to pay the holder of the Debentures certain liquidated damages since such registration statement was not filed by October 5, 2005 and was not declared effective by November 30, 2005. The Company has filed such registration statement and it became effective on January 26, 2006. In connection with the late effectiveness of the registration statement, the Company incurred liquidating damages of approximately $82,500.

F-20

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 4 - CONVERTIBLE DEBENTURES (CONTINUED)

2005 CONVERTIBLE DEBENTURES (CONTINUED)

As a result of a floorless conversion option held by the holders of the Debentures, the derivatives embedded in the Debentures (the Conversion Option and Debenture Warrants) have been classified as derivative liabilities. The combined liabilities recorded during 2005 totaled $5,912,806. Of such amount, $2,745,000 was recorded as a debt discount and is being amortized over the term of the Debentures and $3,167,806 was immediately charged to loss on derivative obligations during 2005.

As a result of the conversion feature contained in the 2005 Convertible Debentures, the Company's outstanding LTDN Warrants at such time no longer qualified as equity. Accordingly, during 2005, these Warrants were reclassified to derivative obligations resulting in an increase to liabilities of $20,565,700 and a reduction to stockholders' equity of an equal amount.

2006 CONVERTIBLE DEBENTURES

In February 2006, the Company issued to an investor $100,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 1,428,571 shares of Common Stock at a per share exercise price of $.10 per share. The terms of these securities are substantially the same as the securities issued in 2005.

In March 2006, the Company issued to an investor $300,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 4,285,714 shares of Common Stock at a per share exercise price of $.10 per share. The terms of these securities are substantially the same as the securities issued in

2005.

In March 2006, the Company issued to an investor $350,000 aggregate principal amount of its 9% Convertible Debentures (the "New Debentures") and warrants (the "New Debenture Warrants") to purchase 5,000,000 shares of Common Stock at a per share exercise price of $.07 per share. In addition, subject to certain conditions such investor has agreed to purchase (i) at least three days prior to the filing of the registration statement registering the shares of Common Stock issuable upon the conversion of such New Debentures and the exercise of such New Debenture Warrants, an aggregate of $250,000 principal amount of New Debentures and New Debenture Warrants to purchase 3,571,428 shares of Common Stock for an aggregate purchase price of $250,000 and (ii) at least three days prior to the effective date of such registration statement, an aggregate of $600,000 principal amount of such New Debentures and New Debenture Warrants to purchase 8,571,428 shares of Common Stock for an aggregate purchase price of $600,000. The New Debentures bear interest at 9% per annum on a simple non-compounded basis and are due and payable on March 24, 2007. The New Debentures are convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs) and 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. If a holder elects to convert all or a portion of the New Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs), in lieu of effecting such conversion, the Company may elect to redeem the amount of the New Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of the New Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of the New Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of the Common Stock from trading on the Over the Counter Bulletin Board.


F-21

<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                            (A Development Stage Company)

              NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                    (unaudited)


NOTE 4 - CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The New Debenture Warrants are exercisable at a per share exercise price of $0.07, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. Each New Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement registering the shares of Common Stock issuable upon the conversion of such New Debentures and the exercise of such New Debenture Warrants. If the average of the closing bid prices of the Common Stock

during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of the Common Stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each New Debenture Warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from the Company that such average price and closing bid prices have occurred, the exercise price for such New Debenture Warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs). Holders of Debenture Warrants are entitled to effect a cashless exercise of the New Debenture Warrants if such registration statement has not been declared effective prior the first anniversary of the issuance of the New Debenture Warrants. The Company has agreed to file a registration statement to register the shares of Common Stock issuable upon the conversion of the New Debentures and the exercise of the New Debenture Warrants.

In April 2006, the Company issued to a group of investors $575,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 8,214,285 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as debentures and debenture warrants issued in March 2006.

In May 2006, the Company issued to a group of investors $200,000 aggregate principal amount of its 9% Convertible Debentures due on May 2, 2007 and warrants to purchase 4,285,714 shares of Common Stock at a per share exercise price of $.07 per share. In addition, the Company issued to such investors $40,000 aggregate principal amount of such 9% convertible debentures as a diligence fee and $200,000 aggregate principal amount of such 9% Convertible Debentures as a penalty for not filing its Annual Report on Form 10-KSB with the Securities and Exchange Commission ("SEC") on or prior to May 17, 2006. The terms of these securities are substantially the same as the New Debenture and New Debenture Warrants.

In May 2006 the Company issued to a group of investors $170,000 aggregate principal amount of its 9% Convertible Debentures due April 3, 2007 and warrants to purchase 1,857,140 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as the New Debentures and New Debenture Warrants. In June 2006, the Company issued to a group of investors $150,000 aggregate principal amount of its 9% Convertible Debentures due April 3, 2007 and Warrants to purchase 2,142,857 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as the New Debentures and the New Debenture Warrants.

During 2006, $250,000 of debentures issued in 2006 and related accrued interest were converted into 17,381,312 shares of Common Stock.

During the first quarter of 2007, $75,000 of debentures issued in 2006 and related accrued interest were converted into 4,244,330 shares of common stock. None of the new warrants issued in 2006 were exercised as of March 31, 2007

The Company is obligated to file a registration statement to register the shares of Common Stock issuable upon the conversion of the Debentures and the exercise of the Debenture Warrants. The Company is obligated to pay the holder of the Debentures certain liquidated damages in the event that such registration statement was not timely filed and was not declared effective by a stated date. As of May 15, 2007, the Company has not filed such registration statement and, accordingly, liable for liquidating damages. As of March 31, 2007, the Company accrued liquidating damages of approximately $354,800.

F-22

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)


NOTE 4 - CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The holders of Debentures have a lien on all of the Company's assets (including
the Intellectual Property) and could foreclose in the event that the Company
defaults under the Debentures. As of March 31, 2007, the Company was not in full
compliance with the Debenture agreements, including the required repayment
terms.

As a result of a floorless conversion option held by the holders of the
Convertible Debentures, the derivatives embedded in the Convertible Debenture
(the Conversion Option and Debenture Warrant) have been classified as derivative
liabilities. The combined liabilities recorded in 2006 totaled $1,007,816. This
amount was recorded as a debt discount and is being amortized over the term of
the debentures.

The fair value of all of the derivative obligations including the embedded
conversion options and Warrants related to the Bridge Notes (Note 7) at March
31, 2007 totaled $6,651,705. The change in the fair value of the derivative
liabilities during 2007 and 2006 was recorded as a gain on derivative
liabilities during the three months ended March 31, 2007 and 2006 resulted in a
gain of $3,476,925 and $8,919,806, respectively.

Amortization of debt discount related to the 2005 and 2006 Convertible
Debentures for the three months ended March 31, 2007 and 2006 was $175,963 and
$417,683, respectively.

NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE

Pursuant to 2006 Bridge Loan Agreements between the Company and six investors,
the Company borrowed an aggregate of $1,960,000. The Company issued to the
investors' Notes (the "Notes") in the aggregate principal amount of $2,087,000
(an amount equal to approximately 107% of the purchase price of the Notes) and
warrants ("Note Warrants") to purchase 55,183,286 shares of Common Stock. The
Company received net proceeds in such sale of $1,942,910, after the payment of
offering related fees and expenses.

The Notes do not bear interest but, as noted above, the face value of the Notes
at issuance was equal to approximately 107% of the purchase price thereof. The
Notes are due and payable between October 25, 2006 and January 15, 2007. When
the Company amends the certificate of incorporation as described below, and if
an event of default under the Note occurs then the Note will be convertible, at
the holder's option, into shares of Common Stock at a conversion rate equal to
75% of the average of the 5 lowest closing bid price of the Common Stock for the
30 trading days immediately preceding the applicable date of conversion. The
Company may, at its option, prepay the Notes at any time. The holder may
accelerate the maturity date of the Note following the occurrence of customary
events of default, including, without limitation, payment defaults, breaches of

certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

As of March 31, 2007, the Company was in default under the terms of the 2006 Bridge Loan agreements.

F-23

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE (CONTINUED)

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants. The Company could be subject to certain penalties if after the amendment to the articles of incorporation the Company does not file a registration nor if the registration statement does not become effective after a certain period of time.

As a result of a floorless conversion option held by the holders of the Convertible Debentures, the derivatives embedded in the Convertible Debenture (the Conversion Option and Debenture Warrant) have been classified as derivative liabilities.

A debt discount of $1,642,916 was recorded in 2006 representing the value of the conversion options and warrants issued to the 2006 Bridge note holders. This amount was amortized to interest expense during 2006.

During 2006, the Company repaid $322,500 of the Bridge loans.

During the quarter ended March 31, 2007, the Company repaid $106,500 of the 2006 Bridge loans.

2007 Bridge Loans

Pursuant to 2007 Bridge Loan Agreements between the Company and three investors, the Company borrowed an aggregate of $1,310,000. The Bridge Loans are as follows:

In January 2007, the Company borrowed $150,000. The Company issued to the investor a Note ("Note") in the aggregate principal amount of $159,000 (an amount equal to approximately 106% of the purchase price of the Note) and warrants ("Note Warrants") to purchase 5,714,286 shares of Common Stock. The

Company received net proceeds in such sale of $150,000. The Note was due on March 10, 2007 and the Company is currently in default under the terms of the agreement.

In February 2007, the Company borrowed $410,000. The Company issued to the investor a Note in the aggregate principal amount of $500,000 (an amount equal to the amount borrowed plus interest in the amount of $90,000) and Note Warrants to purchase 2,500,000 shares of Common Stock. The Company received net proceeds in such sale of $410,000. The Note is due in October 2007.

The Notes do not bear interest. When the Company amends the certificate of incorporation as described below, and if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants.

F-24

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE (CONTINUED)

In March 2007, the Company borrowed $750,000. The Company issued to the investor a Note in the aggregate principal amount of $750,000, Note warrants to purchase 54,000,000 shares of Common Stock, and 10,000,000 shares of the Common Stock. The Company received net proceeds in such sale of $745,000. The Note is due in December 2007.

The Notes do not bear interest. From and after the date, the Company amends the certificate of incorporation as described below, if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days

immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at a range of $0.07 to $0.36 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants.

Regarding the above 2007 Bridge loans, the Company could be subject to certain penalties if after the amendment to the articles of incorporation the Company does not file a registration nor if the registration statement does not become effective after a certain period of time.

In the first quarter of 2007, a debt discount of $2,130,317 was recorded representing the value of the conversion options and warrants issued to the Bridge note holders. This amount was amortized to interest expense during the three months ended March 31, 2007.

Other Loans Payable

During June 2001, Brilliant borrowed $260,000 from an individual and issued a promissory note, which is in default and provides for interest at the rate of 1% per month. This loan is still outstanding at December 31, 2006. Also on July 13, 2001, an officer of Brilliant advanced $10,000 pursuant to a promissory note, which is in default and provides for interest at the rate of 1% per month.

On November 27, 2001, Brilliant borrowed $10,000 from an individual and issued a promissory note which is in default and provides for interest at the rate of 1% per month.

During October 2002, Brilliant received an advance of $120,000 from an individual, payable on demand. The loan accrues interest at 10% per annum.

LTDN has loans outstanding payable to four unrelated parties that aggregate $463,117 at March 31, 2007 and December 31, 2006. These loans are all payable on demand and do not provide for interest.

As of December 31, 2005, LTDN had a loan payable to a related party of $211,440. This loan is payable on demand and provides for interest of 12% per annum. This loan was not repaid during 2006 nor in the first quarter of 2007.

As of March 31, 2007, Brilliant owed its Chief Executive Officer and another director/shareholder $1,574,529 related to advances and accrued salaries. These advances are payable on demand and do not provide for interest. This balance is included in due to related parties on the accompanying consolidated balance sheet.

F-25

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)


NOTE 6 - STOCKHOLDERS' EQUITY

PREFERRED STOCK

The Company has authorized 1,000,000 shares of preferred stock, par value $.001
per share. The Board of Directors of the Company has broad discretion to create
one or more series of preferred stock and to determine the rights, preferences
and privileges of any such series.

As described in Note 1, the Company has designated 950,000 shares of Series A
Convertible Preferred Stock. In connection with the Merger and Recapitalization
between BRILLIANT and LTDN (Note 1), 193,336 shares of Series A Convertible
Preferred Stock were issued to the stockholders of LTDN and 50,000 shares were
issued to the stockholders of BRILLIANT.

At the Annual Meeting of Stockholders held on September 26, 2005, the
stockholders approved an amendment to the articles of incorporation of BRILLIANT
whereby the number of shares of common stock authorized for issuance by the
Company was increased from 100,000,000 shares to 800,000,000 shares.
Accordingly, as a result of this stockholder approval, 293,406 shares of the
Company's Series A Preferred Stock automatically converted into 117,731,600
shares of the Company's Common Stock pursuant to terms of the merger agreement.

COMMON STOCK ISSUANCES FOR THE THREE MONTHS ENDED MARCH 31, 2007

During the quarter ended March 31, 2007, the Company issued 750,000 of common
shares in settlement for liabilities in the amount of $37,000 related to
consulting expenses incurred in 2004.

During the quarter ended March 31, 2007, The Company issued shares in the total
amount of 4,244,330 related to the conversion of convertible debt and note
payable including accrued interest totaling $75,000.

During the quarter ended March 31, 2007, the Company issued shares in the total
amount of 10,000,000 related to a financing expense valued at $500,000 based the
price of the Company's common stock of $.05 per share.


F-26

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)


NOTE 6 - STOCKHOLDERS' EQUITY(CONTINUED)

WARRANTS

At March 31, 2007, there were outstanding warrants to purchase 1,000,000 shares
of Common Stock at $0.165 per share (the "Old Warrants"), outstanding Warrants
issued to the LTDN shareholders (the "LTDN Warrants") to purchase 107,884,680
shares of Common Stock at an exercise price of $0.04 per share and there were
outstanding Debenture Warrants to purchase 44,928,570 shares of Common Stock at
an exercise price of $0.10 per share and outstanding Debenture and Note warrants
to purchase 76,683,280 shares of Common Stock at an exercise price of $0.07 per
share. In addition, in connection with the 2007 Bridge Notes, the Company issued
Warrants to purchase 62,214,286 shares of Common Stock at exercise prices
ranging From $0.07 to $0.36 per share. Each Old Warrant is exercisable until
December 19, 2008. Each Debenture Warrant is exercisable until the second
anniversary of the effective date of the registration statement registering the
shares of Common Stock issuable upon exercise of the Debenture Warrants. The
Note warrants are exercisable over a five-year period.

During the year ended December 31, 2006, various holders of LTDN warrants
exercised warrants and purchased 58,896,477 shares of Company's Common Stock
resulting in proceeds of $2,357,897, all of which was received in 2006.

                                        F-27
<PAGE>

                    BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                            (A Development Stage Company)

                    NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                    (unaudited)


NOTE 6 - STOCKHOLDERS' EQUITY (CONTINUED)

WARRANTS (CONTINUED)

The following is a summary of the Company's warrant activity:

<TABLE>

|  | COMPENSATORY WARRANTS | DEBENTURE AND NOTE WARRANTS | LTDN WARRANTS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Outstanding January 1, 2007 | 1,000,000 | 121,611,850 | 107,884,680 |
| Issued | -- | 62,214,286 | -- |
| Cancelled | -- | -- | -- |
| Exercised | -- | -- | |
| Balance March 31, 2007 | 1,000,000 | 183,826,136 | 107,884,680 |

</TABLE>

EARNINGS PER SHARE

Securities that could potentially dilute basic earnings per share ("EPS") in the future that were not included in the computation of diluted EPS because to do so would have been anti-dilutive for the periods presented consist of the following:

| | | |
|---|---|---|
| Bridge loans | (a) | 48,466,667 |
| Convertible Debentures | (b) | 52,716,068 |
| Options to purchase Common Stock | | 1,712,777 |
| Warrants to purchase Common Stock | | 292,710,816 |
| | | ---------------- |
| Total as March 31, 2007 | | 395,606,328 |
| | | ================ |

    (a)   $1,817,500 / $.0375 (75% of market price at March 31, 2007 for note in default).

    (b)   $1,976,853 / $.0375 (75% of market price at March 31, 2007).

Substantial issuances after March 31, 2007:

| | |
|---|---|
| Common Stock issued for conversions of Convertible Debentures | 12,473,230 |

The Company will not have sufficient Common shares available to issue should all of the above conversions and exercises occur. Accordingly, the Company may have to settle these contracts in cash if they are not successful in increasing the authorized number of shares (Note 9).

F-28

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS

CONSULTING AND EMPLOYMENT AGREEMENT

During October 2005, the Company entered into a one-year consulting agreement with a stockholder which provides for monthly payments of approximately $12,000. The agreement is automatically renewable for an additional year, unless both parties mutually agree not to renew. As of March 31, 2007, amounts owed to such individual approximated $186,000.

During October 2006, the Company entered into an employment contract with an individual to act as Chief Operating Officer with an annual base salary of $333,000. As of March 31, 2007, amount owed under this agreement is $83,250. In April of 2007, the COO resigned and the Company accepted his resignation "with Regret" (see Note 9).

COMPENSATION AGREEMENT

Pursuant to a 2005 compensation arrangement, the Company's Chief Executive officer is being paid a salary of $275,000 per annum plus an expense allowance

of approximately $7,600 per month. Accrued amounts under this agreement total $456,550 as of March 31, 2007.

RUSSIAN CONTRACTS FOR RESEARCH AND DEVELOPMENT

The Company is a party to a research and development agreement with a Moscow-based State Scientific Research Institute Scientific Production Company named Lutch pursuant to which such entity has agreed to perform various contract research and development services related to technology obtained by the Company for a total price of $985,000. The Company paid $100,000 in a previous year under this agreement and was recorded as research and development expense. As a continued result of limited funding, no services have been performed under this agreement to date. It is uncertain when or if any services will eventually be completed under this contract.

The Company is a party to a research and development agreement with a branch of the Ministry of the Atomic Energy of the Russian Federation pursuant to which such entity has agreed to perform various contract research and development services to develop an industrial fireproof swelling cable coating for a total price of $462,000. As a result of limited funding of this contract, the performance of services were rescheduled to occur commencing with the quarter ended December 31, 2003 and to be completed within one year. The work under the contracts has not been completed as of December 31, 2006 and at this time the completion date can not be determined as a continued result of limited funding.

ACQUISITION OF IN-PROCESS TECHNOLOGIES

In connection with an oral agreement, the Company has agreed to acquire the rights to certain in-process technologies now held by a German bank, for an estimated purchase price of $500,000 payable in cash and/or common stock. Management of the Company has indicated that this transaction is expected to close during 2007 although there is no assurance it will be consummated. As of March 31, 2007, LTDN has paid $352,089 to the German bank as part of this oral agreement.

F-29

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LEGAL DISPUTES

On March 31, 2007, Leslie Dick Worldwide, LTD filed a complaint in the Supreme Court of the State of New York against us. Such complaint relates to claims of breach of contract. The Company has counter-claimed against the petitioner, management believes that the eventual outcome of these matters will not have a material adverse effect on our consolidated financial position, results of operations, or cash flow.

During the quarter ended June 30, 2003, the Company was notified that Dr. Jurgen Lempert intended to commence legal proceedings against Brilliant relating to his termination as Chief Executive Officer of Brilliant Nuklear. A German court

ruled that Dr. Lempert is entitled to collect $69,629. As of March 31, 2007, the Company has accrued such amounts.

On March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of New York, County of New York against us, Allan Klepfisz, our Chief Executive Officer, and Ethel Griffin, public administratrix of the estate of Kurt Seifman. Such complaint relates to the alleged default by us under a loan agreement with the plaintiffs. Such complaint seeks compensatory damages in the amount of $459,892.67 plus interest and late fees of approximately $900,000 and the value of certain restricted shares issued to such plaintiffs and punitive damages in the amount of $5,000,000. Management believes that the eventual outcome of these matters will not have a material adverse effect on our consolidated financial position, results of operations, or cash flow.

TPG Capital have filed for arbitration against the Company regarding a purported reset provision in an agreement entered into during 1999. TPG believes it is entitled to receive an additional 1,465,671 shares of Common Stock under an agreement previously executed between the parties. Should litigation arise, the Company believes that it has sufficient defenses and intends to vigorously defend itself against such claims.

Dr. Alexander Kaul, former Chairman of the Supervisory Board of Brilliant Nuklear, initiated legal proceedings against Brilliant for monies he believes are due him under his terminated employment contract. A German court ruled that Dr. Kaul is entitled to collect approximately $67,808. As of March 31, 2007, the Company has accrued such amounts.

Peter Goerke, a former Vice President of Brilliant, initiated legal proceedings against Brilliant for the value of his remaining employment agreement, accrued wages and expenses. A German court ruled that Mr. Goerke is not entitled to the remaining value of his employment contract and is only entitled to collect approximately $197,486. As of March 31, 2007, Brilliant has accrued such amount. Mr. Goerke has filed for a lien against certain assets of Cetoni Umwelttechnologie Entwicklungs Gmbh ("Cetoni"), one of Brilliant's wholly owned subsidiaries.

Cnet Networks, Inc. initiated proceedings against LTDN for amounts due it by a former third party affiliate of LTDN. During June 2005, Cnet Networks, Inc. received a judgment in the amount of $100,000 against LTDN. LTDN believes that it is not liable for this amount and intends to appeal the verdict. Additionally, LTDN believes that it has a cause of action against Cnet Networks, Inc. relating to a breach of contract and other claims relating to a contract between it and Cnet Networks, Inc. As of March 31, 2007, LTDN accrued $100,000 related to this judgment.

A German court has suspended the corporate registration of Cetoni. The Company does not intend to appeal this decision as it is consistent with the restructuring of all German operations. The Company does not believe this ruling will have a material impact on the Company's operations as Cetoni no longer has any significant tangible or intangible assets.

The Company may be subject to additional litigation during its normal course of operations. Management believes that the eventual outcome of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

<div align="center">F-30</div>

&lt;PAGE&gt;

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LIEN ON STAR CAN PATENTS

During June 2003, the Company became aware that a lien had been placed against the patents relating to the Reseal Technology by Paxsys Ltd., a Bermuda corporation, in connection with a failed financing. The Company continues to dispute the validity of the claim.

SETTLEMENT WITH FORMER LTD SHAREHOLDERS

On January 26, 2006, the Company issued 21,795,061 shares of Common Stock in connection with the settlement of claims made by certain former stockholders of LTDN. These stockholders claimed that they were entitled to receive more shares of Common Stock in connection with the merger with BRILLIANT. At December 31, 2005, the Company recorded a liability of approximately $2,200,000 related to the settlement of these claims.

SUPPORT AGREEMENT

In connection with a Support Agreement entered into on November 17, 2005 between the Company and one of its stockholders, Aperchance Ltd. ("Aperchance"), in consideration of inducing Aperchance to exercise their Warrants to purchase 4,841,200 shares of Common Stock, the Company provided Aperchance with certain price protection on shares of Common Stock held by Aperchance. The price protection terminated in February of 2006. As a result of stock price decline in 2006, the Company has issued an additional 5,630,075 shares of Common Stock to Aperchance.

PERIODIC FILINGS

Under a 2005 rule change, OTC Bulletin Board ("OTCBB") issuers that are cited for filing delinquency three times in a 24-month period and those removed for failure to file two times in a 24-month period will be ineligible for quotation by an NASD member. Following removal under this new rule, an issuer's securities would again become eligible for quotation on the OTCBB when the issuer has filed periodic reports for one year in a timely manner.

The Company has been late in three of its periodic filings with the Securities and Exchange Commission ("SEC") during 2006, of which the December 31, 2006 10-KSB was the last late filing. Accordingly, currently the Company is ineligible for quotation by an NASD member. The Company has requested relief from the SEC under a hardship provision. If the Company is not successful with its request from the SEC, the Company will remain listed on the "Pink Sheets."

NOTE 8 - SEGMENT REPORTING

The Company's business is organized on a geographic basis, and the Company's Chief Operating Decision Maker assesses performance and allocates resources on this basis. The information provided in the following section is representative of the information used by the Chief Operating Decision Maker in deciding how to allocate resources and in assessing performance.

The Company has three geographic reportable segments: United States of America
(U.S.A.), Australia and Germany. The accounting policies of the segments are the
same as described in the summary of significant accounting policies. The Company
evaluates segment performance based on net income (loss).

F-31

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 8 - SEGMENT REPORTING (CONTINUED)

Segment results for the three months ended March 31, 2007 and 2006 are as
follows:

<TABLE>

| 2007: | U.S.A. | Australia | Germany | Elim |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Net income (loss) | $ (1,071,975) | $ (183,961) | $ -- | $ |
| Depreciation and amortization | $ -- | $ 8,146 | $ -- | $ |
| Identifiable assets | $ 1,917,173 | $ 695,676 | $ 109 | $ |

| 2006: | U.S.A. | Australia | Germany | Elim |
|---|---|---|---|---|
| Net income (loss) | $ 6,035,970 | $(1,498,194) | $ -- | $ |
| Depreciation and amortization | $ -- | $ 7,573 | $ -- | $ |
| Identifiable assets | $ 55,547 | $ 938,031 | $ 99 | $ |

</TABLE>

NOTE 9 - SUBSEQUENT EVENTS

Subsequent to March 31, 2007, the Company issued shares in the total amount of
12,473,230 related to the conversion of convertible debt and note payable
including accrued interest totaling approximately of $362,000.

On March 14, 2007, the Company filed a definitive proxy pursuant to which the
shareholders will vote on an increase in the number of authorized common shares
from 800 million to 1.5 billion. The meeting was to be held on April 23, 2007.
The meeting was subsequently postponed. As of May 14, 2008, the meeting has not

been rescheduled.

On April 17, 2007, the Company entered into a separation agreement with its
current COO. The agreement requires the Company to pay approximately $250,000
due May 30, 2007 and 4,000,000 shares of the Company's Common Stock.

F-32

<PAGE>

ITEM 2. PLAN OF OPERATION

As used in this quarterly report, references to "we", "us" and "our" refer to
Brilliant Technologies Corporation and its consolidated subsidiaries. The
following discussion and analysis should be read in conjunction with the
financial statements and notes thereto included elsewhere in this quarterly
report and with our annual report on Form 10-KSB for the fiscal year ended
December 31, 2006. In addition, this quarterly report contains certain
statements that are "forward looking statements", which relate to future events
or our future financial performance. Any statements contained in this quarterly
report which are not statements of historical fact may be deemed to be forward
looking statements. Without limiting the generality of the foregoing, forward
looking statements can be identified by the use of words such as "believes,"
"expects," "intends," "projects," "anticipates," "contemplates," or "estimates."
Although we believe that the expectations reflected in the forward looking
statements are reasonable, management can give no assurance that such
expectations will prove to have been correct. Generally, forward looking
statements relate to business plans or strategies, projected or anticipated
benefits or other consequences of such plans or strategies, or projections
involving anticipated revenues, expenses, earnings, levels of capital
expenditures, liquidity or indebtedness, ability to raise working capital, or
other aspects of operating results or financial position. All phases of our
operations are subject to a number of uncertainties, risks and other influences
which are set forth in detail in Item 1A of our annual report on Form 10-KSB for
the fiscal year ended December 31, 2006 under the caption entitled "Risk
Factors", many of which are outside of our control and any one of which, or a
combination of which, could materially affect our results of operations and
whether the forward looking statements made by us ultimately prove to be
accurate.

GOING CONCERN AND MANAGEMENT'S PLAN

The accompanying unaudited condensed consolidated financial statements have been
prepared in conformity with accounting principles generally accepted in the
United States of America, which contemplate the continuation of the Company as a
going concern. As shown in the accompanying unaudited condensed consolidated
financial statements, the Company has incurred losses from operations since
inception. Management anticipates incurring substantial additional losses in
2007. Further, the Company may incur additional losses thereafter, depending on
its ability to generate revenues from the licensing or sale of its technologies
and products, or to enter into any or a sufficient number of joint ventures. The
Company has no significant revenue to date. There is no assurance that the
Company can successfully commercialize any of its technologies and products and
realize any revenues there from. The Company's technologies and products have
never been utilized on a large-scale commercial basis and there is no assurance
that any of its technologies or products will receive market acceptance. There
is no assurance that the Company can continue to identify and acquire new
technologies. These factors raise substantial doubt about the Company's ability
to continue as a going concern. As of March 31, 2007, the Company had an
accumulated deficit since inception of $52,437,606 and a working capital

deficiency and stockholder's deficiency of $21,598,529 and $19,583,195 respectively.

We are a development stage company and our efforts have been primarily devoted to technology identification and acquisition, research and development and raising capital. This discussion provides an analysis of our anticipated plan of operation for the next 12 months.

During the next 12 months we intend to concentrate on the (i) continued development and marketing of the software products of LTDnetwork, Inc., which is referred to in this quarterly report as "LTDN", including our Qtrax service, (ii) commercialization of our proprietary resealable metal beverage can, and (iii) commercialization of products developed by Alfa-Pro Products GmbH and from the intellectual property acquired from Schlattl GBR.

As we prepare to launch the Qtrax service in 2007, we have obtained the necessary music licensing agreements from several prominent record companies in order to provide the digital music content of the site. The music license contracts allow us to make available on Qtrax, the electronic libraries of the record companies in an unrestricted manner for downloading. It is our intention to have all music available on the various record companies' libraries available for access upon commercial launch.

The terms of the licenses vary from twelve to twenty-two months and provide for various conditions to be met. As of May 17, 2007 we were renegotiating the terms of some of the agreements that had certain milestones which as of May 17, 2007 had not been met and included the launching of the Qtrax site. We are in the process of renegotiating the terms of payment and milestones and we are confident that these terms will be extended and milestones reset, however there is no guarantee that the record companies will alter the terms of our agreements. The inability to have terms and milestones adjusted will significantly impact the viability of the Qtrax service.

2

<PAGE>

Except for a nominal amount of revenue from the sale of products of one of our subsidiaries in a prior period, we have not generated any revenue from operations since our inception and we have not been profitable since our inception. We will require additional financing to continue our planned operations during the next 12-month period. We believe that we will be able to raise the necessary financing to continue planned operations. We will attempt to raise this additional capital through the public or private placement of our securities, debt or equity financing, joint ventures, or the licensing or sale of our technologies and products. However, there is no guarantee that we will be able to successfully raise the required funds for operations or that such funds will be available on terms satisfactory to us. Any inability to raise additional funds would require that we significantly scale back our planned operations.

In particular, we need to obtain financing for the production of machine-fabricated samples of our resealable beverage can for distribution to beverage producers who have previously expressed an interest in our resealable beverage can. It is anticipated that production of those samples, marketing and general operational expenses will require less than $450,000. We anticipate that in the event we are required to purchase capital equipment for the full scale production of our resealable beverage cans, an additional $2,000,000 would be required. The production of the machine produced samples has been delayed by a failed financing, the proceeds of which were to be used to complete this production run.

Also, we have launched our intelliPrice product developed by LTDN. We need to raise additional funds in order to put us in a position to successfully market and distribute such product.

Ideally, upon the commercialization of our products, including intelliPrice and Qtrax, and implementation of operational cost controls, we would hope that sustainable revenues will be able to be generated so as to avoid the necessity to raise significant funds in the longer term. There can be no assurances as to when and whether we will be able to commercialize our products and technologies and realize any revenues therefrom.

No assurance can be given that we can complete the development of any technology or that, if any technology is fully developed, it can be manufactured and marketed on a commercially viable basis. Furthermore, no assurance can be given that any technology will receive market acceptance. Being a development stage company, we are subject to all the risks inherent in the establishment of a developing or new business.

As of May 17, 2007, $1,760,000 of our 9% Convertible Debentures are outstanding. In addition, we have raised from various financing sources $2,841,000 in bridge loan financing.

DEBENTURES DUE AUGUST 20, 2006

An aggregate of $150,000 of such 9% Convertible Debentures were due and payable on August 20, 2006 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are convertible, at the holder's option, into shares of our common stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs) and 75% of the average of the 10 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Subject to limited exceptions, a holder shall not be entitled to convert a 9% Convertible Debenture held by such holder if such conversion would result in such holder beneficially owning more than 9.99% of our common stock following such conversion. If a holder elects to convert all or a portion of such 9% Convertible Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs), in lieu of effecting such conversion, we may elect to redeem the amount of such 9% Convertible Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of such 9% Convertible Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of such 9% Convertible Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of our common stock from trading on the OTC Bulletin Board. Such 9% Convertible Debentures are secured by a security interest in all of our assets.

Each warrant issued in connection with such 9% Convertible Debentures and $2,995,000 of our 9% Convertible Debentures previously repurchased by us and converted is exercisable until the second anniversary of the effective date of the registration statement registering our shares of common stock issuable upon the exercise of such warrants. Such warrants are exercisable at $0.10 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits,

dividends of common stock and spin-offs. Subject to limited exceptions, a holder
shall not be entitled to convert a warrant held by such holder if such

3

<PAGE>

conversion would result in such holder beneficially owning more than 4.99% of
our common stock following such conversion (in lieu of such restriction, an
aggregate of 4,285,714 of such warrants provided that the holder thereof shall
not be entitled to convert such warrants held by such holder if such conversion
would result in such holder beneficially owning more than 9.99% of our common
stock following such conversion). If the average of the closing bid prices of
our common stock during any period of 20 consecutive trading days is equal to or
greater than $0.50 and the closing bid price of our common stock is equal to or
greater than $0.50 for at least 10 trading days during such period then with
respect to each such warrant that the holder does not exercise during the 15
trading day period following the receipt by the holder of a notice from us that
such average price and closing bid prices have occurred, the exercise price for
such warrants will each be adjusted to $0.25 per share (subject to adjustment
for customary events including stock splits, reverse stock splits, dividends of
common stock and spin-offs). Holders of such warrants are entitled to effect a
cashless exercise of such warrants if the registration statement registering our
shares of common stock issuable upon the exercise of such warrants has not been
declared effective prior the first anniversary of the issuance of such warrants.

DEBENTURES DUE MARCH 24, 2007

An aggregate of $325,000 of such 9% Convertible Debentures were due and payable
on March 24, 2007 and bear interest at 9% per annum on a simple non-compounded
basis. Such 9% Convertible Debentures are in default but the holders thereof
have taken no action with respect to the collection of such 9% Convertible
Debentures. Such 9% Convertible Debentures are convertible, at the holder's
option, into shares of our common stock at a conversion rate equal to the lesser
of $0.07 (subject to adjustment for subsequent lower price issuances by us and
other customary events including stock splits, reverse stock splits, dividends
of common stock and spin-offs) and 75% of the average of the 5 lowest closing
bid prices of our common stock for the 30 trading days immediately preceding the
applicable date of conversion. Subject to limited exceptions, a holder shall not
be entitled to convert a 9% Convertible Debenture held by such holder if such
conversion would result in such holder beneficially owning more than 4.99% of
our common stock following such conversion. If a holder elects to convert all or
a portion of such 9% Convertible Debentures and the conversion price is less
than $0.07 (subject to adjustment for subsequent lower price issuances by us and
other customary events including stock splits, reverse stock splits, dividends
of common stock and spin-offs), in lieu of effecting such conversion, we may
elect to redeem the amount of such 9% Convertible Debentures requested to be so
converted at a purchase price equal to 150% of the principal amount of such 9%
Convertible Debentures plus accrued and unpaid interest to the date of
redemption. The holder may accelerate the maturity date of such 9% Convertible
Debentures following the occurrence of customary events of default, including,
without limitation, payment defaults, breaches of certain covenants and
representations, certain events of bankruptcy, certain judgment defaults and the
suspension of our common stock from trading on the OTC Bulletin Board. Such 9%
Convertible Debentures are secured by a security interest in all of our assets.

Each warrant issued in connection with such 9% Convertible Debentures is
exercisable until the second anniversary of the effective date of the
registration statement registering our shares of common stock issuable upon the
exercise of such warrants. Such warrants are exercisable at $0.07 per share,

such exercise price subject to adjustment for subsequent lower price issuances
by us and other customary events including stock splits, reverse stock splits,
dividends of common stock and spin-offs. Subject to limited exceptions, a holder
shall not be entitled to convert a warrant held by such holder if such
conversion would result in such holder beneficially owning more than 4.99% of
our common stock following such conversion. If the average of the closing bid
prices of our common stock during any period of 20 consecutive trading days is
equal to or greater than $0.50 and the closing bid price of our common stock is
equal to or greater than $0.50 for at least 10 trading days during such period
then with respect to each such warrant that the holder does not exercise during
the 15 trading day period following the receipt by the holder of a notice from
us that such average price and closing bid prices have occurred, the exercise
price for such warrants will each be adjusted to $0.25 per share (subject to
adjustment for customary events including stock splits, reverse stock splits,
dividends of common stock and spin-offs). Holders of such warrants are entitled
to effect a cashless exercise of such warrants if the registration statement
registering our shares of common stock issuable upon the exercise of such
warrants has not been declared effective prior the first anniversary of the
issuance of such warrants.

DEBENTURES DUE APRIL 3, 2007

An aggregate of $575,000 of such 9% Convertible Debentures were due and payable
on April 3, 2007 and bear interest at 9% per annum on a simple non-compounded
basis. Such 9% Convertible Debentures are in default but the holders thereof
have taken no action with respect to the collection of such 9% Convertible
Debentures. Such 9% Convertible Debentures are otherwise on the same terms as
our 9% Convertible Debentures due on March 24, 2007 described above.

DEBENTURES DUE MAY 2, 2007

An aggregate of $440,000 of such 9% Convertible Debentures are due and payable
on May 2, 2007 and bear interest at 9% per annum on a simple non-compounded
basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9%
Convertible Debentures due on March 24, 2007 described above. Such 9%
Convertible Debentures are in default but the holders thereof have taken no
action with respect to the collection of such 9% Convertible Debentures.

4

<PAGE>

DEBENTURES DUE MAY 31, 2007

An aggregate of $80,000 of such 9% Convertible Debentures are due and payable on
May 31, 2007 and bear interest at 9% per annum on a simple non-compounded basis.
Such 9% Convertible Debentures are otherwise on the same terms as our 9%
Convertible Debentures due on March 24, 2007 described above. Such 9%
Convertible Debentures are in default but the holders thereof have taken no
action with respect to the collection of such 9% Convertible Debentures.

DEBENTURES DUE JUNE 1, 2007

An aggregate of $190,000 of such 9% Convertible Debentures are due and payable
on June 1, 2007 and bear interest at 9% per annum on a simple non-compounded
basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9%
Convertible Debentures due on March 24, 2007 described above. Such 9%
Convertible Debentures are in default but the holders thereof have taken no
action with respect to the collection of such 9% Convertible Debentures.

BRIDGE LOAN FINANCING

We have borrowed an aggregate of $2,841,000 from various investors. In connection with such financing, we issued warrants to purchase 117,397,572 shares of our common stock.

Such Notes do not bear interest but, as noted above, the face value of such Notes at issuance was equal to a certain percentage above the purchase price thereof. All such Notes are due and payable prior to the end of 2006. >From and after the date we amend our certificate of incorporation as described below, if an event of default under such Notes occurs then such Notes will be convertible, at the holder's option, into shares of our common stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. We may, at our option, prepay such Notes at any time. The holders of such Notes may accelerate the maturity date of such Notes following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults.

If the holders of our common stock approve an amendment to our certificate of incorporation to increase our authorized capital stock to an amount sufficient to permit the exercise of such warrants, then each such warrant will be exercisable from the date we file such amendment with the Secretary of State of the State of Delaware until the expiration date provided in each such warrant. Such warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of our common stock and spin-offs. The holders of such warrants are entitled to effect a cashless exercise of such warrants in certain circumstances. Such Notes are in default but the holders thereof have taken no action with respect to the collection of such Notes.

ITEM 3. CONTROLS AND PROCEDURES.

We maintain a set of disclosure controls and procedures designed to ensure that information required to be disclosed by us in the reports filed under the Securities Exchange Act of 1934, is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms. Disclosure controls are also designed with the objective of ensuring that this information is accumulated and communicated to our management to allow timely decisions regarding required disclosure.

Based upon our management's evaluation as of the end of the period covered by this report, our chief executive officer concluded that, our disclosure controls and procedures are not effective to ensure that information required to be included in our periodic Securities and Exchange Commission filings is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

In connection with the audit of our financial statements for the year ended December 31, 2006 our auditors identified the following material weaknesses (and such weaknesses continued during the quarter ended March 31, 2007):

    o    the lack of segregation of duties in the process of cash receipts
         and disbursements;
    o    the lack of a timely closing of our books and records and
         preparation of our financial statements;
    o    the lack of controls with respect to the documentation and
         accounting for the issuance of our equity securities; and

o    inadequate accounting resources to account for and analyze technical
     accounting issues, including, without limitation, accounting for
     derivative obligations.

There have not been any changes in our internal control over financial reporting
during the quarter ended March 31, 2007 that have materially affected, or are
reasonably likely to materially affect, our internal control over financial
reporting.

                                        5

<PAGE>

                          PART II--OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

On March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the
Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of
New York, County of New York against us, Allan Klepfisz, our Chief Executive
Officer, and Ethel Griffin, public administratrix of the estate of Kurt Seifman.
Such complaint relates to the alleged default by us under a loan agreement with
the plaintiffs. Such complaint seeks compensatory damages in the amount of
$459,892.67 plus interest and late fees of approximately $900,000 and the value
of certain restricted shares issued to such plaintiffs and punitive damages in
the amount of $5,000,000. Management believes that the eventual outcome of these
matters will not have a material adverse effect on our consolidated financial
position, results of operations, or cash flow.

We are subject to various matters of litigation during our normal course of
operations. Management believes that the eventual outcome of these matters will
not have a material adverse effect on our consolidated financial position,
results of operations, or cash flows.

ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

We have not purchased any of our equity securities during the quarter ended
March 31, 2007. Except as described below, all unregistered sales of our equity
securities during the quarter ended March 31, 2007 have previously been reported
on Current Reports on Form 8-K.

We issued 750,000 shares of our common stock in settlement for liabilities in
the amount of $37,000 related to consulting expenses incurred in 2004.

We issued 4,244,330 shares of our common stock related to the conversion of
convertible debt and note payable including accrued interest totaling $75,000.

We issued 10,000,000 shares of our common stock related to a financing expense
valued at $500,000.

ITEM 3. DEFAULTS UPON SENIOR SECURITIES.

We are currently in default on all of the indebtedness described in Item 2 (Plan
of Operation) above, except for 1,160,000 of the Bridge Loans.

In addition, on March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as
trustee of the Nancy L. Donenfeld Trust filed a complaint in the Supreme Court
of the State of New York, County of New York against us, Allan Klepfisz, our
Chief Executive Officer, and Ethel Griffin, public administratrix of the estate
of Kurt Seifman. Such complaint relates to the alleged default by us under a

loan agreement with the plaintiffs. Such complaint seeks compensatory damages in the amount of $459,892.67 plus interest and late fees of approximately $900,000 and the value of certain restricted shares issued to such plaintiffs and punitive damages in the amount of $5,000,000.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

There were no matters submitted to a vote of security holders during the quarter ended March 31, 2007.

ITEM 5. OTHER INFORMATION.

None.

ITEM 6. EXHIBITS

Exhibit 31          Certification of the Principal Executive Officer and Principal
                    Financial Officer pursuant to Section 302 of the
                    Sarbanes-Oxley Act of 2002

Exhibit 32          Certification of the Principal Executive Officer and Principal
                    Financial Officer pursuant to Section 906 of the
                    Sarbanes-Oxley Act of 2002


                                    6

<PAGE>

                              SIGNATURES
                              ----------


        In accordance with the requirements of the Securities Exchange Act of
1934, the registrant caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized.

                                    BRILLIANT TECHNOLOGIES CORPORATION

Dated: May 19, 2007                 By /s/ Allan Klepfisz
                                    -------------------------------------
                                    Allan Klepfisz
                                    Chief Executive Officer, President and
                                       Acting Chief Financial Officer




                                    7
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>2
<FILENAME>brilliant_10qsb-ex3101.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

EXHIBIT 31

CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER AND PRINCIPAL FINANCIAL OFFICER

I, Allan Klepfisz, certify that:

(1) I have reviewed the quarterly report on Form 10-QSB of Brilliant Technologies Corporation (the "Company") for the quarter ended March 31, 2007;

(2) Based on my knowledge, such quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by such quarterly report;

(3) Based on my knowledge, the financial statements, and other financial information included in such quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in such quarterly report;

(4) I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which such quarterly report is being prepared;

    (b) [Intentionally Omitted];

    (c) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in such quarterly report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by such quarterly report based on such evaluation; and

    (d) disclosed in such quarterly report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

(5) I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons fulfilling the equivalent function):

    (a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

Date: May 19, 2007                    By: /s/ Allan Klepfisz
                                      --------------------------------------
                                      Allan Klepfisz
                                      President, Chief Executive Officer and
                                        Acting Chief Financial Officer

</TEXT>

```
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32
<SEQUENCE>3
<FILENAME>brilliant_10qsb-ex3200.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>
```

EXHIBIT 32

          AS ADOPTED PURSUANT BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the quarterly report on Form 10-QSB of Brilliant Technologies
Corporation for the quarter ended March 31, 2007 as filed with the Securities
and Exchange Commission on the date hereof (the "Report"), the undersigned,
Allan Klepfisz, Chief Executive Officer, President and acting Chief Financial
Officer of the Company, certifies, pursuant to 18 U.S.C. ss.1350, as adopted
pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that:

          (1) The Report fully complies with the requirements of Section 13 (a) or
15 (d) of the Securities Exchange Act of 1934; and

          (2) The information contained in the Report fairly presents, in all
material respects, the financial condition and result of operations of the
Company.

Date: May 19, 2007                    By: /s/ Allan Klepfisz
                                         -------------------------------------
                                         Allan Klepfisz
                                         President, Chief Executive Officer and
                                            Acting Chief Financial Officer

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# Delaware

PAGE   1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "BRILLIANT TECHNOLOGIES CORPORATION" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-FIFTH DAY OF OCTOBER, A.D. 1995, AT 9 O'CLOCK A.M.

CERTIFICATE OF RENEWAL, FILED THE TWENTY-FOURTH DAY OF MARCH, A.D. 1997, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE NINETEENTH DAY OF MARCH, A.D. 1997, AT 11:30 O'CLOCK A.M.

CERTIFICATE OF RENEWAL, FILED THE FIFTH DAY OF APRIL, A.D. 1999, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "KURCHATOV RESEARCH HOLDINGS, LTD." TO "ADVANCED TECHNOLOGY INDUSTRIES, INC.", FILED THE FIRST DAY OF FEBRUARY, A.D. 2000, AT 9 O'CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIFTH DAY OF OCTOBER, A.D. 2002, AT 9 O'CLOCK A.M.

CERTIFICATE OF RENEWAL, FILED THE FIRST DAY OF DECEMBER,

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

2555570   8100H

080379045

AUTHENTICATION: 6490135

DATE: 04-01-08

# Delaware

PAGE  2

## The First State

A.D. 2004, AT 2:27 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE SECOND DAY OF DECEMBER, A.D. 2004, AT 4:50 O'CLOCK P.M.

CERTIFICATE OF DESIGNATION, FILED THE TWENTY-EIGHTH DAY OF FEBRUARY, A.D. 2005, AT 7:21 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-SEVENTH DAY OF SEPTEMBER, A.D. 2005, AT 5:15 O'CLOCK P.M.

CERTIFICATE OF RENEWAL, FILED THE FOURTEENTH DAY OF APRIL, A.D. 2006, AT 3:14 O'CLOCK P.M.

CERTIFICATE OF OWNERSHIP, CHANGING ITS NAME FROM "ADVANCED TECHNOLOGY INDUSTRIES, INC." TO "BRILLIANT TECHNOLOGIES CORPORATION", FILED THE NINETEENTH DAY OF APRIL, A.D. 2006, AT 11:04 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF OWNERSHIP IS THE FIRST DAY OF MAY, A.D. 2006, AT 8 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "BRILLIANT TECHNOLOGIES CORPORATION".

2555570   8100H

080379045

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 6490135

DATE: 04-01-08

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/25/1995
950246841 - 2555570

## CERTIFICATE OF INCORPORATION
## OF
## KURCHATOV RESEARCH HOLDINGS, LTD.
### (a Delaware corporation)

FIRST:    The name of the corporation is  Kurchatov Research Holdings, Ltd. (the "Corporation").

SECOND:    The registered office of the corporation is located at 32 Loockerman Square, in the City of Dover, in the State of Delaware.  The name of its registered agent at that address is The Prentice-Hall Corporation System, Inc.
County of Kent.

THIRD:    The nature of the business and the purposes to be conducted and promoted by the Corporation , shall be to conduct any lawful business, to promote any lawful purpose and to engage in any lawful activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

For the accomplishment of the aforesaid purposes, and in furtherance thereof, the corporation shall have and may exercise all of the powers, rights and privileges which are now and may hereafter be conferred by the General Corporation Law upon corporations formed thereunder, subject to any limitations thereof contained in the laws of the State of Delaware.

FOURTH:    The total number of shares of all classes of shares of which the Corporation shall have authority to issue is 11,000,000 shares consisting of:

(a)    10,000,000 common shares, par value $.001 per share; and

(b)    1,000,000 preferred shares, par value $.01 per share.

The Corporation is authorized to issue the preferred shares from time to time in one or more series with such designations, preferences and relative participating, optional or other special rights, and qualifications or restrictions, as shall be fixed by the board of directors in the resolution or resolutions providing for the issue of such shares, subject to the limitation.  The board of directors is expressly authorized to adopt such resolution or resolutions providing for the issue of such shares from time to time as the board of directors, in its discretion, may deem desirable.

SIXTH:    The name and address of the single incorporator is:  William P. Ruffa, Ruffa & Ruffa, 150 East 58th Street, New York, New York 10155.

SEVENTH:    The by-laws of the Corporation may be made, altered, amended, changed, added to, or repealed by the board of directors of the Corporation with out the assent or vote of the stockholders. Election of directors need not be by ballot unless the by-laws so provide.

EIGHT:    The personal liability of a director to the Corporation or its stockholders for monetary damages for breach of fiduciary duty is hereby eliminated to the full extent permitted by Delaware law (including attorneys' fees), provided that this Article shall not eliminate or limit the liability of a director for (i) any breach of a director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of Title 8 of the Delaware Code, or (iv) for any transaction from which the director derived improper personal benefit.

NINTH:    The Corporation shall, to the fullest extent permitted by Section 145 of the General Corporation Law of the State of Delaware, as the same may be amended or supplemented, indemnify any and all persons whom it shall have power to indemnify under said section from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said section, and the indemnification provided for herein, shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any by-law, agreement, vote of the stockholders or disinterested directors, or otherwise both as to the action in his official capacity and as to action in another capacity while holding such office, and shall continue as to such person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, ans administrators of such a person. Notwithstanding any other provision of this Article, no person shall be entitled to be indemnified by the Corporation in connection with any action, suit, or proceeding in which he is a plaintiff unless the board of directors consents to such indemnification within ninety days after the commencement of such action, suit or proceeding.

TENTH:    The Corporation reserves the right to amend, alter, change, or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter prescribed by law, and all rights and powers conferred herein on stockholders, directors and officers are subject to this reserved power.

I, THE UNDERSIGNED, to form a corporation for the purposes hereinabove stated, under and pursuant to the provision of the General Corporation Law of the State of Delaware, do hereby certify that the facts stated herein are true and hereunto set my hand and seal this 25th day of October, 1995.

William P. Ruffa, Incorporator

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 03/24/1997
971094643 — 2555570

# STATE OF DELAWARE
## CERTIFICATE FOR RENEWAL
## AND REVIVAL OF CHARTER

KURCHATOV RESEARCH HOLDINGS, LTD, _____, a

corporation organized under the laws of Delaware, the charter of which was voided for non-payment of taxes, now desires to procure a restoration, renewal and revival of its charter, and hereby certifies as follows:

1.  The name of this corporation is Kurchatov Research Holdings, Ltd.

2.  Its registered office in the State of Delaware is located at 1013 Centre Road , City of Wilmington

    Zip Code 19805-1297 County of Newcastle the name and address of its registered agent is Corporation Service Company

3.  The date of filing of the original Certificate of Incorporation in Delaware was 10/25/95

4.  The date when restoration, renewal, and revival of the charter of this company is to commence is the 28th day of February 1997 , same being prior to the date of the expiration of the charter. This renewal and revival of the charter of this corporation is to be perpetual.

5.  This corporation was duly organized and carried on the business authorized by its charter until the 1st day of March A.D. 1997 at which time its charter became inoperative and void for non-payment of taxes and this certificate for renewal and revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

**IN TESTIMONY WHEREOF**, and in compliance with the provisions of Section 312 of the General Corporation Law of the State of Delaware, as amended, providing for the renewal, extension and restoration of charters, William A. Hustwit the last and acting authorized officer hereunto set his/her hand to this certificate this 21st day of March 1997.

BY: _____

TITLE OF OFFICER: President

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 11:30 AM 03/19/1997
971089135 - 2555570

# CERTIFICATE OF AMENDMENT
## TO THE
## CERTIFICATE OF INCORPORATION OF
## KURCHATOV RESEARCH HOLDINGS, LTD.

Kurchatov Research Holdings, Ltd., a corporation organized and existing under the General Corporation Laws of the State of Delaware (the "Corporation"), does hereby certify:

FIRST:  That the Board of Directors of the Corporation by unanimous written consent duly adopted resolutions (i) setting forth the proposed amendments to the Certificate of Incorporation of the Corporation and (ii) calling for the submission of the proposed amendments to a vote of the stockholders of the Corporation for their approval and adoption.  The resolutions setting forth the proposed amendments are as follows:

"RESOLVED, that the Corporation amend its certificate of incorporation so that:

Article FOURTH be amended in its entirety and that such Article, as amended, read as follows:

"FOURTH: (a)  The total number of shares of capital stock which the Corporation shall have authority to issue is Fifty One Million (51,000,000) shares of which Fifty Million (50,000,000) shares shall be designated as common stock with a par value of one mil ($.0001) per share and One Million (1,000,000) shares shall be designated as preferred stock with a par value of One Tenth of One Cent ($.001) per share.

(b)  The Corporation is authorized to issue the preferred shares from time to time in one or more series with such designations, relative rights, preference, or limitations as shall be fixed by the Board of Directors in the resolution or resolutions providing for the issue of such shares, subject to the limitation, that if the stated dividends and amounts payable on liquidation are not paid in full, the shares of all series shall share ratably in the payment of dividends including accumulations, if any, in accordance with the sums which would be payable on such shares if all dividends were declared and paid in full, and in any distribution of assets other than by way of dividends in accordance with the sums payable were discharged in full.  The Board of Directors is expressly authorized to adopt such resolution or resolutions providing for the issue of such shares from time to time as the Board of Directors, in its discretion, may deem desirable."

**SECOND**: That the holders of a majority of the outstanding shares of common stock of the Corporation, by a written consent in accordance with Section 228 of the Delaware General Corporation Law, did duly adopt said amendments proposed by the Board of Directors.

**THIRD**: This amendment was duly adopted in accordance with the provisions of Section 242 of the Delaware General Corporation Laws.

IN WITNESS WHEREOF, the undersigned has caused its corporate seal to be affixed hereto and this Certificate to be executed by its President and attested by its Secretary, this 12th day of March, 1997.

Attest:

_____
William P. Ruffa,
Assistant Secretary

KURCHATOV RESEARCH HOLDINGS, LTD.

By: _____
William Hustwit, President

2

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 04/05/1999
991132363 – 2555570

# STATE OF DELAWARE
## CERTIFICATE FOR RENEWAL
## AND REVIVAL OF CHARTER

_____ Kurchatov Research Holdings, Ltd. _____, a
corporation organized under the laws of Delaware, the charter of which was voided for
non-payment of taxes, now desires to procure a restoration, renewal and revival of its
charter, and hereby certifies as follows:

1.  The name of this corporation is    Kurchatov Research Holdings, Ltd.

2.  Its registered office in the State of Delaware is located at _____
    1013 Centre Road    Street, City of Wilmington
    Zip Code    19805    County of    New Castle    the name and
    address of its registered agent is    Corporation Service Company

3.  The date of filing of the original Certificate of Incorporation in Delaware
    was    October 25, 1995

4.  The date when restoration, renewal, and revival of the charter of this
    company is to commence is the    28th    day of February 1999    ,
    same being prior to the date of the expiration of the charter. This renewal
    and revival of the charter of this corporation is to be perpetual.

5.  This corporation was duly organized and carried on the business authorized
    by its charter until the    1st    day of    March    . A.D. 19 99    ,
    at which time its charter became inoperative and void for non-payment of
    taxes and this certificate for renewal and revival is filed by authority of the
    duly elected directors of the corporation in accordance with the laws of the
    State of Delaware.

    **IN TESTIMONY WHEREOF,** and in compliance with the provisions of Section
312 of the General Corporation Law of the State of Delaware, as amended, providing for
the renewal, extension and restoration of charters, _____ Jacques Saunder _____
the last and acting authorized officer hereunto set his/her hand to this certificate this
_____ 31st _____ day of _____ March _____ 19 99 _____.

BY: _____

TITLE OF OFFICER: _____ Vice President _____

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 02/01/2000
001049700 - 2555570

CERTIFICATE OF AMENDMENT

OF

CERTIFICATE OF INCORPORATION

OF

KURCHATOV RESEARCH HOLDINGS, LTD.

The undersigned corporation, in order to amend its Certificate of Incorporation, hereby certifies as follows:

FIRST: The name of the corporation is:

KURCHATOV RESEARCH HOLDINGS, LTD.

SECOND: The corporation hereby amends its Certificate of Incorporation as follows:

Paragraph FIRST of the Certificate of Incorporation, relating to the corporate title of the corporation, is hereby amended to read as follows:

"FIRST: The name of the corporation is:

ADVANCED TECHNOLOGY INDUSTRIES, INC."

THIRD: The amendment effected herein was authorized by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote thereon at a meeting of shareholders pursuant to Sections 222 and 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, I hereunto sign my name and affirm that the statements made herein are true under the penalties of perjury, this twenty-eighth day of January, 2000.

S/ JACQUES SAUNDER
Jacques Saunder, Vice President

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/25/2002
020660334 — 2555570

# STATE *of* DELAWARE
## CERTIFICATE *of* AMENDMENT *of*
## CERTIFICATE *of* INCORPORATION
## *of* ADVANCED TECHNOLOGY INDUSTRIES, INC.

• **First:** The Board of Directors of Advanced Technology Industries, Inc. duly resolved and adopted a proposed amendment of the Certificate of Incorporation, declaring said amendment to be advisable. The resolution setting forth the proposed amendment is as follows:

RESOLVED FURTHER, that Article Fourth (a) of the Amended Certificate of Incorporation of the Corporation be amended and superseded in its entirety to read in part as follows:

### ARTICLE FOURTH

FOURTH: (a) The total number of shares of capital stock which the Corporation shall have authority to issue is One Hundred One Million (101,000,000) shares of which One Hundred Million (100,000,000) shares shall be designated as common stock with a par value of one hundredth of one cent ($.0001) per share and One Million (1,000,000) shares shall be designated as preferred stock with a par value of one tenth of one cent ($0.001) per share.

• **Second:** That thereafter, the necessary number of shares of each class of stock of said corporation duly approved the resolution.

• **Third:** That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

• **Fourth:** That the capital of said corporation shall not be reduced under or by reason of said amendment.

**IN WITNESS WHEREOF,** the undersigned corporation has caused this Certificate of Amendment of Certificate of Incorporation to be signed by a duly authorized officer this 24th day of October, 2002.

BY: _James Samuelson_
_____
James Samuelson, Vice-President,
Secretary, Chief Financial Officer, Treasure

12/01/2004   12:18    9492604799              PREMIER
11/24/2004   14:21    SUPP SERV 1615    COPYING ONLY → 919492604799

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:27 PM 12/01/2004
FILED 02:27 PM 12/01/2004
SRV 040863731 – 2555570 FILE

# STATE OF DELAWARE
## CERTIFICATE FOR RENEWAL
## AND REVIVAL OF CHARTER

The corporation organized under the laws of Delaware, the charter of which was voided for non-payment of taxes, now desires to procure a restoration, renewal and revival of its charter, and hereby certifies as follows:

1. The name of this corporation is _Advanced Technology Industries, Inc._

2. Its registered office in the State of Delaware is located at _2711 Centerville Road_ _Suite 400_ (street), City of _Wilmington_ Zip Code _19808_ County of _New Castle_ the name of its registered agent is _Corporation Service Company_

3. The date of filing of the original Certificate of Incorporation in Delaware was _October 25, 1995_

4. The date when restoration, renewal, and revival of the charter of this company is to commence is the _29th_ day of _February 2004_, same being prior to the date of the expiration of the charter. This renewal and revival of the charter of this corporation is to be perpetual.

5. This corporation was duly organized and carried on the business authorized by its charter until the _1st_ day of _March_ A.D. _2004_ at which time its charter became inoperative and void for non-payment of taxes and this certificate for renewal and revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

**IN TESTIMONY WHEREOF**, and in compliance with the provisions of Section 312 of the General Corporation Law of the State of Delaware, as amended, providing for the renewal, extension and restoration of charters the last and acting authorized officer hereunto set his/her hand to this certificate this _24th_ day of _November_ A.D. _2004_.

By: _James Samuelson_
Authorized Officer

Name: _JAMES SAMUELSON_
Print or Type

Title: _Vice President, Chief Financial Officer, Director_

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:03 PM 12/02/2004*
*FILED 04:50 PM 12/02/2004*
*SRV 040868360 - 2555570 FILE*

CERTIFICATE OF DESIGNATIONS

OF

SERIES A CONVERTIBLE PREFERRED STOCK

OF

ADVANCED TECHNOLOGY INDUSTRIES, INC.


Pursuant to Section 151 of the General Corporation Law
of the State of Delaware.

The undersigned, James Samuelson, Chief Financial Officer of Advanced Technology Industries, Inc., a Delaware corporation (hereinafter called the "Corporation"), pursuant to the provisions of Sections 103 and 151 of the General Corporation Law of the State of Delaware, does hereby make this Certificate of Designations and does hereby state and certify that pursuant to the authority expressly vested in the Board of Directors of the Corporation by the Certificate of Incorporation, as amended (the "Certificate of Incorporation"), the Board of Directors duly adopted the following resolution:

RESOLVED, that, pursuant to Article 4 of the Certificate of Incorporation (which authorizes the issuance of shares of preferred stock, $0.001 par value ("Preferred Stock")), the Board of Directors hereby fixes the powers, designations, preferences and relative, participating, optional and other special rights, and the qualifications, limitations and restrictions, of a series of Preferred Stock.

RESOLVED, that each share of such series of the Preferred Stock shall rank equally in all respects and shall be subject to the following provisions:

1.      Number and Designation.  700,000 shares of the Preferred Stock of the Corporation shall be designated as Series A Convertible Preferred Stock (the "Series A Preferred Stock").

2.      Dividends.  In case the Corporation shall make any dividend or distribution to holders of common stock of the Corporation (the "Common Stock"), whether payable in cash, securities or other property (other than dividends or distributions payable solely in Common Stock), the holder of each share of Series A Preferred Stock on the record date for such dividend or distribution shall be entitled to receive an equivalent dividend or distribution based on the number of shares of Common Stock that would be issuable to such holder upon the conversion of all shares of Series A Preferred Stock held by such holder on such record date (assuming the Filing Date (as defined in paragraph 4(a)) had occurred on such record date).

3.    Liquidation.  Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the assets and properties of the Corporation shall be distributed ratably among the holders of Series A Preferred Stock (based on the number of shares of Common Stock that would be issuable to such holders upon the conversion of all shares of Series A Preferred Stock held by such holders (assuming the Filing Date had occurred on such record date)) and the holders of Common Stock, in each case, on the record date for such distribution.

4.    Conversion.  (a) Subject to the terms and conditions of this paragraph 4, on the Filing Date, each share of Series A Preferred Stock shall automatically be converted, without any further action of the Corporation or the holders of such shares, at the office of the Corporation or, if the Corporation has a transfer agent for the Series A Preferred Stock, at the office of such transfer agent, into such number of fully paid and nonassessable whole shares of Common Stock equal to the Conversion Number (as defined below). "Filing Date" shall mean the date the Corporation files with the Secretary of State of the State of Delaware an amendment to its Certificate of Incorporation providing for an increase in its authorized Common Stock in an amount sufficient such that all shares of Series A Preferred Stock outstanding on such date and all shares of Series A Preferred Stock subject to warrants outstanding on such date to purchase shares of Series A Preferred Stock can be converted into shares of Common Stock in accordance with the terms of the Series A Preferred Stock. "Conversion Number" shall initially be equal to 400 and shall be subject to adjustment as provided below.

(b)  In case the Corporation shall at any time subdivide its outstanding shares of Common Stock into a greater number of shares or shall declare a dividend or make any other distribution upon any stock of the Corporation payable in Common Stock, the Conversion Number in effect immediately prior to such subdivision shall be proportionately increased, and conversely, in case the outstanding shares of Common Stock shall be combined into a smaller number of shares, the Conversion Number in effect immediately prior to such combination shall be proportionately reduced.

(c)  If any capital reorganization or reclassification of the capital stock of the Corporation or any consolidation or merger of the Corporation with another corporation or entity or the sale of all or substantially all of its assets to another corporation or entity shall be effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets in exchange for Common Stock, then as a condition of such reorganization, reclassification, consolidation, merger or sale, each holder of a share or shares of Series A Preferred Stock shall, upon such exchange, in lieu of Common Stock, receive such shares of stock, securities or assets as may be issued or payable in exchange for a number of outstanding shares of such Common Stock equal to the number of shares of such stock that would be issuable to such holder upon the conversion of all shares of Series A Preferred Stock held by such holder (assuming the Filing Date had occurred prior to such reorganization, reclassification, consolidation, merger or sale).

(d)  No certificates or scrip representing fractional shares of Common Stock shall be issuable upon conversion of the Series A Preferred Stock. Any fractional share interests shall be rounded down to the nearest whole share of Common Stock.

670861-3

(e)   (i) As soon as possible after the Filing Date and after the surrender by a holder of a certificate or certificates of a share or shares of Series A Preferred Stock, the Corporation shall issue and deliver, or cause to be issued and delivered, to such holder, or on the holder's written order (upon compliance by such holder with paragraph (ii) below and federal and state securities laws applicable thereto) to the holder's transferee, a certificate or certificates for the number of whole shares of Common Stock issuable upon the conversion of such share or shares of Series A Preferred Stock in accordance with the provisions of this paragraph 4.

(ii) Unless the shares issuable on conversion pursuant to this paragraph 4 are to be issued in the same name as the name in which such shares of Series A Preferred Stock are registered, each share surrendered for conversion shall be accompanied by instruments of transfer, in form reasonably satisfactory to the Corporation, duly executed by the holder or the holder's duly authorized attorney and an amount sufficient to pay any transfer or similar tax.

(iii) The shares of Common Stock issued upon conversion as provided in this paragraph 4 will constitute "restricted securities" within the meaning of Rule 144 promulgated under the Securities Act of 1933, as amended (the "Securities Act"). The certificates for shares of Common Stock to be issued shall bear appropriate legends to identify such privately placed shares as being restricted under the Securities Act and any applicable state securities law.

(f)   The Corporation covenants that all shares of Common Stock which shall be so issued shall be duly and validly issued and fully paid and nonassessable and free from all taxes, liens and charges with respect to the issue thereof.

(g)   Shares of Series A Preferred Stock which are converted into shares of Common Stock as provided herein shall not be reissued.

(h)   The issuance of certificates for shares of Common Stock upon conversion of the Series A Preferred Stock shall be made without charge to the holders thereof for any issuance tax in respect thereof, provided that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in an name other than that of the holder of shares of Series A Preferred Stock which is being converted as provided in paragraph 4(e)(ii).

5.     Voting. Except as otherwise provided by law and paragraph 6, the holders of Series A Preferred Stock shall vote together with the holders of Common Stock on all matters to be voted on by the stockholders of the Corporation, and each holder of Series A Preferred Stock shall be entitled to one vote for each share of Common Stock that would be issuable to such holder upon the conversion of all the shares of Series A Preferred Stock held by such holder on the record date for the determination of stockholders entitled to vote (assuming the Filing Date had occurred on such record date); provided that holders of Series A Preferred Stock shall not be entitled to vote on (a) any amendment to the Corporation's Certificate of Incorporation that increases the authorized capital stock of the Corporation or (b) any merger or other

transaction the primary purpose of which is to increase the authorized capital stock of the Corporation or to result in a surviving entity with a higher number of shares of authorized capital stock than the Corporation had prior to such merger or other transaction.

      6.    <u>Restrictions</u>.  As long as shares of Series A Preferred Stock are outstanding, in addition to any other vote of stockholders required by law, without the prior consent of the holders of at least a majority of the outstanding shares of Series A Preferred Stock, in each case given in person or by proxy, either in writing or at a special meeting called for that purpose, at which meeting the holders of Series A Preferred Stock shall vote together as a class, the Corporation will not alter or repeal the Corporation's Certificate of Incorporation or By-laws in any manner, or file any directors' resolutions pursuant to Section 151(g) of the General Corporation Law of the State of Delaware containing any provision or otherwise take any act, in any case which materially and adversely alters or changes the rights, preferences, privileges or voting power of the Series A Preferred Stock.

      IN WITNESS WHEREOF, Advanced Technology Industries, Inc. has caused this Certificate of Designations to be executed by the undersigned this 2nd day of December, 2004.

                ADVANCED TECHNOLOGY INDUSTRIES, INC.,

                By:  /s/ James Samuelson
                    Name: James Samuelson
                    Title: Chief Financial Officer

670861-3

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 07:21 PM 02/28/2005*
*FILED 07:21 PM 02/28/2005*
*SRV 050170863 - 2555570 FILE*

# AMENDMENT NO.1 TO THE CERTIFICATE OF DESIGNATIONS

## OF

## SERIES A CONVERTIBLE PREFERRED STOCK

## OF

## ADVANCED TECHNOLOGY INDUSTRIES, INC.

Pursuant to Section 151 of the General Corporation Law
of the State of Delaware.

The undersigned, James Samuelson, Chief Financial Officer of Advanced Technology Industries, Inc., a Delaware corporation (hereinafter called the "Corporation"), pursuant to the provisions of Sections 103 and 151 of the General Corporation Law of the State of Delaware, does hereby make this Amendment No. 1 to the Certificate of Designations of Series A Convertible Preferred Stock of the Corporation and does hereby state and certify that pursuant to the authority expressly vested in the Board of Directors of the Corporation by the Certificate of Incorporation of the Corporation, as amended, the Board of Directors duly adopted the following resolution:

RESOLVED, that, in order to increase the number of shares of Series A Convertible Preferred Stock of the Corporation, paragraph 1 of the Certificate of Designations of Series A Convertible Preferred Stock of the Corporation is deleted in its entirety and in lieu thereof the following is inserted:

"1.    Number and Designation. 950,000 shares of the Preferred Stock of the Corporation shall be designated as Series A Convertible Preferred Stock (the "Series A Preferred Stock")."

701487-1

IN WITNESS WHEREOF, Advanced Technology Industries, Inc. has caused this Amendment No.1 to the Certificate of Designations of Series A Convertible Preferred Stock of the Corporation to be executed by the undersigned this 28th day of February, 2005.

ADVANCED TECHNOLOGY INDUSTRIES, INC.,

By: /s/ James Samuelson
    Name: James Samuelson
    Title: Chief Financial Officer

701487-1

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:28 PM 09/27/2005*
*FILED 05:15 PM 09/27/2005*
*SRV 050791997 – 2555570 FILE*

CERTIFICATE OF AMENDMENT

TO

THE CERTIFICATE OF INCORPORATION

OF

ADVANCED TECHNOLOGY INDUSTRIES, INC.

---

Pursuant to Section 242 of the
General Corporation Law of the State of Delaware

---

ADVANCED TECHNOLOGY INDUSTRIES, INC., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

FIRST: Article FOURTH(a) of the Certificate of Incorporation of the Corporation is hereby amended and restated to read as follows:

"FOURTH: (a) The total number of shares of capital stock which the Corporation shall have authority to issue is Eight Hundred One Million (801,000,000) shares of which Eight Hundred Million (800,000,000) shares shall be designated as common stock with par value one hundredth of one cent ($0.0001) per share and One Million (1,000,000) shares shall be designated as preferred stock with a par value of one tenth of one cent ($0.001) per share."

SECOND: That the Amendment of the Certificate of Incorporation of the Corporation effected by this Certificate was duly authorized by the stockholders of the Corporation, after first having been declared advisable by the Board of Directors of the Corporation, all in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, ADVANCED TECHNOLOGY INDUSTRIES, INC., has caused this Certificate to be signed by its Chief Executive Officer, who hereby acknowledges under penalties of perjury that the facts herein stated are true and that this Certificate is the act and deed of the Corporation, this 26th day of September, 2005.

ADVANCED TECHNOLOGY INDUSTRIES, INC.

By    /s/ Allan Klepfisz
       Allan Klepfisz
       Chief Executive Officer

3138985-1

04/14/2006  14.03 FAX                                                                                                002/006

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:14 PM 04/14/2006
FILED 03:14 PM 04/14/2006
SRV 060353295 - 2555570 FILE

# STATE OF DELAWARE
## CERTIFICATE FOR RENEWAL
### AND REVIVAL OF CHARTER

The corporation organized under the laws of Delaware, the charter of which was voided for non-payment of taxes, now desires to procure a restoration, renewal and revival of its charter, and hereby certifies as follows:

1. The name of this corporation is _Advanced Technology Industries, Inc._

2. Its registered office in the State of Delaware is located at _Suite 400_ _2711 Centerville RD_ (street), City of _Wilmington_ Zip Code _19808_ County of _New Castle_ the name of its registered agent is _Corporation Service Company_

3. The date of filing of the original Certificate of Incorporation in Delaware was _October 25, 1995_

4. The date when restoration, renewal, and revival of the charter of this company is to commence is the _28th_ day of _February_, same being prior to the date of the expiration of the charter. This renewal and revival of the charter of this corporation is to be perpetual.

5. This corporation was duly organized and carried on the business authorized by its charter until the _1st_ day of _March_ A.D. _2006_ at which time its charter became inoperative and void for non-payment of taxes and this certificate for renewal and revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

**IN TESTIMONY WHEREOF**, and in compliance with the provisions of Section 312 of the General Corporation Law of the State of Delaware, as amended, providing for the renewal, extension and restoration of charters the last and acting authorized officer hereunto set his/her hand to this certificate this _5th_ day of _April_ A.D. _2006_.

By: _____
Authorized Officer

Name: _Allan Klephsz_
Print or Type

Title: _President_

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:15 AM 04/19/2006*
*FILED 11:04 AM 04/19/2006*
*SRV 060362591 - 2555570 FILE*     CERTIFICATE OF OWNERSHIP AND MERGER

Of

BRILLIANT TECHNOLOGIES CORPORATION
A Delaware Corporation

With and into

ADVANCED TECHNOLOGY INDUSTRIES, INC.
A Delaware Corporation

Pursuant to Section 253 of the
General Corporation Law of the State of Delaware

———————————————

ADVANCED TECHNOLOGY INDUSTRIES, INC., a Delaware corporation (the "Corporation"), does hereby certify that:

FIRST:    Each of the Corporation and Brilliant Technologies Corporation (the "Subsidiary") is incorporated pursuant to the provisions of the General Corporation Law of the State of Delaware.

SECOND:    The Corporation owns, as of the date hereof, all of the outstanding shares of the capital stock of the Subsidiary.

THIRD:    The Corporation's Board of Directors by unanimous written consent pursuant to Section 141 of the General Corporation Law of the State of Delaware, dated the 18th day of April 2006, determined to merge the Subsidiary with and into the Corporation and did adopt the following resolutions:

WHEREAS, the Corporation owns, as of the date hereof, all of the outstanding shares of the capital stock of the Subsidiary and the Corporation desires to merge the Subsidiary with and into the Corporation (the "Merger");

NOW, THEREFORE, BE IT RESOLVED, that the Merger is hereby ratified and approved; and be it

FURTHER RESOLVED, that the Corporation shall be the surviving corporation (the "Surviving Corporation") and shall continue to exist as a domestic corporation under the laws of the State of Delaware with all the rights and obligations of such surviving domestic corporation as are provided by the General Corporation Law of the State of Delaware; and be it

FURTHER RESOLVED, that pursuant to the Merger the Surviving Corporation shall assume all of the obligations of the Subsidiary pursuant to the General Corporation Law of the State of Delaware; and be it

FURTHER RESOLVED, that the Merger shall be consummated by filing with the Secretary of State of Delaware a properly executed Certificate of Ownership and Merger in accordance with the General Corporation Law of the State of Delaware, which shall be effective on the date and time specified in such Certificate of Ownership and Merger (the "Effective Time"); and be it

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holder thereof, each outstanding or treasury share of capital stock of the Corporation shall remain unchanged and continue to remain outstanding or held in treasury, respectively, as one share of capital stock of the Corporation, held by the person who was the holder of such share of capital stock of the Corporation immediately prior to the Merger; and be it

FURTHER RESOLVED, that by virtue of the Merger and without any action on the part of the holder thereof, each outstanding share of common stock of the Subsidiary shall be cancelled and no consideration shall be issued in respect thereof; and be it

FURTHER RESOLVED, that the Certificate of Incorporation of the Corporation in effect at the Effective Time shall be the Certificate of Incorporation of the Surviving Corporation, except that at the Effective Time Article First thereof shall be amended to read in its entirety as follows:

"FIRST: The name of the corporation is Brilliant Technologies Corporation (the "Corporation")."

FURTHER RESOLVED, that the Bylaws of the Corporation in effect at the Effective Time shall be the Bylaws of the Surviving Corporation, except that at the Effective Time any reference therein to the name of the Corporation shall be amended by substituting therefore the name "Brilliant Technologies Corporation"; and be it

FURTHER RESOLVED, that the directors and officers of the Corporation immediately prior to the Effective Time shall be the directors and officers, respectively, of the Surviving Corporation until expiration of their current terms as such, or their prior resignation, removal or death; and be it

FURTHER RESOLVED, that the Corporation shall take any further action, whether within or without the State of Delaware, that may be necessary to effect the Merger; and be it

FURTHER RESOLVED, that the proper officers of the Corporation be, and each of them hereby is, authorized and directed to execute and deliver, in the name and on behalf of the Corporation, and under its corporate seal or otherwise, any and all instruments and documents and to take all such further actions and to pay all such expenses as they or any of them may deem necessary or advisable to carry out the intent and to accomplish the purpose of any and all of the

3203378-1

foregoing resolutions and the transactions contemplated thereby, and that the execution and delivery of each such instrument or document, the taking of such action, and the payment of each such expense shall be conclusive evidence of its necessity or advisability.

FOURTH:    The Certificate of Incorporation of the Corporation in effect at the Effective Time shall be shall be the Certificate of Incorporation of the Surviving Corporation, except that Article First thereof shall be amended to read in its entirety as follows:

"FIRST: The name of the corporation is Brilliant Technologies Corporation (the "Corporation")."

FIFTH:    This Certificate of Ownership and Merger, and the Merger provided for herein, shall not become effective until, and shall become effective at 8:00 a.m. on May 1, 2006.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its President, on the 19th day of April 2006.

ADVANCED TECHNOLOGY INDUSTRIES, INC.

By:    /s/ Allan Klepfisz
       Allan Klepfisz
       President